UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>TANMAYA KABRA,<br><br>Defendant | Criminal No. 19cr 10335<br><br>Violations:<br><br>Counts One – Seven: Wire Fraud<br>(18 U.S.C. § 1343)<br><br>Count Eight: Money Laundering<br>(18 U.S.C. § 1957)<br><br>Count Nine: Bank Fraud<br>(18 U.S.C. § 1344)<br><br>Forfeiture Allegation:<br>(18 U.S.C. § 981(a)(1)(C) and<br>28 U.S.C. § 2461) |

INDICTMENT

At all times relevant to this Indictment:

General Allegations

1. The defendant, TANMAYA KABRA, was a resident of Boston, Massachusetts until on or about June 2019, when he moved to Weehawken, New Jersey.

2. KABRA held himself out as a successful serial entrepreneur, venture capitalist, and angel investor in start-up companies. KABRA conducted his business individually and through LaunchByte.io, LLC (also known as The Kabra Group, LLC) and other affiliated companies.

1

### Representative Victims

3. Victim 1, Victim 2, Victim 3, and Victim 4 are individuals who reside in Massachusetts and elsewhere, and whose identities are known to the Grand Jury. They were among the investors who fell victim to the fraud scheme described in this Indictment.

### Wire Fraud Scheme

4. KABRA attracted investors by holding himself out as a successful entrepreneur and investor, and by offering lucrative and low or no-risk returns on purported investments. KABRA solicited money from investors by falsely representing that their investment money would be used to foster the growth and development of start-up companies, to prepare those companies for sale, or for other legitimate business opportunities. Instead of investing in legitimate business opportunities, however, KABRA used much of the money that he received from investors for other purposes, including to pay personal expenses.

#### *Victims 1 and 2*

5. Victim 1 and Victim 2 are individuals residing in Boston, Massachusetts who invested funds with KABRA in or about July 2018.

6. Beginning in or about December 2017, KABRA presented himself to Victim 1 as a successful investor and entrepreneur who, through his work and business contacts, had access to various lucrative investment opportunities. During the first half of 2018, Victim 1 made investments with KABRA—in amounts less than $50,000—which were repaid to Victim 1 with interest within a period of months.

7. On or about June 20, 2018, KABRA sent two text messages to Victim 1. The first read: "Do you want to go in with me on a bigger deal." The second read: "It's 120 days and it's a fatter payout." Victim 1 responded on the same day: "Possibly. What's the deal?"

8. In a series of text messages exchanged over the next several days, KABRA outlined a purported investment to Victim 1. KABRA represented both that he would invest funds himself and that the money would be invested with a third party. The investment would earn a 30 percent return and payments would be made every 30 days. KABRA also represented that the investment would be backed by "[t]okenized collateral" and, in response to a question from Victim 1 regarding the risk, KABRA indicated that there was "none" because of the collateral and because KABRA himself was securing the purported investment.

9. On or about June 28, 2018, Victim 1 introduced KABRA to Victim 2 via text messages. In a series of text messages sent that day, KABRA provided an outline of an investment proposal similar to what he had described to Victim 1.

10. Ultimately, Victim 1 agreed to invest $250,000 with KABRA's company, LaunchByte, and Victim 2 agreed to invest $100,000.

11. KABRA and Victim 2 executed a promissory note dated July 2, 2018. KABRA and Victim 1 executed a promissory note dated July 7, 2018. Both notes were signed using DocuSign, an online service that permits documents to be signed electronically.

12. The promissory notes identified the purpose of the investments by Victim 1 and Victim 2 as "financing the startup," provided for an interest rate of 32 percent, and stated that "[t]he principal due hereunder shall be payable in one (1) installment four (4) months from the

first day (kickoff) of the project, or three payments during the term not more than thirty (30) days apart from each other." The note between Victim 1 and KABRA identified the amount of Victim 1's investment as $250,000. The note between Victim 2 and KABRA identified the amount of Victim 2's investment as $150,000—though Victim 2 actually invested only $100,000.

13. Victim 1 executed a $250,000 cashier's check from Santander Bank dated July 6, 2018 payable to KABRA. The check was deposited on or about that day into a personal checking account at Santander Bank in KABRA's name (the "SANT-9382 Account"). Immediately prior to this deposit, the SANT-9382 account had a balance of $0.00.

14. On or about July 5, 2018, Victim 2—through his business—transferred $30,000 via wire to an account at Brookline Bank in the name of LaunchByte.io LLC (the "Brookline-3538 Account"). Victim 2 transferred an additional $20,000 and $50,000 to the Brookline-3538 Account on or about July 6 and July 9, 2018, respectively.

15. The money provided to KABRA by Victim 1 and Victim 2 was not used "for the purpose of financing the startup" as set forth in the promissory notes, nor was it used for any other investment purpose. In addition, contrary to his representations, KABRA did not invest any of his own funds in any purported "deal" or investment.

16. Despite representations in his text messages and in the promissory notes that Victim 1 and Victim 2 would be repaid in monthly installments, and despite repeated assurances that payments would be made promptly, KABRA did not make any payments to Victim 1 and Victim 2 through September 2018. Instead, KABRA strung them along by making a series of

4

excuses and misrepresentations, including that: (1) KABRA's accounts had been blocked due to verifications being conducted by the Internal Revenue Service ("IRS") and the Securities and Exchange Commission ("SEC"), (2) KABRA had incorrectly entered wire instructions when wiring funds to Victim 2, and (3) in excess of $1 million had been transferred into KABRA's accounts and would be available to repay Victim 1 and Victim 2 shortly.

17. On or about October 18, 2018, KABRA received a wire from a third party into the Brookline-3538 Account in the amount of $75,000 with a notation "loan." That day, KABRA wired $34,500 to Victim 2 from the Brookline-3538 Account and delivered to Victim 2 a sum of cash.

18. KABRA paid Victim 2 an additional $80,000 via wire transfer on December 18, 2018, using $250,000 that KABRA solicited from Victim 3—as described below. In addition to repaying Victim 2, KABRA also used a portion of the $250,000 from Victim 3 to make a payment of $88,500 to the third party who had wired $75,000 to KABRA on October 18, 2018.

19. Victim 1 has not received a repayment of his $250,000 investment with KABRA.

### *Victim 3*

20. Victim 3 is an individual residing in Brookline, Massachusetts who was a social acquaintance of KABRA. Victim 3 invested funds with KABRA in or about December 2018.

21. At some point in 2018, KABRA approached Victim 3 about a purported investment opportunity. KABRA told Victim 3 that the investment would be backed by a promissory note with KABRA personally guaranteeing the note. KABRA represented that the

term of the investment would be one year, at which point Victim 3 would receive $300,000 on an investment of $250,000.

22. KABRA explained to Victim 3 that the note would comprise part of $1 million in debt that would be used to finance the acquisition of LaunchByte by KV Ventures, another investment fund that KABRA told Victim 3 he was launching. In an email dated December 6, 2018, KABRA advised Victim 3 that KV Ventures had already completed a "first close" of $7 million, that "wires are coming in," and that he needed the additional $1 million to complete the "second close" of the fund.

23. On or about December 13, 2018, KABRA and Victim 3 executed a promissory note reflecting Victim 3's $250,000 investment. The note indicated that the investment was for the purpose of "financing the acquisition of the portfolio," that the investment carried an interest rate of 20 percent, and that principal and interest would be paid "starting 12 months from the execution of this Agreement or receipt of funds, whichever is later."

24. Contrary to the representations in KABRA's December 6, 2018 email to Victim 3 and the terms of the promissory note, the funds provided by Victim 3 were not used for "the purpose of financing the acquisition of the portfolio." Instead, as described above, KABRA used the money to repay $80,000 to Victim 2 and $88,500 to the third-party who had transferred $75,000 to KABRA two months earlier.

*Victim 4*

25. KABRA met Victim 4 at a party in or about 2018. KABRA told Victim 4 that one of the start-up companies in LaunchByte's portfolio had signed a letter of intent to be

6

acquired by a large, well-known company, and convinced Victim 4 to enter into a $75,000 promissory note—which LaunchByte and KABRA himself would guarantee. Victim 4 understood that his investment would be used to facilitate the purchase of the start-up company.

26. KABRA and Victim 4 executed a promissory note, dated August 1, 2018, reflecting Victim 4's $75,000 investment. The note indicated that the investment was for purposes of "financing the startup," that the note carried an interest rate of 20 percent, and that principal and interest were "payable in one (1) installment six (6) months from the date of this Agreement."

27. On or about August 3, 2018, Victim 4 wired $75,000 to the Brookline-3538 Account with a memo accompanying the wire identifying the "purpose" of the payment as "investment."

28. KABRA's representations to Victim 4 were false. In fact, the start-up company never entered into a letter of intent to be acquired by the larger well-known company.

29. To avoid paying Victim 4, KABRA made a number of excuses and misrepresentations, including that LaunchByte would be acquired and that Victim 4 would be paid when that occurred, and that money to repay Victim 4 had been deposited into KABRA's accounts, but had not yet cleared.

30. Despite the repeated representations that funds would be available, Victim 4 was not repaid until June 2019. KABRA ultimately paid Victim 4 $120,000 on or about June 12, 2019, using funds solicited from new investors in LaunchByte.

## The Money Laundering Scheme

31. KABRA used money that he fraudulently obtained from investors to pay off existing debts to prior investors in his scheme and to fund his lavish personal expenses.

32. For example, KABRA used funds he received from Victim 1 and Victim 2 to pay off pre-existing credit card debt.

33. As another example, or about July 9, 2018, KABRA wired $201,500 from the SANT-9382 account to the Rockland Trust Company account of a marina in Peabody, MA to buy a boat. The funds KABRA used to buy the boat included funds he fraudulently obtained from Victim 1 for the purported purpose of financing an investment opportunity, as set forth above.

## The Bank Fraud Scheme

34. Brookline Bank is a federally insured financial institution.

35. KABRA held a Northwestern Mutual Cash Management bank account in his name (the "NW-8976 Account"). From the time it was opened, on or about June 19, 2018, until at least March 31, 2019, the NW-8976 Account was not funded and did not hold a positive balance.

36. On or about March 11, 2019, the Brookline-3538 Account had a negative balance of $114.36. That day, KABRA executed and deposited a check for $125,000 from the NW-8976 Account—which he knew had a zero balance—to the Brookline-3538 Account, bringing the balance in the Brookline-3538 Account to $124,885.64.

37. On or about March 11, 2019 and March 12, 2019, KABRA wrote checks and executed outgoing money transfers from the Brookline-3538 Account totaling approximately $124,000, causing the balance to decline to $675.28 by the end of the day on March 12, 2019.

38. On or about March 14, 2019, the $125,000 credit from the check drawn on the NW-8976 Account was charged-back due to insufficient funds. As a result, the balance in the Brookline-3538 Account fell to negative $124,324.72.

39. In or about March and April 2019, KABRA falsely represented to Brookline Bank that funds would be wired into the Brookline-3538 Account. Ultimately, the bank closed the account in May 2019 at a substantial loss.

## COUNTS ONE THROUGH SEVEN
Wire Fraud
(18 U.S.C. § 1343)

The Grand Jury charges:

40. The Grand Jury re-alleges and incorporates by reference paragraphs 1-30 of this Indictment.

41. From in or about at least June 2018 through on or about August 4, 2019, in the District of Massachusetts and elsewhere, the defendant,

TANMAYA KABRA,

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud, as set forth below:

| Count | Approximate Date | Description |
|---|---|---|
| 1 | July 5, 2018 | $30,000 wire transfer from Victim 2's business to LaunchByte.io LLC |
| 2 | July 6, 2018 | $20,000 wire transfer from Victim 2 to LaunchByte.io LLC |
| 3 | July 9, 2018 | $50,000 wire transfer from Victim 2 to LaunchByte.io LLC |
| 4 | August 3, 2018 | $75,000 wire transfer from Victim 4 to LaunchByte.io LLC |
| 5 | July 8, 2018 | Promissory note between KABRA and Victim 1 executed using DocuSign |
| 6 | July 2, 2018 | Promissory note between KABRA and Victim 2 executed using DocuSign |
| 7 | December 6, 2018 | Email from KABRA to Victim 3 proposing investment |

All in violation of Title 18, United States Code, Section 1343.

## COUNT EIGHT
Money Laundering
(18 U.S.C. § 1957)

The Grand Jury charges:

42. The Grand Jury re-alleges and incorporates by reference paragraphs 1-33 of this Indictment.

43. On or about July 9, 2018, in the District of Massachusetts and elsewhere, the defendant,

## TANMAYA KABRA,

did knowingly engage and attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000, that is, a wire transfer of $201,500 from the SANT-9382 account to an account at Rockland Trust Company to buy a boat, where such property was derived from specified unlawful activity, that is, wire fraud, in violation of 18 U.S.C. § 1343 as charged in Count 5.

All in violation of Title 18, United States Code, Section 1957.

## COUNT NINE
## Bank Fraud
## (18 U.S.C. § 1344)

The Grand Jury further charges:

44. The Grand Jury re-alleges and incorporates by reference paragraphs 1-2 and 34-39 of this Indictment.

45. From on or about March 11, 2019 through May 2019, in the District of Massachusetts and elsewhere, the defendant,

### TANMAYA KABRA,

knowingly executed and attempted to execute a scheme and artifice to defraud a federally insured financial institution, that is, Brookline Bank, and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of Brookline Bank, by means of materially false and fraudulent pretenses, representations, and promises.

All in violation of Title 18, United States Code, Section 1344.

## FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

The Grand Jury further finds:

46. Upon conviction of one or more of the offenses in violation of Title 18, United States Code, Section 1343, Title 18, United States Code, Section 1957, and Title 18, United States Code, Section 1344, set forth in Counts 1 through 9 of this Indictment, the defendant,

TANMAYA KABRA,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

47. If any of the property described in Paragraph 46, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant --

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 46 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

A TRUE BILL

_____
FOREPERSON

_____
CHRISTOPHER LOONEY
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS

District of Massachusetts: September 10, 2019
Returned into the District Court by the Grand Jurors and filed.

_____
DEPUTY CLERK

9-10-19

3:23 pm