UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>TANMAYA KABRA,<br><br>    Defendant | **Criminal Action No. 1:19-cr-10335-DJC** |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO REVOKE DETENTION ORDER AND FOR PRETRIAL RELEASE

Pursuant to 18 U.S.C. §§ 3142 and 3145(b), Tanmaya Kabra ("Kabra"), by and through counsel, has moved for an order revoking the Magistrate-Judge's Order of Detention dated August 23, 2019 and granting Kabra pretrial release under the conditions requested herein or other conditions the Court deems appropriate.[1]   The Court's review under § 3145(b) is *de novo*.  *United States v. Pierce*, 107 F. Supp. 2d 126, 128 (D. Mass. 2000).  To warrant Kabra's continued detention, the government must prove by a preponderance of the evidence that Kabra is a "serious" flight risk (§ 3142(g)), and that no condition or combination of conditions will reasonably assure his appearance as required and the safety of other persons in the community.  (§ 3142 (e)).

## INTRODUCTION

Tanmaya Kabra is not, by any measure, a flight risk and his present detention (of over 5 weeks) is contrary to the bedrock ideal in American law that pre-trial liberty is the norm and detention limited to compelling circumstances applicable to very few defendants.  Kabra is a

---

[1] An Indictment was filed against Kabra on September 10, 2019 with counts for wire fraud, money laundering, bank fraud and forfeiture.  The Indictment alleges these substantive counts with respect to "Victims" 1-4 who correspond to "Investors" A-D in the Affidavit of Kevin M. Sheahan submitted at the detention hearing ("Sheahan Aff.").  The money laundering count (not formally alleged in the Sheahan Affidavit) is part and parcel of the wire fraud count, alleging that Kabra used money obtained from the alleged Ponzi scheme to pay off prior lenders and credit card debts, and to buy a boat from funds obtained from Victim 1 (Investor A).  Indictment, ¶¶ 31-33, 43.  There is a related SEC case.  Detention Hearing Transcript ('Tr.") p. 59, attached to the Declaration of Mark Berthiuame ("Berthiaume Decl.") as Exhibit A.  In those proceedings, the SEC sought and received a freeze order over Kabra's assets.

naturalized 25 year old American citizen, with no criminal record, who has firm roots in Boston. He attended Babson College from 2012 to 2016 and subsequently built a business in the unpredictable world of entrepreneurial tech startups and angel investing.  He has a committed relationship with a young woman from the Boston area, Alma Tambone, who would now be his fiancé had the government not arrested him at Logan Airport. Kabra vehemently denies, and intends to vigorously defend, the unwarranted charges of wire fraud, money laundering and bank fraud, which in the law is the least important factor in the detention analysis. Kabra's company, LaunchByte, was not a Ponzi scheme but rather a real operating company.  The venture fund Kabra was contemplating was real and in the process of being registered and documented by Goodwin Procter.  The government's assertion that Kabra duped so-called "investors" is entirely misleading and not supported by evidence.  The "investors" were lenders who provided short-term loans evidenced by promissory notes and were not investors in LaunchByte, any other entity, or the investment fund.  These lenders knew that they were providing bridge loans to cover liabilities in preparation for the planned launch of the venture fund.  There were no circumstances advanced at the detention hearing that established or even suggested that at 25 years old Kabra would flee (i) to avoid defending the government's case (which is weak and which in any event he denies) and instead to face real charges of flight that would necessarily result in a lengthy imprisonment; (2) to permanently rupture his relationship with Ms. Tambone; and (3) to bring disgrace to his family that believes in his innocence and is fully supporting him.[2]  The government has not and cannot meet its burden to establish that Kabra is a serious flight risk, let alone to prove that no

---

[2] Judge Keeton long ago recognized a plain truth in the pretrial release context when he observed in *United States v. Phillips*, 732 F. Supp. 255, 269 (D. Mass. 1990) that a defendant has a strong incentive to abide by conditions of pretrial release because any violation of those conditions is likely to prejudice his case, both at trial and, if convicted, at sentencing, with respect to the pending charges, and, in addition would be exposed to additional imprisonment of up to ten years should the defendant be convicted of committing an offense while on pretrial release.

circumstances exist that would provide reasonably assurance of his appearance in these proceedings.

## BACKGROUND

**Tan Kabra**.  Kabra is a 25-year old American citizen who immigrated from India with his parents as a two year old in 1996 and lived in the U.S. until his parents relocated to Singapore in 2006 when he was 13 years old.  (Declaration of Atim Kabra ("A. Kabra Decl."), ¶ 1; Tr. 7-8)).  Kabra started his first company while still in high school in Singapore with the help of his computer science instructor for the re-sale of used electronics which he successfully wound up before leaving to attend college. (A. Kabra Decl., ¶ 5).  In 2012 Kabra returned to the U.S. to attend Babson College where he majored in business and entrepreneurship and graduated in 2016. He worked in the Babson mailroom to earn money for personal expenses.  (*Id.*, ¶ 6). The genesis of what would become LaunchByte came about during his freshman year.  He would make digital presentations and websites for people in his free time, sometimes working for them for free and sometimes being offered sweat equity and fees for his work. (*Id.*, ¶ 7).

After college Kabra remained in the Boston area where he built his business.  Since September 2017 Kabra and his girlfriend, Alma Tambone, lived in various Boston apartments until their lease expired in June 2019.  In July and early August 2019, they travelled between Kabra's parents' condominium in Weehawken, New Jersey and Ms. Tambone's parents' home in Wenham, Massachusetts, while the couple searched for apartments/houses in the Boston area.  They are now in the process of renting an apartment in Beverly, Massachusetts.  (Declaration of Alma Tambone ("Tambone Decl.") ¶ 4).[3]  As Ms. Tambone confirms, Tan Kabra has many friends, including a

---

[3] Ms. Tambone has known Kabra as a friend for 3 years and as his girlfriend for over 2 years. She grew up in Wenham, Massachusetts.  (Decl., ¶ 2). She owns own a Boston based business which is a social, travel application that assists vacationers and travelers to manage their trip itineraries: www.planmytineraries.com.  Kabra assisted her in developing the business. (*Id.* ¶ 3).

number from his college days, and of course friends and acquaintances he gained through his business activities, including the startup companies he assisted, with whom Kabra and she would socialize from time to time. (*Id.* ¶ 5). Kabra worked hard to develop and grow LaunchByte and to be actively involved in the Boston community, including efforts to engage students at Excel High School in South Boston where he donated services and $13,000 in computers to improve their business and technology curriculum. (A. Kabra Decl., ¶ 20 & Ex. H thereto; Tambone Decl., ¶ 7). Unquestionably, Kabra's roots are in Boston.

Ms. Tambone was with Kabra when he was arrested at Logan Airport on August 4, 2019. (Tambone Decl., ¶ 8). They were intending to start a two-week vacation to London and Italy and had return tickets for August 16th. (*Id.*). They were planning to meet Kabra's grandmother who was flying to London from her home in India. (*Id.*). Ms. Tambone did not know until after her arrest that Kabra was intending to propose marriage and had brought with him a beautiful diamond engagement ring from Shreve Crump and Low. (*Id.*). She returned the ring after his arrest because she was concerned that the funds that were to be deposited into the account from which the check to the jeweler was drawn were unavailable or frozen due to his arrest. (*Id.*).

**LaunchByte and the Investment Fund**. Kabra formalized LaunchByte in 2015. (A. Kabra Decl., ¶ 7). Essentially, LaunchByte was a full service "startup incubator" specializing in early stage ventures, providing product design, business development and marketing to entrepreneurs in exchange for cash and equity from the startups. Specifically, LaunchByte provided IT platform development, web design and digital advertising and guided startups through rounds of funding typical for early stage companies. (*Id.* ¶ 8). In return, LaunchByte was paid in cash and an equity investment in the startup. LaunchByte was not a Ponzi scheme; it was a real

tangible business with employees, products and services, startup companies as clients, and with revenue and liabilities.  (A. Kabra Decl., ¶¶ 9-10).

In 2018, Kabra envisioned and took steps to create a micro investment fund of equities in startups and early stage companies.  Kabra's plan was to have the planned investment fund acquire the portfolio of equity interests LaunchByte had received in exchange for services.  Kabra hired Goodwin Procter to prepare the necessary preliminary documentation.  (*Id.* ¶¶ 8,10).  He also retained Partridge, Snow & Hahn for legal services related to various aspects of his business, including drafting the promissory notes that reflected bridge financing for LaunchByte as it proceeded to the creation of the investment fund. (*Id.* ¶ 8). The proceeds of the fund acquisition would be used for, among other things, the satisfaction of LaunchByte's liabilities, including the repayment of lenders who provided the early bridge financing.  (*Id.* ¶ 10).

**The "Investors."**  The lenders who provided short-term bridge loans to get LaunchByte to the point that it could launch the investment fund were not "investors" as the government characterizes them.  They were lenders who provided short-term loans at standard hard money interest rates, which loans were reflected in promissory notes and in some cases backed by guaranties. (A. Kabra Decl., ¶ 11).  There were no expectations that these lenders would obtain (in addition to repayment of principal and interest) any equity interests in any entity or the venture fund Kabra was hoping to create. (*Id.* ¶ 12).

The promissory notes evidencing the short-term loans, many of which are not due even now, variously referenced "financing of the startup" and "kickoff of the project" (i.e., the prospective launch of the venture fund) in some notes executed in 2018 and, in the later notes executed in 2019, contained this language:

> Lender agrees and acknowledges that the purpose of this Note is to provide funds to
> Borrower so that Borrower may, inter alia, consolidate creditors and support Borrower's

fees associate with the associated venture fund's setup and administration, fundraising, and closings, including, without limitation, professional services fees.

(A. Kabra Decl., ¶ 13 & Exs. A & B attached thereto; Sheahan Aff., ¶¶ 20-26, 49-50, 51-58)[4].

Kabra's December 6, 2018 email to Investor C provides a brief explanation of the investment fund and the need for bridge financing to pay for deal related expenses:

> I wanted to take a few minutes to provide you with a quick background on the deal:
>
> There is a management company (LaunchByte) that will be taking on the $1M debt. That management company owns 20 investments that have a value of $2.5M at the time of acquiring them (now they have grown). Our new fund, KV Ventures I LP will be purchasing these investments from the management company at arm's length, aka $2.5M.
>
> The management company needs to take on the $1M ASAP to complete the SECOND close of KV Ventures I, LP. The first close has already been done at $7M and that cash will be coming into the fund within the next few weeks (documents are being signed right now by the investors and wires are coming in). The second close will be the remaining $18M, and requires significant travel, legal expenses, and a ramp up of the management company staff.
>
> The $1M note will carry 20% interest on it, and the duration will be for 1 year. We anticipate the second close of KV Ventures I, LP to be at the latest by May of 2019. Promptly upon the second close, we will accelerate this debt note and still pay the 20% on top. So most likely, this will only be a 7 month term, but we would like to keep a buffer of an extra few months just in case.

(A. Kabra Decl., ¶ 14; Sheahan Aff., ¶ 47).   Thus, it is not true, as the government claimed, that Kabra represented to the lenders that their funds would be used "to foster the growth and development of startup companies [or] to prepare those companies for sale." (Sheahan Aff., ¶ 9). In fact, Investor A (Salvatore Viscomi) was a LaunchByte employee hired by Kabra to help market LaunchByte and to seek the necessary bridge financing in preparation for the launch of the fund. (A. Kabra Decl., ¶¶ 13-14; Tr. 12).   Viscomi also brought in Investor B. (A. Kabra Decl., ¶ 13;

---

[4] The Sheahan Affidavit attaches no promissory notes; the affidavit sets forth certain language from the promissory notes of Investors A through D. (*See* ¶¶ 20-26, 49-50, 51-58).   There are no allegations concerning the notes of Investors E and F (*See* ¶¶ 65-66).

Sheahan Aff., ¶ 17). Viscomi was hired in mid-2018 by LaunchByte as "Chief Medtech Investment Officer." (A. Kabra Decl., ¶ 14 & Ex. C thereto). Shortly thereafter, at Viscomi's insistence, Kabra hired Mahsa Noble as Global Director of Growth. (Id. ¶ 14). Viscomi and Noble were hired because of their investment connections. They contacted high-wealth individuals (both U.S. and foreign) and ultimately identified investment sources sufficient to take LaunchByte to fund launch, which Kabra conservatively estimated in his December 6, 2018 email at $7 million. (*Id.* & Ex. D attached thereto).[5] In late 2018 and early 2019, Kabra and Noble made marketing trips to meet Noble's connections, including to Dubai, UAE. (A. Kabra Decl., ¶ 14).

Viscomi (Investor A) and Investor B sought repayment of their notes shortly after making the loans in July 2018, notwithstanding that the term of their notes expressly contemplated repayment of principal "four (4) months from the first day (kickoff) of the project", which in July was contemplated to be in or about October 2018. (A. Kabra Decl., ¶ 15; Sheahan Aff., 21, 26). Investor B approached Kabra for early repayment claiming that his wife needed the money in connection with a new medical practice. (A. Kabra Decl., ¶ 15). Kabra agreed to make efforts to repay Investor B before the note was due to preserve the relationship between Viscomi and Investor B. (*Id.*). Soon thereafter, Viscomi breached his employment agreement, ceased providing services and insisted on early repayment of his note as well. (*Id.*). Kabra turned Viscomi's demands over to his attorneys. (*Id.* & Ex. E attached thereto). The unreasonable and disruptive demands of Viscomi and Investor B required Kabra to scramble to address these demands (including the need for legal representation) and ultimately caused Kabra to reallocate funds received from future bridge financing to make these unanticipated early repayments. (*Id.*).

---

[5] The spreadsheet Kabra created for the investment contacts identified by Viscomi and Noble had anticipated investments ranging from $16.25 million to $50 million for Noble and from $3.5 to $6 million for Viscomi. (A. Kabra Decl., Ex. D).

In early 2019, the $1 million debt that Kabra was facing increased to $1.5 million, due in large part to the premature demands for repayment by Mr. Viscomi and Investor B. (*Id.* ¶ 16)  In or about March 2019, Scott Taylor, an investor with one of the portfolio companies agreed to take on the entire $1.5 million debt at 20% interest.  That $1.5 million would have secured repayment of the prior notes, estimated to be approximately $770,000.[6] (*Id.*).  Unfortunately, in April 2019, Taylor backed out at the last-minute citing personal reasons attributable to unanticipated litigation. (*Id.*).  Kabra subsequently solicited new loans, again evidenced by promissory notes and guaranties.  Atim Kabra agreed to provide a personal guaranty for these loans.  (*Id.*).  Kabra put together a slide deck in April 2019 to solicit the $1.5 million in bridge financing. (*Id.* & Ex. F attached thereto).

**International wire transfers.**  To support the notion that Kabra was a flight risk, the government argued that Kabra sent out large sums in international wires, suggesting that he was pocketing large sums of money overseas. (Tr. 27).  In support, the government proffered a redacted bank statement simply identifying an outgoing wire. (Tr. 16).  The Special Agent testified he could not identify the recipient of these wires. (Tr. 41). The Magistrate Judge accepted that argument. The Order expressly referenced "bank records [that] show that the defendant has made numerous transfers of funds overseas." (Order at 3).  The unredacted version of government Exhibit 4 (Berthiaume Decl., Ex. C) evidences three outgoing international wires from LaunchByte's Brookline Bank account.  On January 4, 2019, there was a wire of $19,985 to Code to Art Technology Private Ltd.  On January 4 and 8, 2019, there were wires of $10,000 and $5,000 to Digital Brandster Private Ltd.  Both companies are located in India.  Both companies are software development companies to whom Kabra farmed out work for LaunchByte's startups.  Digital

---

[6] Kabra created a spreadsheet of debts that would be paid off from the $1.5 million loan, including the satisfaction of the Viscomi note.  (A. Kabra Decl., ¶ 16 & Ex G.)

Brandster Pvt Ltd offers software development and digital marketing services, especially helping startups in their journey, and its website is www.digitalbrandster.com. (A. Kabra Decl., ¶ 18). Digital Brandster provided LaunchByte with services for specific startups. Code to Art provides similar services. (*Id.*). See https://codetoart.com. Thus, the government's nefarious connotation with respect to international wire transfers lacks any basis in the evidence. To the contrary, the international wires confirm the integrity of Kabra's business.

Similarly, the government suggested at the detention hearing that Kabra was laundering money through the Brookline Bank account, speculating improper conduct evidenced by the December 2018/January 2019 bank statement (Berthiaume Decl., Ex. C) which showed that $573,000 went into that account and $570,000 exited the account. (Tr. 19). Based on that account the government argued that Kabra had access to tremendous amounts of cash. (Tr. 57). The government did not identify to the Court any of the transactions it reasonably believed were suspect and not in the ordinary course of business (other than the international wire transactions). There are none. The government's insinuation was passed to the court as fact instead of the pure speculation and improper argument that it was. Obviously, at the time of the hearing, the government had the unredacted exhibit and supposedly had conducted an investigation.

**Intermingling of personal and business expenses**. To suggest improper conduct, the government points to the intermingling of Kabra's personal and business expenses in various bank accounts and further suggests that LaunchByte's business accounts were used to pay American Express credit cards. (Tr. 51, 54). It is not uncommon (and certainly not suggestive of criminal activity) for owners of small closely-held businesses to intermingle personal and business expenses; leaving accounting firms the task of separating such expenses for tax purposes at year end with input from the business owner. (A. Kabra Decl., ¶ 17). In addition, Kabra used an

American Express business card to pay for LaunchByte expenses which were appropriately deducted from LaunchByte's bank accounts. (*Id.*). Finally, LaunchByte also had separate bank accounts with banks other than Brookline Bank, including a Bank of America bank account that was used as LaunchByte's operating account for payroll and similar expenses. (*Id.*).

**The Boat**.   Kabra's purchase of a boat was not personal indulgence as the government suggests. (Sheahan Aff., ¶ 32).   Raising investment funds requires access to decision makers who decide whether to back an entrepreneur.   Successful fund raising requires access to networks of decision makers in places they visit socially and professionally. (A. Kabra Decl., ¶ 19).   In short, a boat in Boston has legitimate business justifications for an entrepreneur.   (*Id.*).   In any event, Kabra ended up selling the boat shortly thereafter when he was led to believe that the marketing threshold had been met. (*Id.*).

**The Ring**.   As noted above, Kabra purchased a diamond engagement ring that he intended to present to Ms. Tambone during their planned vacation to London and Italy in early August. After Kabra's arrest, Ms. Tambone returned the ring to Shreve, Crump and Low because she was concerned that the deposit made from Kabra's personal account from which the check was drawn would be unavailable or frozen due to his arrest. (Tambone Decl., ¶ 8).   The purchase of the engagement ring has absolutely no bearing on whether Kabra is a flight risk and certainly has no connection to the question of whether conditions of release exist to reasonably ensure Kabra's appearance.   Notwithstanding, at the hearing the government distorted the circumstances of Kabra intending to propose marriage to Ms. Tambone with the ring and instead characterized the situation as one supporting risk of flight: "I would also like to point out that he was prepared to get engaged with a ring that was written – that was purchased with a check that was going to bounce.   There is

a certain seriousness to doing that which undermines the claim of ties to the United States through
that route." (Tr. 56). This is both untrue and illogical.

**Overseas assets**. Pointing to a single obscure reference in a text message from Kabra --
"My stuff is in Mauritius" (Tr. 13) -- the government suggests without any true evidence that Kabra
may have financial resources overseas. (Tr. 56). Kabra does not have assets in Mauritius. (A.
Kabra Decl., ¶ 21). His father, however, is the investment manager of two Mauritius based private
equity funds. *(Id.)*

**Bank Fraud.** The government charges that Kabra committed bank fraud in violation of
18 U.S.C. ¶ 1344 when he deposited on March 11, 2016 a $125,000 personal check into
LaunchByte's Brookline Bank account that ultimately was returned due to insufficient funds.
(Indictment at ¶¶ 34-39). The evidence demonstrates, however, Kabra did not intend to defraud
Brookline Bank. In January 2019, LaunchByte negotiated and executed a consulting agreement
with Michael Cormier on behalf of Chef Dazzer LLC for services whereby LaunchByte would
receive $125,000 cash and $125,000 in equity. (A. Kabra Decl., ¶ 22 & Ex. I). Cormier introduced
Kabra to Matt Waldner who agreed to lend money to fund Chef Dazzer's cash obligation.
LaunchByte then began to render services to Chef Dazzer. On or about March 6, 2019, Chef
Dazzer executed a promissory note to Waldner for the $125,000 to be paid to LaunchByte. *(Id. &*
Ex. J). Cormier committed to Kabra that the $125,000 from Waldner would be wired to Kabra's
bank on Monday March 11, 2019. To meet payroll and other expenses Kabra deposited his
personal check for $125,000 into Brookline Bank on March 11, 2019, believing that Waldner's
funds would be wired to cover that check. After the Kabra check was deposited, Cormier reneged
on his commitment and agreements on behalf of Chef Dazzer, leaving Kabra scrambling to find
solutions, including assistance from his father, until more bridge funding could be obtained but

unfortunately could not be obtained in time. (*Id.*). It was always Kabra's intention to repay Brookline Bank from funds that were being raised and Kabra's father has now done so on his behalf. (A. Kabra Decl., Ex. G) (Brookline Bank identified debt repayment schedule).

## ARGUMENT

### I.   Governing Law

The Supreme Court in *United States v. Salerno,* 481 U.S. 739, 755 (1987), in reviewing the Bail Reform Act ("Statute"), reaffirmed the principle that liberty is the norm, and detention is a carefully limited exception.   Accordingly, pretrial detention is reserved for the rarest of cases. *See, e.g., United States v. Acevedo-Ramos,* 755 F.2d 203, 206 (1st Cir. 1985) (where risk of flight is "unusually great") citing *United States v. Abrahams*, 575 F.2d 3 (1978) (where risk of flight "exceptional"); *United States v. Schiavo*, 587 F.2d 532, 633 (1st Cir. 1978) (only in the rarest of circumstances may bail be denied) citing *United States v. Abrahams, supra*).   For that reason, there is a "strong presumption against detention" or conversely a presumption in favor of release. *See, e.g., United States v. Hassanshahi*, 989 F. Supp. 2d 110, 113 (D.D.C. 2013); *United States v. Abrahams*, 575 F.2d at 6 (strong presumption in favor of release).   The Statute "mandates *every form of release* be considered before detention may be imposed." *United States v. Hansen*, 108 Fed. Appx. 331, 332, 2004 WL 1888858 (6th Cir. 2004) (emphasis added).[7]   Importantly, the Statute does not impose a guarantee requirement. *United States v. Tortora*, 922 F.2d 880, 884 (1st

---

[7] In determining whether there are conditions of release which will reasonably assure the appearance of the person and the safety of any other person and the community, courts take into account: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug; (2) the weight of the evidence against the accused; (3) the history and characteristics of the person, including; (A) his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, he was on probation, on parole, or other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State or local law; and (4) the nature and seriousness of the danger to any other person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g).

Cir. 1990) ("Requiring that release conditions *guarantee* the community's safety would fly in the teeth of Congress's clear intent that only a limited number of defendants be subject to pretrial detention"). Release requires only an objectively reasonable assurance of Kabra's appearance. *Tortora*, 922 F.2d at 884; *United States v. Duran*, 2006 WL 3498337 *1, 05-cr-10304-GAO, Dec. 5, 2006) (release of the defendant is warranted if the court can reasonably be assured of "the appearance of the person as required and the safety of any other person and the community). These mandates apply in cases involving foreign defendants.[8]

Detention determinations must be made on the individual circumstances of the case and be based on the evidence before the court regarding the particular defendant. *Tortora*, 922 F.2d at 888. In this case, the government's argument for detention rests on (i) the alleged seriousness of the charges (Tr. 55); Kabra's ties abroad (Tr. 55-56); and the alleged availability of funds overseas (Tr. 56-58). As the Background section demonstrates, the government presents no reasonable basis to detain Kabra pending trial in this complex and document heavy case.

## II. Kabra Is Not A Flight Risk

**Kabra's History and Circumstances**. Neither the government's evidence nor any other circumstance related to Kabra supports a finding that Kabra poses a "serious risk" of flight required for detention under § 3142 (f)(2)(A). First, to be sure there is no claim that Kabra is a risk to obstruct justice by threatening, intimidating or injuring any witness or juror as provided in 18 U.S.C. § 3142 (f)(2) (B). This is not a rebuttable presumption case involving drugs, a violent crime or other pertinent circumstances listed in the Statute which presumes flight risk. *See* 18

---

[8] *See, e.g.*, *Hansen*, 108 Fed. Appx. at 332 ("The bail statute, however, does not require that foreign defendants be detained simply because their return cannot be guaranteed through extradition."); *Hanson*, 613 F. Supp. 2d at 87-88; *United States v. Karni*, 298 F. Supp. 2d 129, 132-33 (D.D.C. 2004) (Israeli citizen with no U.S. ties); *Hassanshahi*, *supra* (dual U.S. Iranian citizen released on conditions).

U.S.C. § 3142(e)(3).  When stripped of rhetoric and speculation, the government's position on detention is essentially predicated on an opportunity to flee if released, but the Statute requires more.  An opportunity to flee is not enough to justify detention as the Statute does not seek ironclad guaranties.  *United States v. Jamal*, 285 F. Supp. 2d 1221, 1228 (D. Ariz. 2003) (citing *United States v. Himler*, 797 F.2d 156 (3d Cir. 1986)); *Tortora*, 922. F.2d at 884 (release conditions do not require guarantee).  This case does not involve the use of aliases, false identifications, or the transfer of substantial funds after knowledge the defendant is a target, or evidence of actual flight to avoid prosecution, which are common hallmarks in cases finding a serious risk of flight.  *See., e.g.*, *Abrahams*, *supra* (use of alias and flight to avoid prosecution); *United States v. Anderson*, 384 F. Supp. 2d 32, 36-38, 42 (D.D.C. 2005); *Hanson*, 613 F. Supp. 2d at 90 (discussing and distinguishing *Anderson*).

The government argues, among other things, that Kabra is a flight risk because he has family in India and that extradition from India will take many years should he flee.  Neither Kabra's parents nor brother have lived in India since 1996 (when Kabra was less than 2 years old) and since 2006 they have lived in Singapore.  It is true that Kabra has more distant relatives living in India who he has visited, but he does not have immediate family in this country.  Kabra is an American citizen who has lived permanently in the Boston area since 2012, who has a significant relationship with a young woman (who has lived in the Boston area her entire life), and who remained in Boston after college to build a business after graduating Babson in 2016.  He has numerous friends and business acquaintances in Boston. (Tambone Decl., ¶ 5).

The Magistrate Judge erred in concluding that Kabra lacked stable employment, a stable residence and lacked significant community ties to Boston.  Order at 2-3.  The evidence does not support these findings.  The undisputed facts, as attested by the Declaration of Alma Tambone and

the Declaration of Atim Kabra, evidence his substantial and stable connections to this district, both personal and business, and his interaction with the Boston community, including his relationship with Excel High School where he devoted time, money and resources to assist Boston-area students in furthering their education through entrepreneurial activities.

That he has no immediate family here and that extradition from India might prove time consuming certainly cannot trump in the detention analysis his substantial ties in Boston without upending the law on its head: pretrial detention is reserved for the rarest of cases where the risk of flight is unusually great or exceptional. *See, e.g., United States v. Acevedo-Ramos*, 755 F.2d 203, 206 (1st Cir. 1985) (where risk of flight is "unusually great") citing *United States v. Abrahams*, 575 F.2d 3 (1978) (where risk of flight "exceptional"); *United States v. Schiavo*, 587 F.2d 532, 633 (1st Cir. 1978) (only in the rarest of circumstances may bail be denied) citing *United States v. Abrahams*, *supra*). In this country, literally millions of immigrants (let alone those who became citizens) would trip over these criteria, which effectively under the circumstances impose a guarantee requirement for bail. And it is an insult to immigrants who have become American citizens, like Kabra, his mother and brother, to contend, as the government does, that they would simply ignore their oaths and obligations as citizens and flee to avoid the hardship occasioned by the government bringing charges. Indeed, the government goes so far in arguing flight risk as to suggest that Kabra had overseas accounts based on his family's wealth in Singapore (Tr. 57), clearly implying that they would be complicit in his flight. Kabra is made of sterner stuff and would not rupture his relationship with Ms. Tambone and disgrace his family by fleeing, simply to avoid a legal fight in this case where the government's case is exceedingly weak, as the Background section demonstrates.

There are no other hallmarks in Kabra's case that support detention: no criminal record, no mental health or drug issues, no history of avoiding prosecution, no evidence of aliases, false identifications, or transferring assets overseas in preparation for flight. The government's insinuations that Kabra (i) has offshore accounts, (ii) wired funds overseas from his business account and (iii) has seemingly laundered funds through his business bank account with Brookline Bank are completely baseless. The government argues that there is evidence that Kabra has financial resources overseas (Tr. 56-58), suggesting as evidence (i) the Brookline Bank account statement (Ex. 4) which in December 2018/January 2019 had over $500,000 pass in and out of that account (Tr. 57) (which includes, one assumes the international wire transfers evidenced in that exhibit; (ii) that Kabra's family in Singapore has real estate in Weekhawken, suggesting the his parents likely would become complicit in any flight (Tr. 57-58); and (iii) that when he was arrested he was "exiting" the country with a "highly transferable fungible asset" (Tr. 58), i.e., the diamond engagement ring intended for Ms. Tambone.  The government's unusual transformation of the ring, from romantic vacation to fleeing the country with a valuable asset, found its way into the detention order. See Order at 3 (Kabra "was arrested leaving the country with a substantial tangible asset and leaving extensive debts").

All of these insinuations are baseless.  First, there is no actual evidence that the Brookline Bank account was in any way used improperly or to funnel assets overseas.  Although the government had the unredacted bank statement, it still induced testimony from the Special Agent that he did not know who received the wire transfers (Tr. 41) allowing the Magistrate Judge to surmise nefarious dealings. The Order expressly referenced "bank records [that] show that the defendant has made numerous transfers of funds overseas." (Order at 3).  In fact, the wire recipients listed on the bank statement were software development companies in India to whom Kabra

farmed out work for LaunchByte's startups.  (A. Kabra Decl., ¶ 18).  Assuming good faith, it is

obvious that the government did not conduct any real investigation into Kabra's transactions

reflected in the Brookline Bank statement, being content to insinuate improper dealings to support

an argument that Kabra was a flight risk with overseas assets.  The argument made with respect to

the international wires also applies to the transactions in the bank statement as a whole which, as

noted, showed over $500,000 passing through the account. The government alluded to these huge

figures in its argument (Tr. 57), yet at no point during the hearing did it produced evidence that

any of the transactions were suspect or tied in any way to overseas assets generally.   The

government's "investigation" apparently was sufficient to hit the high points to support its

arguments that Kabra used business accounts to pay off his credit card debts, but was not thorough

enough to glean that Kabra had American Express business cards for business purposes that were

paid off through the Brookline Bank account or that outgoing transfers to Bank of America

evidenced in that bank statement were to operational accounts used to pay LaunchByte payroll and

expenses. (A.  Kabra Decl., ¶ 17).  In much the same way, the government in its evidence and

argument stressed a single obscure reference in a text message from Kabra that he had "stuff" in

Mauritius (Tr. 13), without any real investigation or evidence, to bolster its flight risk argument

that he had any funds overseas.

Second, it is simply incredible that the government would argue that Kabra had wealth

abroad based on the fact that his parents in Singapore own a small condominium in Weehawken,

(Tr. 57) intimating quite clearly that they would seemingly assist in financing Kabra in his flight

from justice.  Finally, the government's transformation of the engagement ring found on Kabra at

Logan Airport to an insinuation that he was "exiting" the country with a valuable asset –

completely bereft of context and the fact of return trip tickets to Boston (Tr. 10) – demonstrates

the length the government was willing to go to conjure up Kabra as a flight risk.  And, as noted, the manipulation had traction with the Magistrate Judge.  Order at 3 (Kabra "was arrested leaving the country with a substantial tangible asset and leaving extensive debts").

In sum, there simply is no evidence related to Kabra's history, character, personal and family circumstances that remotely supports a finding that he is any risk, let alone a serious risk to flee to avoid prosecution.

## III.     The Weight of the Evidence Does Not Support Flight Risk

It is well established that the weight of the evidence against a defendant is the least important factor to consider in the detention analysis. *See., e.g., United States v. Jones*, 2008 WL 2434131 at *5 (S.D.N.Y, June 12, 2008) ("Our court has stated, however, that the weight of the evidence is the least important of the various factors").  The government's reliance on the strength of its case against Kabra to warrant detention is misplaced.  The government's charges depend on proof that Kabra intentionally engaged in a scheme to defraud investors through a Ponzi scheme and to defraud Brookline Bank.  Without reiterating the bulk of the Background section, the government's case is weak and does nothing to raise an inference that Kabra would flee to avoid the proceedings.

Kabra's company, LaunchByte, was a real company and the venture fund Kabra was contemplating was being preliminarily documented by Goodwin Procter.  Kabra also used counsel for, among other things, drafting promissory notes that reflected bridge financing for LaunchByte as it proceeded to the creation of the investment fund.  It is inconceivable that Kabra would incur debt of hundreds of thousands in legal fees with respected Boston law firms to prop up a Ponzi scheme.  Second, the so-called "investors" were lenders not investors.  None were duped.  The lenders understood that their loans were bridge loans to carry LaunchByte to the launch of the

investment fund.  (A. Kabra Decl., ¶ 13 & Exs. A & B). There is no language in the notes or in any other document indicating that the lenders would obtain (besides payment of principal and interest) any equity interests in any entity or the venture fund Kabra was hoping to create. ((*Id.* ¶ 12).  Moreover, the very first lender who loaned $250,000, Salvatore Viscomi, was actually hired to help market LaunchByte and obtain bridge financing in advance of the contemplated launch of the venture fund. He also brought in Investor B. (A. Kabra Decl., ¶¶ 13-14; Tr. 12).  They certainly were not duped.

The Background section also addresses (i) the propriety of the international wire transfers; (ii) the alleged money laundering though Brookline Bank, including credit card payments and other transfers, and the alleged fraud on that bank; (iii) the intermingling of personal and business expenses; (iv) the boat; (v) the ring; and (vi) the overseas assets.  What emerges from a reasonable view of the evidence is not a portrait of a fraudster intent on bilking unsuspecting investors, but rather a young man filled with ideas on growing and generating a business helping entrepreneurs and creating an investment fund, who often had to scramble to keep his vision afloat when expected high income investors fell through or other roadblocks arose.  This is not the stuff of fraud and he should not have been detained for the last five weeks.

## IV.   **Release Conditions**

Kabra proposes the following release conditions.

(1) to appear at all proceedings as required and to surrender for service of any sentence imposed.

(2) to report to Pretrial Services in person and/or by telephone (508-929-9940), as directed;

(3) to execute a bond in the amount of $25,000;

(4) to surrender his passport and international travel documents (already in the government's possession);

(5) to obtain no passport or international travel documents of any kind;

(6) to not leave the Commonwealth of Massachusetts without the prior approval of Pretrial Services;

(7) to maintain residence in the Boston metropolitan area and to provide his address to Pretrial Services; and

(8) to avoid all contact directly or indirectly, with any person who is a victim or potential witness in the subject prosecution.

Finally, in making detention determinations a court should consider the effect of pretrial detention on the defendant's rights to effective assistance of counsel. *See United States v. DiGiacomo*, 746 F. Supp. 1176, 1182-83 (D. Mass. 1990) (noting the importance of considering whether release facilitates the fair and efficient preparation of defendant's case for trial and thus serves the interest of justice). Release is critical to enable Kabra and undersigned counsel to meaningfully prepare this complex, extremely document intensive case.

## CONCLUSION

For the reasons herein, Kabra respectfully requests that this Court revoke the Order and order his release on the above conditions or such other conditions as the Court deems appropriate.

Respectfully submitted,

TANMAYA KABRA,

By his attorneys,

/s/ *Mark A. Berthiaume*
Mark A. Berthiaume (BBO # 041715)
E-mail: berthiaumem@gtlaw.com
Angela C. Bunnell (BBO #690429)
E-mail: bunnella@gtlaw.com
GREENBERG TRAURIG, LLP
One International Place, 20th Floor
Boston, MA 02110
(617) 310-6000
(617) 310-6001 (fax)

Dated:  September 12, 2019

### CERTIFICATE OF SERVICE

I hereby certify that on September 12, 2019, I electronically filed the foregoing document with the United States District Court, District of Massachusetts by via the CM/ECF system. I further certify that on September 12, 2019, I served a copy of the foregoing document on all parties or their counsel.

/s/ Mark A. Berthiaume
Mark A. Berthiaume