UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES, | ) |
| | ) |
| v. | ) Case No. 1:19-cr-10335-DJC |
| | ) |
| TANMAYA KABRA | ) |

## **DECLARATION OF ATIM KABRA**

Atim Kabra hereby declares under the penalties of perjury as follows:

1. I am the father of Tanmaya Kabra ("Tan"). Tan is our eldest son. We have another son, Avi, who is now 14 years old. Both my wife Himali and Tan became U.S. citizens in 2009. Avi was born in the United States. I was a permanent U.S. resident until 2006 and remain a citizen of India.

2. I have much the same business background and experience in startups and angel investing as Tan. By way of background, I majored in economics (Honors) from Delhi University and have a Master's degree in Management Studies from NMIMS (Bombay University). I have over 25 years of experience in equities related businesses including portfolio management, equity sales and equity research with global institutions like ABN AMRO Bank in New York, and ANZ Grindays Bank in India.

3. After working for the equity research section at HG Asia, India, I was relocated by my company to New York in 1996 when Tan was less than three years old. I worked for ABN Amro Inc., setting up the sub-continent equity sales desk for about four years. I set up my own firm in 2000 and in 2006 we moved to Singapore where over the last 13 years I established my present business interests. We do, however, own an apartment in Weehawken, New Jersey.

4. I am the founding principal of Frontline Strategy Limited, the investment manager/advisor for India Industrial Growth Fund and Strategic Ventures Fund (Mauritius) Limited, two Mauritius based India centric private equity funds. I am also the founder and CEO of Frontline Strategy Funds Pte. Ltd., a Singapore registered and licensed venture capital fund manager, which acts as the investment manager/advisor to the Singapore based Venture Capital Fund – Prestellar Ventures Fund I Pte Ltd.

5. Tan started his first company while still in high school in Singapore with the help of his computer science instructor for the re-sale of used electronics, before leaving to attend Babson College in Wellesley, Massachusetts in 2012. He has resided exclusively in the United States since then.

6. At Babson, Tan majored in business and entrepreneurship and graduated in 2016. He worked in the Babson mailroom to earn money for personal expenses. The genesis of what would later become LaunchByte, sprang up during Tan's freshman year. In his free time, Tan made digital presentations and websites for people, sometimes working for them for free and sometimes being offered sweat equity and fees for his work.

7. My understanding is that Tan formalized LaunchByte in April 2015, while still attending college. Essentially, per my understanding of Tan's business, LaunchByte was a version of a "startup incubator" specializing in early stage ventures, providing product design, business development, marketing and other services in exchange for cash and equity.

8. Specifically, it is my understanding that LaunchByte provided IT platform development, web design and digital advertising and guided startups through rounds of funding typical for early stage companies. I also believe that in 2018 Tan envisioned and took steps to create a micro investment fund of equities in startups and early stage companies, including hiring

2

Goodwin Procter, a Boston law firm, to prepare the necessary registration and fund documentation. It is my understanding that Tan also used Partridge, Snow and Hahn of Boston for legal work related to various aspects of Tan's business, including the drafting of promissory notes for the bridge financing LaunchByte needed prior to the creation of the investment fund.

9. I have reviewed the Complaint and supporting affidavit filed against Tan. As I understand it, the government essentially alleges that Tan was running a Ponzi scheme through LaunchByte, which included (i) the solicitation of so-called investors (actually lenders) who provided short-term loans reflected in promissory notes; (ii) the repayment of prior "investors" through funds obtained through subsequent "investors"; and (iii) the intermingling of Tan's personal and business expenses in various bank accounts.

10. Based on my training and experience and my knowledge of the angel investing and startup business, I do not believe that Tan and LaunchByte can in any respect be characterized as a Ponzi scheme. Ponzi schemes typically do not have a real operational underlying business with real cash flow and consequently have no defined means of paying creditors and investors other than through funds provided by subsequent creditors and investors. LaunchByte was a real tangible business with employees, products and services, startup companies as clients, and significant revenue. As I understand it, Tan's plan was to house the equity interests that LaunchByte held in various startups in an investment fund which would acquire the portfolio of equity interests from LaunchByte for its investors. The proceeds of the portfolio acquisition would be used, among other things, to satisfy LaunchByte's debts and obligations, including the repayment of lenders who provided the early bridge financing.

11. While I understand that the government has characterized the individuals who provided short-term bridge loans to LaunchByte as "investors" - they are more accurately

described as lenders. Based upon the documents I have seen and based on my discussions with a couple of my friends who had been approached by Tan for such loans, these lenders had provided short-term loans at standard hard money interest rates reflected in promissory notes and in some cases backed by guaranties.

12. My understanding is that there was no agreement that these lenders would obtain (besides repayment in cash of principal and interest) any equity interests in any entity or the venture fund Tan was hoping to create (which was only in the preparation stages). I also understand that the bridge financing was intended to get Tan and LaunchByte to the point where they could launch the startup venture fund.

13. The promissory notes evidencing the short-term loans, many of which seem not yet due, variously reference "financing of the startup" and "kickoff of the project" (meaning the launch of the startup venture fund, in my view) in some notes executed in 2018, including the note to Viscomi. The later notes executed in 2019 contained this language:

> Lender agrees and acknowledges that the purpose of this Note is to provide funds to Borrower so that Borrower may, inter alia, consolidate creditors and support Borrower's fees associate with the associated venture fund's setup and administration, fundraising, and closings, including, without limitation, professional services fees.

A copy of the promissory note signed by Viscomi in 2018 and an unexecuted copy of one of the notes signed by a lender in 2019 are attached as Exhibits A and B, respectively. I believe that each of the "investors" referenced by the government knew they were short-term lenders and not investors in any fund, LaunchByte or the startups. I understand that the person identified as Investor A (Salvatore Viscomi) was in fact hired by Tan to help market LaunchByte and obtain bridge financing in advance of the fund's official registration and investment launch. I also understand that it was Viscomi who introduced Tan to a lender identified by the government as Investor B.

14. Indeed, the government has referenced a December 6, 2018 email from Tan to a lender identified as "Investor C" which reads:

> I wanted to take a few minutes to provide you with a quick background on the deal:
>
> There is a management company (LaunchByte) that will be taking on the $1M debt. That management company owns 20 investments that have a value of $2.5M at the time of acquiring them (now they have grown). Our new fund, KV Ventures I LP will be purchasing these investments from the management company at arms length, aka $2.5M.
>
> The management company needs to take on the $1M ASAP to complete the SECOND close of KV Ventures I, LP. The first close has already been done at $7M and that cash will be coming into the fund within the next few weeks (documents are being signed right now by the investors and wires are coming in). The second close will be the remaining $18M, and requires significant travel, legal expenses, and a ramp up of the management company staff.
>
> The $1M note will carry 20% interest on it, and the duration will be for 1 year. We anticipate the second close of KV Ventures I, LP to be at the latest by May of 2019. Promptly upon the second close, we will accelerate this debt note and still pay the 20% on top. So most likely, this will only be a 7 month term, but we would like to keep a buffer of an extra few months just in case.

It is my understanding, based in part on press releases attached as Exhibit C, that in August and September 2018, Tan and LaunchByte hired Viscomi as "Chief Medtech Investment Officer" and, at Viscomi's insistence, Mahsa Noble as Global Director of Growth. I further understand that each was hired because of their investment connections, and that, thereafter, they contacted high-wealth individuals (both U.S. and foreign) and identified investment sources sufficient to take LaunchByte to the fund launch stage, which Tan appears to have estimated in his email at $7 million. In that regard, in October 2018 and January 2019, Tan and Noble made trips together to Dubai, UAE for the purpose of meeting Noble's

connections. As I recollect, Tan introduced me to Noble in Dubai and she spoke to me about her many connections with wealthy individuals in the Middle East, some of whom would be interested in the new fund, and how she was extremely impressed by Tan's acumen and was helping him market the fund. A copy of what I understand is a LaunchByte spreadsheet reflecting the investment funds identified by Noble and Viscomi is attached as Exhibit D.

15. I also understand that Viscomi and Investor B sought repayment of their notes shortly after making the loans in July 2018 notwithstanding that the term of their notes expressly contemplated repayment of principal "four (4) months from the first day (kickoff) of the project", which in July was contemplated to be in or about October 2018. I understand that Investor B approached Tan seeking early repayment on his note because he said that his wife supposedly needed the money in connection with a new medical practice. Tan seemingly agreed to make early repayment to Investor B to preserve the relationship between Viscomi and Investor B. I also understand that soon thereafter, Viscomi breached the terms of his employment agreements with LaunchByte, ceased providing services, and insisted on the early repayment of his note as well. A copy of an email exchange between LaunchByte's counsel and Viscomi's counsel challenging the claim for payment by Viscomi is attached as Exhibit E. The unreasonable and disruptive demands of Viscomi and Investor B forced Tan to scramble to address these demands (including the need for legal representation) and ultimately caused Tan to reallocate funds received from future bridge loans to make these unanticipated early repayments.

16. In early 2019, I understand the $1 million debt that Tan was raising increased to $1.5 million, apparently due in large part to the premature demands for repayment by Viscomi and Investor B. I understand that at that time, Scott Taylor, an investor with one of

LaunchByte's portfolio companies came forward and agreed to take on the entire $1.5 million debt at 20% interest. That $1.5 million would have secured repayment of the prior notes, estimated to be approximately $770,000. Unfortunately, in April 2019, Taylor backed out at the last-minute citing personal reasons attributable to unanticipated litigation that he needed to address. Tan subsequently solicited new loans, again evidenced by promissory notes and guaranties. I agreed to provide a personal guaranty for these loans if and as and when required by Tan. A copy of the slide deck put together by Tan in April 2019 to solicit the $1.5 million in bridge financing still necessary after the Taylor commitment fell through is attached as Exhibit F. In addition, attached as Exhibit G is what I understand is a LaunchByte spreadsheet that listed the debts that LaunchByte intended to pay with the anticipated $1.5 million in bridge financing.

17. To suggest improper conduct, the government points to the intermingling of Tan's personal and business expenses in various bank accounts and further suggests that LaunchByte's business accounts were used to pay American Express credit cards. It is my understanding, per my discussions with accountants, that it is common (and certainly not suggestive of criminal activity) for owners of small businesses to intermingle personal and business expenses; leaving accounting firms the task of separating such expenses for tax purposes at the year end with input from the business owner. In addition, I understand that Tan used an American Express business card to pay for LaunchByte expenses which were appropriately deducted from LaunchByte's bank accounts. Finally, I am aware that LaunchByte also had separate bank accounts with banks other than Brookline Bank, including a Bank of America bank account which was used as LaunchByte's operating account for payroll and similar expenses.

18. I also understand that during the detention hearing there were some discussion of international wires drawn from LaunchByte's Brookline Bank account and the suggestion was

made that Tan was sending funds overseas for his personal benefit. I am informed that the documents submitted at the detention hearing specifically evidenced three international wires to companies in India: two wires totaling $15,000 to Digital Brandster Private Ltd and one wire of $19,985 to Code to Art Private Ltd. Digital Brandster Private Ltd. (www.digitalbrandster.com), located in New Delhi, India, provides software development and digital marketing services and works especially with startups to provide IT, quality software and digital services and support to them at very reasonable prices, and that Digital Brandster provided these services to LaunchByte for its startups, and was partially paid for its services through wire transfers. Until recently, I had no personal knowledge of Code to Art Private Ltd, but, according to its website, the company appears to provide IT and software development services. It is a common industry practice to get software development done from offshore companies that can offer cost savings.

19. With respect to Tan's purchase of a boat, it should be remembered that raising investment funds requires access to decision makers who decide whether to back an entrepreneur. Successful fundraising requires access to networks of decision makers in places they visit socially and professionally. In short, a boat in Boston has legitimate business justifications for an entrepreneur. It is my understanding that Tan purchased the boat for this purpose and sold it three months later when he understood that the marketing threshold had been met.

20. I know that Tan worked hard to develop and grow LaunchByte, and was actively involved in the Boston community, including his efforts to help the Boston public schools improve their business and technology curriculum by, among other things, I believe, donating two $25,000 service grants and $13,000 in Apple computers. Attached as Exhibit H are a

number of press reports on Tan and LaunchByte that evidence Tan's energy, innovation and determination in building his business and in helping startups and entrepreneurs.

21. I understand that the government has alleged, based on a single vague comment in an email to Viscomi, that Tan has offshore assets in Mauritius. To the best of my knowledge this is not true. As noted above, however, I am the investment manager of two Mauritius based private equity funds and have been regulated by the Financial Services Commission of Mauritius for more than a decade.

22. I also understand that the government has alleged that Tan committed bank fraud when he deposited, on March 11, 2019, a $125,000 personal check into LaunchByte's Brookline Bank account that lacked sufficient funds. I believe that Tan did not intend to defraud Brookline Bank. It is my understanding, based in part on LaunchByte documents that I have reviewed, that Tan fully expected that a deposit of $125,000 would be made on March 11, 2019 into the account from which his personal check was drawn. I understand from these documents that in January 2019 LaunchByte negotiated and executed a consulting agreement with Michael Cormier on behalf of Chef Dazzer LLC for services whereby LaunchByte would receive $125,000 in cash and $125,000 in equity. An unexecuted copy of the consulting agreement from Chef Dazzer to LaunchByte is attached as Exhibit I. I understand that Cormier also introduced Tan to Matt Waldner who was to lend Chef Dazzer the $125,000 necessary to make the $125,000 cash payment. I understand that in connection therewith, on or about March 6, 2019, Chef Dazzer executed a promissory note to Waldner for $125,000. An unexecuted copy of the promissory note from Chef Dazzer to Waldner is attached as Exhibit J. I also understand that Cormier committed to Tan that the $125,000 from Waldner would be deposited on March 11, 2019. I further understand that it was with the expectation of that deposit that Tan deposited his

personal check for $125,000 into Brookline Bank on March 11, 2019 to meet payroll and other expenses. I have been informed that the funds from Chef Dazzer were not sent leaving Tan's personal account overdrawn. In a demonstration of our family's good faith, however, I recently wired to Brookline Bank funds sufficient to cover the debt owed as a result of the overdraft.

23. Finally, while the charges against him are serious, I am confident that he will undertake a full and vigorous defense and justice will prevail. I do not believe that he has engaged in a Ponzi scheme or otherwise engaged in fraud to secure loans, which indeed are evidenced by promissory notes, or could have had any intention to defraud Brookline Bank.

24. Finally, I am certain that Tan would not bring shame and disgrace on his family by fleeing Massachusetts or the United States. I know that he is committed to defending himself and restoring his hard-earned reputation. Moreover, Tan is 25 years old, a US citizen who has lived almost all of his life in the US. He has a committed relationship with Alma Tambone who would have been his fiancé but for the present arrest, and has friends and business associates in the Boston area. He also will need to attend to his work and significant interests with startup companies which requires his immediate attention to avoid further losses.

25. The statements contained in this affidavit are based upon my personal knowledge or information made available to me which I believe to be true.

Signed this 10 day of September 2019 under the penalties of perjury.

_____
Atim Kabra

## CERTIFICATE OF SERVICE

I hereby certify that on September 12, 2019, I electronically filed the foregoing document with the United States District Court, District of Massachusetts by via the CM/ECF system. I further certify that on September 12, 2019, I served a copy of the foregoing document on all parties or their counsel.

/s/ Mark A. Berthiaume
Mark A. Berthiaume