# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,        )
                                 )
         Plaintiff,              )
                                 )   Criminal Action
v.                               )   No. 1:19-mj-02257-MBB-1
                                 )
TANMAYA KABRA,                   )
                                 )
         Defendant.              )
                                 )


BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE


PROBABLE CAUSE AND DETENTION HEARING


August 7, 2019


John J. Moakley United States Courthouse
Courtroom No. 25
One Courthouse Way
Boston, Massachusetts 02210


Linda Walsh, RPR, CRR
Official Court Reporter
John J. Moakley United States Courthouse
One Courthouse Way, Room 5205
Boston, Massachusetts 02210
lwalshsteno@gmail.com

```
1    APPEARANCES:

2    On Behalf of the Government:

3         UNITED STATES ATTORNEY'S OFFICE
          By: AUSA Christopher R. Looney
4         One Courthouse Way
          Boston, Massachusetts 02210
5         617-748-3287
          Christopher.Looney@usdoj.gov
6
     On Behalf of the Defendant:
7
          YANNETTI LAW FIRM
8         By: Gregory L. Johnson, Esq.
          44 School Street, #1000A
9         Boston, Massachusetts 02108
          617-338-6006
10        greg@yannettilaw.com

11

12

13
              Proceedings recorded by sound recording and
14              produced by computer-aided stenography

15

16

17

18

19

20

21

22

23

24

25
```

1                                    INDEX

2    WITNESS                      DIRECT   CROSS   REDIRECT   RECROSS

3    DAVID CIRILLI

4        By Mr. Looney                5                50
         By Mr. Johnson                      35

5

6                          E X H I B I T S

7

                                DESCRIPTION                    RECEIVED

8

     GOVERNMENT EXHIBITS

9

         1       Affidavit of Kevin Sheahan.....................        7

10

         2       Text communication on April 3, 2018............       11

11

         3       Text exchange dated December 16, 2018..........       14

12

         4       Brookline Bank bank statement for the period

13               December 11, 2018, to January 10, 2019........       16

14       5       Check Number 1139..............................       20

15       6       E-mail.........................................       20

16       7       Brookline Bank bank statement..................       21

17       8       Text message exchange between Mr. Kabra and
                 Brookline Bank officer.........................       23

18

         9       Personal financial statement...................       29

19

         10      Santander Bank statement for the period July

20               1, 2019, to July 31, 2019......................       32

21       11      Santander Bank statement for the period August
                 1, 2019, to August 3, 2019.....................       33

22

23

24

25

```
 1                  P R O C E E D I N G S
 2            (Recording begins at 2:31:07)
 3            THE CLERK:  United States District Court, the District
 4   of Massachusetts, is now in session, the Honorable Marianne B.
 5   Bowler presiding.  Today is August the 7th, 2019, in the case
 6   of United States versus Kabra, Magistrate Judge Action 19-2257,
 7   which will now be heard.
 8            Will counsel please identify themselves for the
 9   record.
10            MR. LOONEY:  Good afternoon.  Chris Looney on behalf
11   of the Government.
12            THE COURT:  Thank you very much.
13            MR. JOHNSON:  And good afternoon, Your Honor.  Greg
14   Johnson for Tanmaya Kabra.
15            THE COURT:  Thank you very much.
16            Ready to proceed?
17            MR. LOONEY:  Yes, Your Honor.
18            MR. JOHNSON:  Yes, Your Honor.
19            THE COURT:  All right.
20            MR. LOONEY:  The Government calls FBI Special Agent
21   Dave Cirilli.  He's right outside.
22            THE COURT:  Would you please come -- bring him
23   forward.
24            MR. LOONEY:  I'll bring him forward.
25            THE COURT:  Could I just have a docket in this case?
```

1   I just -- the cover sheet, the first page is all I need.  I'm

2   just looking for a spelling.

3          Would you please come forward and be sworn.

4          THE CLERK:  Please raise your right hand.

5          (Witness sworn.)

6          THE WITNESS:  I do.

7          THE COURT:  I'll just ask you to speak up and speak

8   into the microphone, please.

9          THE WITNESS:  Okay.

10          THE COURT:  Proceed.

11          DAVID CIRILLI, having been duly sworn by the Clerk,

12   was examined and testified as follows:

13                       DIRECT EXAMINATION

14   BY MR. LOONEY:

15   Q.   I'll take the same admonition.  I'm sometimes soft-spoken.

16          Would you state your name for the record and spell

17   your last name.

18   A.   David Cirilli, C-i-r-i-l-l-i.

19   Q.   Okay.  Special Agent, what is your position?  Who is your

20   employer?

21   A.   I work at the FBI.

22   Q.   And what is your role with the FBI?

23   A.   A special agent.

24   Q.   And what are your duties as a special agent with the FBI?

25   A.   I work on a white collar criminal squad, and I investigate

1    white collar crimes such as wire fraud, mail fraud, securities

2    fraud.

3    Q.    How long have you been working with the FBI?

4    A.    Coming up on nine years.

5    Q.    Are you familiar with an individual named Tanmaya Kabra?

6    A.    Yes.

7    Q.    When did you first become familiar with Mr. Kabra?

8    A.    Last Sunday.

9    Q.    And how did that happen?

10   A.    He was arrested.

11   Q.    And that's when you became familiar with him?

12   A.    Yes.

13   Q.    You weren't involved in the investigation prior to that?

14   A.    I was not.

15   Q.    What have you done to prepare for today's hearing?

16   A.    I read the affidavit of Special Agent Kevin Sheahan, and I

17   discussed the case with him, have been briefed on it, and I've

18   seen some documents related to it.

19   Q.    When did that preparation take place?

20   A.    The past two days.

21          MR. LOONEY:  May I approach the witness?

22          THE COURT:  You may, and you need not ask again.

23          MR. LOONEY:  I have one for the Court as well.

24   Q.    Can you open that binder in front of you to the tab marked

25   as Exhibit 1.  Do you recognize this document?

1  A.   I do.

2  Q.   What is it?

3  A.   This is the affidavit, excuse me, of Special Agent Kevin

4  Sheahan.

5  Q.   Did you review this affidavit?

6  A.   I did.

7  Q.   And did you discuss it with Special Agent Sheahan?

8  A.   I did.

9  Q.   Can you turn to the last page, and tell me whose signature

10  appears on that page.

11  A.   Kevin Sheahan.

12       MR. LOONEY:  I'd ask that Mr. Sheahan's affidavit be

13  admitted as Exhibit 1.

14       MR. JOHNSON:  No objection, Your Honor.

15       THE COURT:  Hearing no objection, it will be marked as

16  Exhibit 1 -- Government Exhibit 1 for the purpose of this

17  hearing.

18       (Government Exhibit 1 received in evidence.)

19  Q.   Let's start by discussing Mr. Kabra's personal and family

20  history.  During your preparation for this hearing, did you

21  learn where Mr. Kabra was born?

22  A.   Yes.

23  Q.   Where was that?

24  A.   New Delhi, India.

25  Q.   What citizenship status does Mr. Kabra hold?

1    A.    He has a U.S. citizenship.   He also has an overseas

2    citizenship status with India.

3    Q.    Did you do anything to investigate or understand what that

4    means, having an overseas citizenship?

5    A.    I did.

6    Q.    What did you do?

7    A.    I spoke with a member of the Department of Justice, Office

8    of International Affairs.

9    Q.    What did you learn about what that status means or

10   confers?

11   A.    We learned that it gives the holder of that free travel in

12   and out of India, and they can stay there permanently if they

13   choose.

14   Q.    During your discussion with an individual from the

15   Department of Justice, did you discuss whether there was an

16   extradition treaty between India and the United States?

17   A.    We did.

18   Q.    Does such a treaty exist?

19   A.    Yes.

20   Q.    Did he give you information about how long it takes to

21   extradite an individual from India?

22   A.    He did.

23   Q.    What did he tell you about that?

24   A.    He mentioned it was on average eight to nine years.

25   Q.    Can it can take longer than that?

1   A.   It can.

2   Q.   Do you know if Mr. Kabra has family who lives in India?

3   A.   He does.

4   Q.   And how did you learn that?

5   A.   His girlfriend said that to the investigators when -- on

6   the day of the arrest.

7   Q.   And what did she tell investigators?

8   A.   That they were traveling to London -- sorry.

9   Q.   They -- who is "they," "they were traveling"?

10  A.   Who was traveling?

11  Q.   Yes.

12  A.   Mr. Tanmaya here and his girlfriend.

13  Q.   Okay.  Where was he arrested?

14  A.   He was arrested at the airport.

15  Q.   Okay.  And were these statements given by Mr. Kabra and

16  his girlfriend at the airport?

17  A.   Repeat the question, please.

18  Q.   Were the statements you were just offering made at the

19  airport at the time of his arrest?

20  A.   Yes.

21  Q.   What did she tell you -- what did she tell agents?

22  A.   That they were traveling to London and then on to Italy

23  and that the elderly grandmother from India was going to be

24  meeting up with them.

25  Q.   Whose elderly grandmother from India?

```
 1   A.    Tan's.
 2               THE COURT:   And the ultimate destination was India?
 3               THE WITNESS:   Italy.
 4               THE COURT:   Italy.
 5   Q.    Did he have a return trip ticket?   Did he have a return
 6   ticket for his travel?
 7   A.    His return was dated for August 16th, 2019.
 8   Q.    Up until the time of his arrest, do you know where
 9   Mr. Kabra was living?
10   A.    Yeah.   He had an address in Weehawken, New Jersey.
11   Q.    That was his last residence?
12   A.    Yes.
13   Q.    Do you know who owns that residence?
14   A.    His parents.
15   Q.    Have you reviewed any communications that were obtained
16   during this investigation to or from Mr. Kabra?
17   A.    I have.
18   Q.    What types?
19   A.    E-mail and texts.
20   Q.    Can you turn in your binder to the document behind Tab 2,
21   the document that's been marked as Exhibit 2.   Are you there?
22   A.    I am on Exhibit 2.
23   Q.    Okay.   Do you recognize this document?
24   A.    I do.
25   Q.    And what is it?
```

1   A.   It's a text communication dated April 3rd -- it's a chain

2   of communications, April 3rd, 2018.

3   Q.   Between whom?

4   A.   This is between Mr. Kabra and an investor.

5   Q.   One of the investors identified in Mr. Sheahan's

6   affidavit?

7   A.   Yes.

8   Q.   Okay.

9        THE COURT:   Thank you.

10       MR. LOONEY:   I'd ask that Exhibit 2 be admitted into

11   evidence.

12       MR. JOHNSON:   Your Honor, I'd object with regard to

13   authentication, hearsay, with regard to how they obtained the

14   thread, so for those reasons I would ask it be excluded.

15       THE COURT:   This is a detention hearing.   The rules of

16   evidence are not strictly adhered to.   I'll take it.   It's

17   admitted as Government Exhibit 2 for the purpose of this

18   hearing.

19       (Government Exhibit 2 received in evidence.)

20   Q.   And how did Government investigators obtain this document?

21   A.   From the investor.

22   Q.   Okay.   When you look at this document, there are two

23   columns, correct?

24   A.   Yes.

25   Q.   Whose messages are on the left and whose are on the right?

1    A.    On the left-hand side in the lightly colored text are from

2    Mr. Kabra, and on the right-hand side in a blue coloring is

3    from the investor.

4    Q.    Okay.  Can you tell about the relationship between this

5    investor and Mr. Kabra?

6    A.    They have an investment relationship, and I also

7    understand this investor to have had an employee relationship,

8    a salaried employee with Mr. Kabra.

9         THE COURT:  For the record, is this investor referred

10   to in the affidavit?

11        MR. LOONEY:  Yes, Your Honor.

12        THE COURT:  As investor by an initial?

13        MR. LOONEY:  Yes, by initials, Investor A.

14        THE COURT:  Okay.

15   Q.    At some point in time did this investor invest $250,000

16   with Mr. Kabra?

17   A.    Yes.

18   Q.    Has that not been repaid?

19   A.    No.

20   Q.    Can you read the first text message in this chain.

21   A.    "So jealous about Paris."

22   Q.    And who wrote that?

23   A.    Mr. Kabra.

24   Q.    And who wrote the following text message?

25   A.    The investor responded.

Q. And how did the investor respond? Can you read through his responses?
A. Yes. "I'm def think about Greece and Spain in June. Loved. So jealous about Paris. Light, getting a new one overnighted by tomorrow. Let me know when you wire. Grazie mille."
THE COURT: Mille. Grazie mille.
THE WITNESS: Thank you.
A. "I need to transfer money while in France to an Italian account."
Q. Did Mr. Kabra respond to that?
A. He did.
Q. What was his response?
A. "Offshoring your stuff?"
Q. And how did this investor respond?
A. "Have been doing a little of that but need to do repairs to my house there before summer."
Q. And did Mr. Kabra respond to that?
A. He did.
Q. And what was his response?
A. "Bahamas" -- "Bahamas," excuse me, "or Mauritius?"
Q. And did -- was there an additional text?
A. There was an additional response of "My stuff is in Mauritius."
Q. And that last response was a text from Mr. Kabra?

```
 1   A.   Yes.
 2   Q.   Can you turn in your binder to the document that is behind
 3   Tab 3.  Do you recognize this?
 4   A.   I do.
 5   Q.   What is it?
 6   A.   It's an additional text chain between the investor and
 7   Mr. Kabra dated December 16th, 2018.
 8   Q.   Is it the same investor, Investor A?
 9   A.   It is.
10        MR. LOONEY:  I'd ask that Exhibit 2 be moved into
11   evidence.
12        THE COURT:  Hearing no objection?
13        MR. JOHNSON:  Correct, Your Honor.
14        THE COURT:  Government Exhibit 2 is --
15        THE CLERK:  Government Exhibit 3.
16        MR. LOONEY:  This is moved in as Government Exhibit 3.
17        THE COURT:  3, all right.  Government Exhibit 3 is
18   made part of the record for the purpose of this hearing.
19        (Government Exhibit 3 received in evidence.)
20   Q.   Can you just read through the text that's on the left-hand
21   side -- and those are from whom, the ones on the left-hand
22   side?
23   A.   On the left-hand side is Mr. Kabra, and on the right-hand
24   side --
25   Q.   Can you read through the text messages in the middle of
```

1  the page from Mr. Kabra starting with "Yeah."

2  A.   "Yeah, man.  You have no idea how badly I want/need this

3  to work.  My outflow is 400K a month now.  I'm down to my last

4  2M in the bank, that means five months.  That's personal

5  savings, et cetera."

6  Q.   You can stop there.

7        During your preparation for this hearing and your

8  review of records, did you identify any accounts associated

9  with Mr. Kabra, any bank accounts associated with Mr. Kabra

10  that held $2 million at or around the time of this text message

11  chain?

12  A.   We did not.

13  Q.   What's the date of this text message chain?

14  A.   December 16th, 2018.

15  Q.   So you didn't identify any accounts associated with

16  Mr. Kabra that held $2 million at or around December 16th,

17  2018?

18  A.   We did not.

19  Q.   Can you flip to the next exhibit in the binder, please.

20  Can you tell us -- do you recognize this document?

21  A.   I do.

22  Q.   Can you tell us what this is?

23  A.   It's a bank statement from Brookline Bank.

24  Q.   For what entity?  Who is the account holder on this?

25  A.   LaunchByte.io, LLC.

1    Q.    And what time period is covered by this account?

2    A.    December 11, 2018, through January 10th, 2019.

3          MR. LOONEY:   I'd ask that exhibit -- that this

4    document be moved into evidence as Exhibit 4, please.

5          THE COURT:   Hearing no objection?

6          MR. JOHNSON:   No objection, Your Honor.

7          THE COURT:   Government Exhibit 4 is admitted for the

8    purpose of this hearing.

9          (Government Exhibit 4 received in evidence.)

10   Q.    I want to take a look at the transactions occurring in

11   this account on or around December 16, 2018, the same date as

12   the text messages we just looked at.  Can you get there in this

13   statement?  Which page are you looking at in the statement?

14   A.    Page 2.

15   Q.    According to this bank statement, how much money was in

16   this bank account on December 16th, 2018?

17   A.    Approximately $6,434.

18   Q.    Okay.  Do you see an entry on the middle of this page

19   dated December 13th -- December 13th, 2018, for a check, Check

20   Number 1139?

21   A.    Yes.

22   Q.    Okay.  And that line on this statement shows a debit of

23   $88,000 on that date; is that right?

24   A.    Yes.

25   Q.    Have you seen a check affiliated with that line item?

1   A.   I have.

2   Q.   Can you turn to Exhibit 5, please.  Do you recognize this

3   document?

4   A.   I do.

5   Q.   Is this the check associated with that line item in the

6   bank statement?

7   A.   It is.

8   Q.   And how do you know that?

9   A.   Check Number 1139 in the upper right-hand corner, the date

10  is 12/13/2018 for when it was deposited, and in the upper

11  left-hand corner it refers to LaunchByte.io, LLC.

12  Q.   Is the amount of the dollar figure on this check that it's

13  drawn for the same as the line item on the bank statement?

14  A.   Yes.

15  Q.   Okay.  Without using the individual's name, do you know to

16  whom this check was written?

17  A.   I do.

18  Q.   And what was the relationship between that person and

19  Mr. Kabra?

20  A.   They were solicited to be an investor with Mr. Kabra.

21  Q.   Did they actually invest with Mr. Kabra?

22  A.   And they did.

23  Q.   Did this check clear?

24  A.   No.

25  Q.   What happened to the check?

1    A.    It was returned.

2    Q.    And why was that?

3    A.    It left the bank account in a negative position of

4    $81,408.

5    Q.    And that's reflected on -- back on Exhibit 4?

6    A.    Yes, on Page 2.

7    Q.    There's a line item "Return item of $88,000"?

8    A.    Yes.

9    Q.    That's the reversal of this transaction?

10   A.    Yes.

11   Q.    So is it correct to say that at the same time he told one

12   investor he had $2 million, he wrote a check to another

13   investor for $88,000, and that check was returned for

14   insufficient funds?

15   A.    Yes.

16   Q.    Can you turn to the first page of that same document,

17   Exhibit 4, please.

18              What date does this bank statement cover?

19   A.    The dates December 11th, 2018, through January 10, 2019.

20   Q.    So a one-month period?

21   A.    Yes.

22   Q.    What is the total amount of credits that accrued into this

23   account over that one-month period?

24   A.    Roughly $573,000.

25   Q.    And what is the total amount of debits that flowed out of

 1    this account during that same period of time?

 2    A.    Roughly $570,000.

 3    Q.    So roughly $570,000 flowed into this account over that

 4    one-month period?

 5    A.    Roughly $573,000 went into the account, and roughly

 6    $570,000 went out of the account.

 7    Q.    I'm going to ask you to turn to Exhibit -- to the next

 8    document behind Tab 6.  Do you recognize this document?

 9    A.    I do.

10    Q.    And was this a document that was obtained by investigators

11    during the course of the investigation?

12    A.    Yes.

13    Q.    And what is this document?

14    A.    It's an e-mail.

15    Q.    Okay.  Can we go to the bottom of the last page of this

16    document to the first e-mail in the chain.  Are you there?

17    A.    I am.

18    Q.    And who sent the first e-mail in this chain?

19    A.    Mr. Kabra.

20         MR. LOONEY:  I'd ask that this document be admitted as

21    Exhibit 6.

22         THE COURT:  I think you didn't move on 5.

23         MR. LOONEY:  Oh, I'd also ask that the document that

24    is behind Tab 5 be admitted as Exhibit 5.

25         MR. JOHNSON:  No objection, Your Honor.

1          THE COURT:  All right.  Hearing no objection as to

2     both Government Exhibits 5 and 6, they'll be made part of the

3     record for the purpose of this hearing.

4               (Government Exhibits 5 and 6 received in evidence.)

5     Q.    Staying at the first e-mail in this chain, what is the

6     date of that e-mail?

7     A.    March 14, 2019.

8     Q.    And it's an e-mail from Mr. Kabra?

9     A.    Yes.

10    Q.    And, again, without identifying the individual, can you

11    tell us to whom it was sent?

12    A.    It's sent to a business address of a business banking

13    officer for Brookline.

14    Q.    Okay.  Can you read this e-mail?

15    A.    "Saw you called me.  I am at the Northwestern Mutual

16    office sorting out an issue with my brokerage account that has

17    caused the issue with Brookline Bank.  Working on getting it

18    resolved ASAP and wiring in.  The other check tomorrow should

19    also take care of it.  Sorry and thanks.  Best Tan Kabra,

20    founder and managing director of the LaunchByte Group."

21    Q.    Do you know what the issue with Brookline Bank referred to

22    in that e-mail was?

23    A.    Yes.

24    Q.    What is it?

25    A.    Money that was deposited in the account.

1    Q.    A sum of money was deposited in the account.

2              Can I ask you to turn to Exhibit 7.  Do you recognize

3    this document?

4    A.    I do.

5    Q.    And what is this document?

6    A.    It's a bank statement for Brookline Bank.

7    Q.    And what entity holds that account?

8    A.    LaunchByte.io, LLC.

9              MR. LOONEY:  I'd ask that Exhibit 7 be admitted into

10   evidence.

11             THE COURT:  Hearing no objection, Government Exhibit 7

12   is made part of the record for the purpose of this hearing.

13             (Government Exhibit 7 received in evidence.)

14   Q.    So starting at the first transaction identified on this

15   bank statement, what is that transaction?

16   A.    It's a deposit of $125,000.

17   Q.    And what did that bring the balance in this account to?

18   A.    $124,885.

19   Q.    And is it fair to say that from that point over -- and

20   what was the date of that first transaction?

21   A.    March 11th, 2019.

22   Q.    Is it fair to say over the next two days, March 11th and

23   March 12th, there were a series of debits from this account?

24   A.    Yes.

25   Q.    From this bank statement, can you determine what the

1   balance in this account was at the end of the day on March

2   12th, 2019?

3   A.   It was $675.

4   Q.   And which page do you see that on?

5   A.   Page 3.

6   Q.   And that's at the close of business on March 12, 2019?

7   A.   Yes.

8   Q.   What's the next transaction that occurs in this account?

9   A.   There's a chargeback.

10  Q.   Of what amount?

11  A.   $124,300 -- excuse me, $125,000.

12  Q.   And is that a reversal of that first transaction we saw,

13  that deposit, the $125,000?

14  A.   It is.  It is.

15  Q.   Do you know what occurred that led to that reversal?

16  A.   There were no funds from the offsetting bank that the

17  check was drawn on.

18  Q.   So the check was written from a bank with no funds and

19  deposited in this account?

20  A.   Correct.

21  Q.   And is -- do you understand this to be the issue referred

22  to in that e-mail?

23  A.   I do.

24       MR. LOONEY:  I apologize.  If I haven't moved Exhibit

25  7 into evidence, I ask that it be admitted.

```
 1              THE COURT:  You have.

 2              MR. LOONEY:  I have.  Thank you.

 3   Q.   Can we turn now to Exhibit 8, please.

 4              Do you recognize this document?

 5   A.   I do.

 6   Q.   And what is it?

 7   A.   Text communications with the bank officer at Brookline

 8   Bank.

 9   Q.   Between whom and --

10   A.   Between Tan and the bank officer.

11   Q.   So this is a series of text exchanges between Mr. Kabra

12   and an employee of Brookline Bank?

13   A.   Correct.  Thank you.

14   Q.   Is it the same employee that that e-mail was sent to?

15   A.   Yes.

16              MR. LOONEY:  I'd ask that Exhibit 8 be admitted into

17   evidence.

18              THE COURT:  All right.  Hearing no objection,

19   Government Exhibit 8 is made part of the record for the purpose

20   of this hearing.

21              (Government Exhibit 8 received in evidence.)

22   Q.   Can you turn to the text messages dated Friday, March

23   15th, 8:17 a.m.  Are you there?

24   A.   Yes.

25   Q.   And this is the day after Mr. Kabra's account at Brookline
```

1    Bank turned negative by $124,000?

2    A.    Yes.

3    Q.    Can you read those -- the text messages on that date and

4    at 8:17 a.m.?

5    A.    "Please follow up on this first thing.  It cannot stay in

6    this status."

7    Q.    And who sent that text?

8    A.    The bank employee.

9    Q.    Did Mr. Kabra respond?

10   A.    He did.

11   Q.    And what was his response?

12   A.    "All set.  My dad will send a wire from Singapore.  Just

13   talked to him.  Then I'll wire back once the check I'm

14   expecting comes in today or mon."

15   Q.    Do you know if Brookline Bank received any such wire from

16   Singapore?

17   A.    They have not.

18   Q.    You mentioned at the start of your testimony that you

19   reviewed some bank records; is that right?

20   A.    Yes.

21   Q.    As preparation for this hearing?

22   A.    Yes.

23   Q.    Can you provide any information concerning the number of

24   bank accounts that have been used by Mr. Kabra since 2017?

25   A.    I have seen at least six bank accounts.

1   Q.   So he's used or had access to six banks since 2017?

2   A.   Yes.

3   Q.   Are they all with the same bank or with different banks?

4   A.   Different banks.

5   Q.   Are there multiple accounts at the same bank?

6   A.   Yes.

7   Q.   Can you provide information regarding the number of credit

8   card accounts?

9          THE COURT:  Are those accounts still open?

10         THE WITNESS:  I don't have the answer to that.  I know

11  in at least one instance there's a closing -- there's a closed

12  account.

13  Q.   Are you aware of some accounts that are still open?

14  A.   I am.

15  Q.   So there are some that are open and some that are closed?

16  A.   Yes.

17         THE COURT:  Do you have any -- can you specify by

18  number the open accounts?

19         THE WITNESS:  I can't.

20         THE COURT:  You can?

21         THE WITNESS:  I can't recall.

22         THE COURT:  You can't, all right.

23  BY MR. LOONEY:

24  Q.   And just to be clear, when you said six bank accounts, do

25  you know whether that encompasses all the accounts used by

1    Mr. Kabra?

2    A.    I don't.

3    Q.    There can be other accounts?

4    A.    Yes.

5    Q.    Can you provide information concerning the number of

6    credit cards that Mr. Kabra has used or had access to since

7    2017?

8    A.    In that same time frame there was at least six.

9    Q.    Are they with the same issuer or different issuers?

10   A.    Different.

11   Q.    And do you know whether those are still open or closed?

12   A.    I don't know.

13   Q.    Focusing only on the investors who were identified in

14   Mr. Sheahan's affidavit, do you have any information about the

15   amount of money that had been invested with Mr. Kabra that has

16   not yet been repaid?

17   A.    I do.

18   Q.    And what is that?

19   A.    It's over $750,000.

20   Q.    As of now, do you know whether members of the

21   investigation team have been able to trace all of that

22   $750,000?

23   A.    Not to my knowledge.

24   Q.    Do you know whether there are additional potential victims

25   that have come forward or that have been identified?

```
 1   A.   I do.

 2   Q.   And how do you know that?

 3   A.   Phone calls have been coming in.

 4   Q.   Since when?

 5   A.   Yesterday.

 6   Q.   From your review of bank records associated with this

 7   case, did you observe whether Mr. Kabra executed any wire

 8   transfers overseas?

 9   A.   I did.

10   Q.   Do you have any information about the size of those wire

11   transfers?

12   A.   In some cases they were over $5,000.

13   Q.   Were there multiple such transfers?

14   A.   There were.

15   Q.   From your review of bank records associated with this

16   case, do you know whether Mr. Kabra has transferred money from

17   his personal bank accounts to business accounts associated with

18   LaunchByte or the Kabra Group or vice versa?

19   A.   Yes.

20   Q.   So such transfers have occurred?

21   A.   I have seen that.

22   Q.   Do you know whether funds provided by investors to

23   Mr. Kabra have been deposited into Mr. Kabra's personal

24   accounts?

25   A.   Yes.
```

1   Q.   That has occurred?

2   A.   That has occurred.

3   Q.   I'd ask you to turn now to Exhibit 8 in your binder, and

4   what is this document?  Sorry.  This is Exhibit 9.  I

5   apologize.

6   A.   Yeah, sorry.  Exhibit 9 is a personal financial statement.

7   Q.   Do you know how -- know how investigators obtained this

8   document?

9   A.   Yes.

10   Q.   And how was that?

11   A.   From an investor.

12   Q.   Do you know who provided it to that investor?

13   A.   Mr. Kabra.

14   Q.   Let's look at the information on here.  Starting in the

15   upper left -- or actually, I'd ask first that Exhibit 8 be

16   admitted into evidence.

17          MR. JOHNSON:  No objection, Your Honor.

18          THE COURT:  8 is in.  Now this is 9.

19          MR. LOONEY:  I apologize.

20          THE CLERK:  Counsel, it's just two pages?

21          THE COURT:  Government Exhibit 9 is admitted and made

22   part of the record for the purpose of this hearing.

23          MR. LOONEY:  It's three pages.  I'll provide it to

24   you.

25          THE CLERK:  Thanks.

```
 1              (Government Exhibit 9 received in evidence.)
 2    Q.   Starting at the section of this document marked as Part 1,
 3    what is the name listed on this personal financial statement?
 4    A.   Tanmaya Kabra.
 5    Q.   And who is listed as the employer in this document?
 6    A.   LaunchByte.io, LLC.
 7    Q.   And what's the address associated with that business?
 8    A.   715 Boylston Street, Suite 120.
 9    Q.   And what is Mr. Kabra's title identified as?
10    A.   Chief executive officer.
11    Q.   Moving to Section 2 of this document, the caption of that
12    is "Financial Information," correct?
13    A.   Yes.
14    Q.   And there's a section for annual income?
15    A.   Yes.
16    Q.   And there's a line item for salary?
17    A.   Yes.
18    Q.   What is the salary -- what is Mr. Kabra's salary according
19    to this document?
20    A.   $300,000.
21    Q.   And, actually, I would like to pause and turn to the last
22    page.  Do you know what the date of this document is?
23    A.   It is signed by Mr. Kabra, December 20th, 2017.
24    Q.   So the amount listed for his salary for that year is
25    $300,000?
```

1    A.    Yes.

2    Q.    And what other income did he receive that year?

3    A.    Bonuses and commissions of $800,000, consulting income of

4    $250,000.

5    Q.    And so, according to this document, what is Mr. Kabra's

6    total income?

7    A.    $1.35 million.

8    Q.    Going to "Assets," the first line item is cash and

9    savings.  What amount of assets are identified in that line

10   item?

11   A.    Cash and savings of $100,000.

12   Q.    Going to the next line item, "Marketable Securities," what

13   amount is identified for that line item?

14   A.    Marketable securities is listed as crypto $1 million.

15   Q.    What are cryptocurrencies?

16   A.    Cryptocurrencies are a virtual currency.  They often use

17   blockchain technology for encryption and to remain anonymous.

18   Q.    Are they easily traceable funds?

19   A.    No.

20   Q.    Do you know whether the investigation has identified any

21   accounts holding $1 million in cryptocurrency associated with

22   Mr. Kabra?

23   A.    I'm not aware of any.

24   Q.    Skipping down to "Ownership Interest in Businesses," what

25   amount is listed there?

1   A.   $16,462,500.

2   Q.   What is the next line item below that?

3   A.   Profit-sharing and other vested retirement accounts for

4   $700,000.

5   Q.   Do you know whether the investigation has identified any

6   profit-sharing or vested retirement accounts held by Mr. Kabra

7   in the amount of $700,000?

8   A.   I am not aware of any.

9   Q.   And what figure is listed as Mr. Kabra's total assets on

10   this form?

11   A.   Total assets, $19,762,500.

12   Q.   And what is your understanding of what Mr. Kabra did with

13   this document?

14   A.   He provided it to the investor in the context of telling

15   him he could guarantee his investment.

16   Q.   I would like to look at one more set of documents.   Can

17   you turn to the document marked as Exhibit 10 behind Tab 10.

18        And what is this document?

19   A.   This is a bank statement from Santander.

20   Q.   Okay.   What is the entity that holds this account?

21   A.   LaunchByte Ventures, LLC.

22   Q.   And what period is covered by this bank statement?

23   A.   July 1st, 2019, to July 31st, 2019.

24        MR. LOONEY:   I'd ask that Exhibit 10 be admitted into

25   evidence.

```
 1              MR. JOHNSON:  No objection, Your Honor.
 2              THE COURT:  Thank you.  Government Exhibit 10 is made
 3    part of the record for the purpose of this hearing.
 4              (Government Exhibit 10 received in evidence.)
 5    Q.   And this statement covers a period up until July 31st,
 6    2019, right?
 7    A.   Yes.
 8    Q.   It's about a week ago?
 9    A.   Yes.
10    Q.   Can you tell me what the balance was in this account as of
11    one week ago?
12    A.   Negative $31,609.
13    Q.   Have you reviewed records of any transactions that
14    are -- transactions taking place in this account that occurred
15    after July 31st, 2019?
16    A.   Yes.
17    Q.   Can I ask you to turn to the next exhibit.
18              THE COURT:  For the record, this would be Government
19    Exhibit 11?
20              MR. LOONEY:  Yes, Your Honor.  I'll move it in in just
21    one moment.
22    Q.   What is this document?
23    A.   It's an account inquiry for the Santander account that we
24    just looked at.
25    Q.   Same account?
```

1    A.    Same account.

2    Q.    What period does it cover?

3    A.    August 1st, 2019, to August 3rd, 2019.

4    Q.    Okay.  It's about four days ago?

5    A.    Yes.

6          MR. LOONEY:  I'd ask this document be moved in as

7    Government Exhibit 11.

8          MR. JOHNSON:  No objection, Your Honor.

9          THE COURT:  All right.  It will be marked as

10   Government Exhibit 11 and admitted for the purpose of this

11   hearing and made part of the record.

12         (Government Exhibit 11 received in evidence.)

13   Q.    And according to this bank -- this record of transactions,

14   what was the balance in the Santander account for LaunchByte

15   Ventures as of August 3rd, 2019?

16   A.    Negative $31,679.

17   Q.    And that was last Saturday?

18   A.    Yes.

19   Q.    And when was Mr. Kabra arrested?

20   A.    On Sunday.

21   Q.    Where was he arrested?

22   A.    At the airport.

23   Q.    Where was he going?

24   A.    London and then on to Italy.

25   Q.    And what was the purpose of that?

1   A.   Vacation.

2   Q.   Was there any other special purpose?

3   A.   He had mentioned that he planned to propose to his

4   girlfriend.

5   Q.   Do you know if there was anything notable -- do you know

6   whether Mr. Kabra was carrying anything notable at the time he

7   was traveling?

8   A.   He mentioned he had an expensive engagement ring in his

9   bag.

10  Q.   Did he describe it or say why it was expensive?

11  A.   He mentioned the quality and the clarity was high.

12  Q.   So it was a large high-quality diamond?

13  A.   Yes.

14  Q.   And it was, according to him, very expensive?

15  A.   Yes.

16  Q.   Do you know where Mr. Kabra acquired that ring?

17  A.   We do.

18  Q.   How did you find out?

19  A.   We spoke to the manager at Shreve, Crump & Low.

20  Q.   How did you get in touch?

21  A.   He called the FBI.  He had been made aware of Mr. Kabra's

22  arrest and was worried.

23  Q.   Following that complaint, did you learn how Mr. Kabra

24  acquired the ring?

25  A.   He paid with a personal check for $35,000.

1    Q.    Written on what bank?

2    A.    Santander.

3    Q.    Okay.  Do you know one way or the other whether it was the

4    same Santander account we were just looking at?

5    A.    I don't know.

6    Q.    You don't know.  Do you have any information regarding

7    whether that check would clear?

8    A.    We spoke with the manager.  That was one of his concerns

9    initially when he called was whether the check would clear.  We

10   spoke to him recently, as recently as today.  We learned that

11   the ring was returned by the girlfriend.

12   Q.    By whom?

13   A.    The girlfriend of Mr. Kabra.

14   Q.    Mr. Kabra's girlfriend?

15   A.    Mr. Kabra's girlfriend.

16   Q.    Did she give you any information or did she provide any

17   information to the jeweler regarding whether the check would

18   clear?

19   A.    She said to him that the check was likely to bounce.

20         MR. LOONEY:  Nothing further.

21         THE COURT:  Cross-examination?

22         MR. JOHNSON:  Thank you, Your Honor.

23                          CROSS-EXAMINATION

24   BY MR. JOHNSON:

25   Q.    Good afternoon, sir.

1    A.    Good afternoon.

2    Q.    So were you present when Mr. Kabra was arrested on Sunday?

3    A.    I was not.

4    Q.    And you learned of the arrest in the day after or that

5    evening?

6    A.    I learned that there was an arrest that evening.  I

7    learned about the details Tuesday.  I was out on Monday.

8    Q.    And that's when you began preparing for today's hearing;

9    is that correct?

10   A.    Correct.

11   Q.    You got up to speed by talking with Special Agent Sheahan;

12   is that accurate?

13   A.    It is.

14   Q.    So you played no role whatsoever in the actual

15   investigation of Mr. Kabra?

16   A.    I did not.

17   Q.    And met with the Assistant United States Attorney in order

18   to get ready for today's hearing?

19   A.    Correct.

20   Q.    And went over the information that you just testified to

21   today?

22   A.    Correct.

23   Q.    Now, you at no point were told by any of the agents or law

24   enforcement involved that Mr. Kabra put up any struggle when he

25   was arrested, were you?

1    A.    No.

2    Q.    And he was taken off of the airplane and taken into

3    custody and booked in the ordinary fashion; is that what you

4    would conclude from the fact that you didn't hear otherwise?

5    A.    That's my understanding.

6    Q.    Okay.  And did he have any cash on his person when he was

7    arrested?

8    A.    I don't know.

9    Q.    Did you -- do you know if law enforcement ever documented

10   or was able to inspect the ring that you were just testifying

11   to?

12   A.    I don't believe they did.  I don't have a recollection of

13   that.

14   Q.    And were you told that Mr. Kabra's United States passport

15   was seized by law enforcement when the arrest took place?

16   A.    I'm aware of that.

17   Q.    And were you also aware that there was a travel card

18   issued by India that was also seized by law enforcement?

19   A.    I am aware of that.

20   Q.    And were you told that law enforcement actually took that

21   card and ripped it into pieces?

22   A.    I'm not aware of that.

23   Q.    Now, you testified at the outset that Mr. Kabra had dual

24   citizenship; is that your testimony?

25         THE COURT:  No, that was not the testimony.

```
 1    Q.    What was your testimony, if you could refresh our
 2    recollection, regarding the dual nature?
 3    A.    Well, my understanding was that he's a U.S. citizen but he
 4    also has overseas citizenship status with India.
 5    Q.    So citizenship status but not actually a dual citizen,
 6    correct?
 7    A.    I'm not familiar with the technical response.  That's the
 8    response that I received.
 9    Q.    Special Agent, are you aware that India does not allow for
10    dual citizenship?
11    A.    I am not aware of that.
12    Q.    Now, you learned that he was born in New Delhi, India,
13    correct?
14    A.    I did.
15    Q.    And did you also learn that his family brought him to New
16    Jersey when he was about a year and a half old?
17    A.    I'm not aware of that.
18    Q.    And were you also aware of the fact that he spent about 80
19    percent of his life in the United States of America and not in
20    India?
21    A.    I'm not aware of that.
22    Q.    So you didn't review that with the Government in preparing
23    for today's hearing?
24    A.    I did not.
25    Q.    And do you know if Mr. Kabra -- do you know if any agents
```

1  reached out to Mr. Kabra prior to the arrest to attempt to

2  effectuate an interview of him?

3  A.   I don't know.

4  Q.   Do you know whether the girlfriend that you referenced in

5  your testimony was interviewed other than the fact that it took

6  place following the arrest?

7  A.   Other than that, I don't know.

8  Q.   So you are not aware of any statements made by either

9  individual in connection with the investigation?

10  A.   Outside of those comments, no.

11  Q.   Now, the bank accounts, I was a little fuzzy on your

12  knowledge as to the accounts that you were able to track that

13  are somehow connected with Mr. Kabra.  Just to begin, so you

14  weren't involved with actually researching these accounts, were

15  you?

16  A.   I was not.

17  Q.   So all the information that's coming to you is we'll call

18  it secondhand, correct?

19  A.   It was told to me and then I saw the underlying documents.

20  Q.   Okay.  And do you recall who the account holders were of

21  each of the six accounts?

22  A.   Again, I looked at statements, so I saw a name on a

23  statement.  For instance, Mr. Kabra's -- excuse me.  I'm not

24  pronouncing his last name well enough -- on a statement or

25  LaunchByte.io, LLC or LaunchByte Ventures.

1   Q.   So there were multiple different names that were utilized

2   in these specific accounts, correct?

3   A.   From the statements I saw.

4   Q.   All right.  And as of the moment in time when you actually

5   reviewed these accounts, are you able to testify today as to

6   the approximate total balance of these six accounts?

7   A.   Like I said, I have a recollection of one of them being

8   closed because they were in a negative status.  I certainly saw

9   some low balances, but I can't put a specific number on it.

10  Q.   Do you recall the highest dollar balance that you saw?

11  A.   I cannot.

12  Q.   And so I presume the closed account would have been the

13  Brookline Bank account that we -- the prosecution introduced

14  the statement from, correct?

15  A.   I believe that is the account, yes.

16  Q.   The one with a $125,000 transaction that you testified to?

17  A.   I believe that's the account, yes.

18  Q.   And then another account, Exhibit 11, that's before the

19  Court, that shows a negative $31,000 balance, correct?

20  A.   It does.

21  Q.   And do you know whether either of the other four accounts

22  show positive or negative balances?

23  A.   I can't recollect.

24  Q.   So you have no ability to testify today as to what access

25  to funds Mr. Kabra may have at this point in time?

1  A.   Actually, I think I am aware that he told pretrial

2  services that he had $65 in his personal bank account.

3  Q.   Other than that $65, do you have any knowledge that there

4  is additional monies that he has access to?

5  A.   I don't know.

6  Q.   Do you know if there is any -- you also testified about

7  overseas wire transfers.  Do you remember those?

8  A.   Yes.

9  Q.   And where were they sent from?

10 A.   I can't recall the exact account, which account it was.

11 Q.   And do you know when they were sent?

12 A.   The period that I was reviewing would have been 2018.

13 Q.   So sometime during that calendar year?

14 A.   Yes.

15 Q.   Do you recall the approximate value of those transfers

16 that were sent?

17 A.   As I mentioned, there was $5,000, and then there were some

18 more than that.

19 Q.   Were these transfers coming in from overseas or going out?

20 A.   I saw them going out.

21 Q.   Anything coming in?

22 A.   I can't recollect.

23 Q.   And you don't have the knowledge as to who might be on the

24 other end receiving those wire transfers, correct?

25 A.   I don't know.  I don't know.

1  Q.   Did you see any international wire transfers during the

2  2019 calendar year?

3  A.   Nothing specific is coming to my mind.

4  Q.   This Exhibit Number 9, the Brookline Bank personal

5  financial statement, you're familiar with that document,

6  correct?

7  A.   Yes.

8  Q.   And that's dated December 20th, 2017, just reading from

9  the exhibit.  That's accurate, correct?

10 A.   Yes.

11 Q.   And who is this document provided to?

12 A.   An investor.

13 Q.   Which one?

14 A.   Investor C.

15 Q.   And who is that person?

16         MR. LOONEY:  I ask that -- objection -- not to use the

17 name of the victim.

18         THE COURT:  Sustained.

19 Q.   Do you know my client's relationship to that person?

20 A.   I believe my recollection is he met them at a party.

21 Q.   And so do you know why -- or strike that.

22         Did you or any other members of the investigative

23 team make efforts to look into the net worth that was put on

24 this personal financial statement back in the summer of 2017?

25 A.   One more time, please.

1          MR. LOONEY:  Objection.  Not sure what it's asking

2    for.

3          THE COURT:  You want to rephrase it?

4          MR. JOHNSON:  Sure.  I'll narrow it down, Your Honor.

5    Q.   Did you look at, you or somebody from the FBI that

6    investigated this case, look into the amount of cash and

7    savings that Mr. Kabra had in December of 2017?

8    A.   Not to my knowledge.

9    Q.   What about the crypto, the marketable securities

10   cryptocurrency; did you investigate that currency in any

11   fashion?

12   A.   I did not, and not to my knowledge for anybody else.

13   Q.   And the ownership and interest in businesses, did you or

14   somebody else attempt to verify that dollar figure?

15   A.   Not to my knowledge.

16   Q.   The remaining two, the profit-sharing and then the

17   personal property?

18   A.   Not to my knowledge.

19   Q.   Does Mr. Kabra -- strike that.

20          And so Investor C provided this document to the

21   investigative team as part of the investigation, I presume?

22   A.   Yes.

23   Q.   And likewise, for Exhibit Number 8, the text messages that

24   were introduced?

25          MR. LOONEY:  Objection.  It's not clear that he's

1    suggesting that the same person provided both sets.

2            MR. JOHNSON:  I can rephrase, if necessary, Your

3    Honor.

4            THE COURT:  Just rephrase.

5            MR. JOHNSON:  I'm sorry.  I didn't hear the Court.

6            THE COURT:  Just rephrase it.

7            MR. JOHNSON:  Oh, understood.  Thank you.

8    Q.   Exhibit Number 8, which investor sent those messages to

9    the investigators?

10           MR. LOONEY:  Objection.  It technically wasn't sent by

11   an investor in the scheme.

12   Q.   Do you know how the prosecution team obtained Exhibit

13   Number 8?

14   A.   From the witness.

15   Q.   And was that one of the investors?

16   A.   This was not one of the investors.

17   Q.   Was this one of the bankers?

18   A.   This was one of the bankers.

19   Q.   Now, Special Agent, did you or somebody from the FBI in

20   March of 2019, at the time of the $125,000 transaction that was

21   discussed as it pertains to Exhibit Number 7, did you make any

22   efforts to look into any bank transactions outside of Brookline

23   Bank, if that makes sense?

24           MR. LOONEY:  Objection.  I think he's testified that

25   he's reviewed bank records and a number of bank records were

1   obtained in the investigation.

2        THE COURT:  He may answer if he can.

3   A.   Clarification, please.

4   Q.   Did you see any transactions in that amount coming into

5   other banks?

6   A.   On that day, March 11th?

7   Q.   In March of 2019.

8   A.   I don't have a recollection of that.

9   Q.   Do you know whether there were any business deals or

10  contracts that were entered into by Mr. Kabra and a potential

11  investor in March of 2019 for that approximate dollar value?

12  A.   I don't know.

13  Q.   Other than referring to Exhibit 2, sir, other than the

14  text message that's about two thirds of the way down that page,

15  "My stuff is in Mauritius" that was allegedly sent by Tan

16  Kabra, did you or any other investigators attempt to perform

17  research or an investigation as to whether there was anything

18  in that country related to Mr. Kabra?

19  A.   I'm not aware of any.

20  Q.   And are you aware of any business dealings that he had

21  there?

22  A.   I'm not.

23  Q.   Or any relationships whatsoever that he had with anybody

24  in that country?

25  A.   I'm not.

1   Q.   What about other foreign countries, other than the

2   outgoing international wire transfers that you testified to;

3   you're not aware of any other business relationships overseas,

4   are you?

5   A.   No.

6   Q.   Other than the fact that Mr. Kabra's parents -- strike

7   that.

8        Let's go back to the trip that was supposed to start

9   on Sunday.  You learned that there was in fact a return flight

10   that was planned, correct?

11   A.   Yes.

12   Q.   And the trip was supposed to go initially to London and

13   then on to Mulan; is that your memory?

14   A.   That's my understanding.

15   Q.   And you learned from the -- I believe you testified the

16   girlfriend is a person that told you that there was a

17   grandparent that was going to be meeting them in the U.K. at

18   some point?

19   A.   They didn't tell me that -- she didn't tell me that,

20   excuse me, but that's been relayed to me.

21   Q.   That was relayed to you from a different investigator,

22   correct?

23   A.   Correct.

24   Q.   Do you know where that grandparent resided?

25   A.   My understanding was India.

1   Q.   And was traveling from India to the U.K. to see her

2   grandson, correct?

3   A.   I'm not sure where the stop was for the meet, but there

4   was going to be a meeting up.

5   Q.   And you also testified earlier that the extradition

6   period -- or strike that.  Let me withdraw the question.

7        Who told you about the eight- or nine-year wait for

8   getting somebody back from a foreign country?

9        MR. LOONEY:  Objection, not a wait.  He didn't testify

10  there was a waiting period or anything like that.

11       THE COURT:  A waiting period.

12       MR. JOHNSON:  That was my understanding of the

13  testimony, Your Honor.  I don't think it's an unfair

14  characterization.

15       THE COURT:  Yes, yes.

16  Q.   Who told you that?

17  A.   We spoke to a member of the Department of Justice.

18  Q.   And located in India or in the United States?

19  A.   I believe they were in the United States when we were

20  calling them.

21  Q.   Who was this person?

22  A.   I can't recall their name right now.

23  Q.   So it was just somebody at the Department of Justice that

24  you called to inquire about --

25  A.   It was a male.

1   Q.   -- the history in terms of getting people back from India

2   that have outstanding warrants?

3   A.   Well, they had dealt with India.  So that was more their

4   responsibility, so that's why we called them.  And, again, I

5   don't have the exact name of the person.

6   Q.   Did they tell you whether the person would be held in

7   custody during that eight- or nine-year time period they would

8   take to get somebody back from there?

9   A.   That wasn't discussed.

10  Q.   Did they tell you -- I know you've already testified to

11  this, but they did confirm the extradition -- the extradition

12  treaty, correct?

13  A.   Yes.

14  Q.   And did you discuss with them if a person were to sign a

15  waiver of extradition, how that would affect the eight- or

16  nine-year waiting period?

17  A.   We didn't discuss that.

18  Q.   Do you know the last time that Mr. Kabra actually went to

19  India?

20  A.   I can't recall.

21  Q.   What about the last time he traveled internationally; do

22  you have any information about that?

23  A.   The information I have is that in the past year he's had

24  16 overseas travels.

25  Q.   And who told you that?

```
 1    A.   I looked at his passport.
 2    Q.   Okay.  And do you know where those travels were to?
 3    A.   I can't say off the top of my head.
 4    Q.   And do you know the duration of each of those trips or the
 5    purposes of those trips?
 6    A.   I cannot recite that.
 7    Q.   Do you know where Mr. Kabra's girlfriend's family resides,
 8    sir?
 9    A.   I don't.
10    Q.   Are you familiar with the fact that Mr. Kabra's family
11    actually owns real estate in the State of New Jersey?
12    A.   My understanding is his parents live in Singapore and own
13    a home in this property in Weehawken.
14    Q.   Are you aware that they spend at least a month at that
15    residence every single year, sir?
16    A.   I'm not aware of that.
17         MR. JOHNSON:  May I just have a brief moment, Your
18    Honor, to look through the exhibits?
19         THE COURT:  Take your time.
20         (Pause.)
21         MR. JOHNSON:  Nothing further, Your Honor.
22    Thank you very much.
23         THE COURT:  Any redirect?
24         MR. LOONEY:  Just very briefly to make one point.
25                        REDIRECT EXAMINATION
```

1    BY MR. LOONEY:

2    Q.   The first time you were involved in this investigation or

3    became aware of Mr. Kabra was in the last couple of days,

4    correct?

5    A.   Yes.

6    Q.   And you reviewed certain documents associated with the

7    investigation?

8    A.   Correct.

9    Q.   You have not reviewed all documents or materials obtained

10   in the course of the investigation?

11   A.   I have not.

12   Q.   So when you were asked questions about whether you knew

13   whether certain investigative steps have been taken or

14   information obtained, and you responded "I don't know," that

15   didn't mean it did occur or didn't occur?

16   A.   Correct.

17        MR. LOONEY:   Nothing further.

18        MR. JOHNSON:   Nothing based on that.

19        THE COURT:   All right.   You may step down, Special

20   Agent Cirilli.

21        Further witnesses for the Government?

22        MR. LOONEY:   No, Your Honor.

23        THE COURT:   Witnesses for the Defendant?

24        MR. JOHNSON:   No, Your Honor.

25        THE COURT:   All right.   I'll hear argument.

1          MR. LOONEY:  There are just a few brief points I want

2     to make.

3          THE COURT:  Probable cause and detention.

4          MR. LOONEY:  Pardon me?

5          THE COURT:  Probable cause and detention.

6          MR. LOONEY:  I didn't understand that we were going

7     forward on probable cause today.

8          THE COURT:  This is a probable cause and detention

9     hearing.

10         MR. LOONEY:  Okay.  Well, on probable cause, I rely on

11    the facts set forth in the affidavits submitted by Mr. Sheahan,

12    and what that demonstrates is, with respect to each of the

13    investors in his scheme, they were lured in with

14    representations that money would be used for purposes of

15    investments, for purposes of -- for purposes of investments and

16    legitimate business purposes.

17         Instead, what the affidavit demonstrates is that in

18    each instance, rather than doing so, he either spent the money

19    on personal property, if you look at the transactions involving

20    Investor A.  He represented in a promissory note and text

21    messages and discussions that it's a legitimate business

22    opportunity.  He took that money and he promptly wire

23    transferred it to a marine for -- a marina for purposes of

24    purchasing a boat.  Investor B, this situation is -- and that

25    investor invested $250,000 based on his representations.  He's

1   not been repaid.

2        Investor B, the situation is similar, a similar set of

3   representations were made at almost the same time.  The

4   investment by Investor B of $100,000 was made at the same time.

5   That money was not used for any investment.  It was not used

6   for any business opportunity.  Instead it was used to pay off

7   existing debts.  It was used to pay off existing debts and for

8   personal expenses.

9        Through the debt incurred in July of 2018, through the

10  latter half of that year, Mr. Kabra, as set forth in the

11  affidavit, again put off both investors, particularly Investor

12  B, promised him money.  We introduced the check that was

13  written to Investor B for $80,000.  That check bounced.  That's

14  evidence that he was stringing along this investor willing to

15  pay the amounts that were promised.

16        The way Mr. Kabra ultimately paid back Investor B, who

17  was paid back, was by luring another investor into his scheme.

18  That investor, Investor C, was lured in again, representations

19  by Mr. Kabra with Investor C.  I just want to verify.  Again,

20  he made a representation to Investor C regarding the

21  establishment of a new fund.  He represented that he'd already

22  attracted investors into that fund.  He represented that money

23  was being wired in for purposes of establishing that fund, all

24  of which was untrue.  The money from Investor C was not used

25  for purposes of a new investment fund for some venture by

1    Mr. Kabra.  Instead it was promptly used to pay off Investor B,

2    and then a third party, who provided money to Mr. Kabra, a wire

3    transfer with a notation, "Loan."

4         It all demonstrates that the representations about

5    legitimate business opportunities, made in e-mails, made in

6    text messages, via wires, were all false.

7         Investor C, his note is not due yet, but has not been

8    paid.  The debt is outstanding, and there is no sense that he

9    will be repaid according to the loan representation we have

10   regarding the assets that Mr. Kabra has, is that he has $65 in

11   his personal account, and we have virtually no information

12   regarding his business accounts and whether there is any money

13   to provide to investors like Investor C.

14        Investor D, a very similar situation.  With Investor

15   D's case, he was a social acquaintance.  They -- Investor D was

16   told that -- I just want to make sure I have my investors

17   straight.  What Investor D was told was that one of the

18   portfolio companies in LaunchByte's portfolio of investments

19   was ready to be sold to a large well-known acquirer, and that

20   it just needed funding to essentially bridge that transaction.

21   That was not true.  That company that was discussed, that

22   start-up company in the portfolio, that company did exist, but

23   it had never been any cost to acquire, there was no letter of

24   intent to acquire that company.  There were false

25   representations.  And, once again, that money was not used for

1   the purpose of the investment described by Mr. Kabra, and when

2   Investor D's note came due, the money that was used to repay

3   him was not from a legitimate business opportunity, nothing of

4   that sort.  It was simply money from two more individuals, at

5   this point one of whom has contacted the United States

6   Attorney's Office -- or, rather, has contacted the SEC

7   following Mr. Kabra's arrest.

8        And for those last two investors, they're individuals

9   who in June of this year they deposited $133,000 each into

10  Mr. Kabra's accounts.  And, again, that money was promptly used

11  to pay off a prior investor.  It was not used for a legitimate

12  investment opportunity.  So that is the wire fraud scheme.

13  It's a repeated process where he receives funds, and they are

14  promptly wired out to repay prior investors, to make personal

15  purchases, lavish purchases.

16       The bank fraud scheme, it is simpler.  You saw the

17  balance statement which shows what occurred in the Brookline

18  Bank, 3538 account.  Mr. Kabra wrote a check from one account,

19  an account that had zero dollars in it, for $125,000.  He wrote

20  that check, executed it, deposited that money into Brookline

21  Bank, and then if you review the bank statement for that

22  account for that period of time, and it's Exhibit 7, what you

23  see are a series of debits.  Money is wired out, $20,000,

24  $4,000, $4,000, $5,000, $5,000, $6,000, $7,000, two checks

25  which were eventually returned for $20,000 and $29,000.  The

1   money was not used for -- the money was wired out as soon as it

2   arrived, within a day of arriving at the bank, in the Brookline

3   Bank account, and then they -- the original deposit was

4   promptly reversed because there was no money in the original

5   account.  It wasn't that it was overdrawn.  It wasn't a math

6   error.  There never had been any money in the account from

7   which he wrote the check, from which he drew the check.  And he

8   used it simply to spend money that didn't exist, leaving

9   Brookline Bank holding the bag on the payments that had been

10  made, and that's the bank fraud scheme in summary.

11          THE COURT:  All right.  You want to move to detention?

12          MR. LOONEY:  Yes.  On detention, a few points I want

13  to make.  The first just relates to the seriousness of these

14  charges.  Wire fraud and bank fraud, they carry a maximum

15  penalty of 20 years and 30 years respectively.  And in this

16  case, the evidence you heard is that there is upwards of

17  $750,000 in unpaid debts just for the investors identified in

18  this complaint, and there is information to suggest that there

19  are further victims so that the loss amount will be higher,

20  suggesting a fairly significant sentence may be warranted in

21  the situation.  So the seriousness of the offense militates in

22  favor of the detention hearing.

23          The second point I want to make is just about

24  Mr. Kabra's ties abroad.  They're strong.  He has parents who

25  live in Singapore.  He has family who live in India, according

1   to the statements made by his girlfriend to agents at the time

2   of the arrest.  They are close enough that they were meeting

3   there.  He holds a quasi-citizenship status with India, which

4   allows him to travel freely into and out of the country and to

5   remain there indefinitely.

6        If he were to relocate to India, there would be very

7   little -- he has the means to do so, he has the connections,

8   and he would be virtually unattainable at that point in any

9   reasonable time.  And you balance those against his ties to the

10  United States.  He has lived here for the majority of his life,

11  but his family lives abroad.  He has no familial ties here.  He

12  owns no personal -- no real estate property here.  He has ties

13  to a girlfriend.  They've been together for two years.  I do

14  understand that he was prepared to get engaged.  I would also

15  make the point that he was prepared to get engaged with a ring

16  that was written -- that was purchased with a check that was

17  going to bounce.  There is a certain seriousness to doing that

18  which undermines the claim of ties to the United States through

19  that route.  So I think that the relative ties overseas versus

20  United States suggest that he is a meaningful and significant

21  flight risk.

22        The second point I'd make relates to the extent and

23  existence of financial resources overseas.  And, as you heard,

24  there is tremendous unclarity regarding extent of assets, but

25  he has represented having assets overseas -- that is clear --

1    or having other virtually untraceable assets that he could

2    access overseas.  He has represented that he has cryptocurrency

3    accounts worth $1 million.

4         I take defense counsel questions about Mr. Kabra's

5    worth, and whether it had been verified, to attempt to

6    undermine the existence of that worth and to suggest that that

7    worth didn't exist.  At best where that leaves Mr. Kabra is

8    that he was incredibly deceptive about the existence of assets

9    and the existence of his wealth.  But at the same time, where

10   it's unclear if this wealth exists, there are many indicia of

11   his access to tremendous amounts of monies.  We saw in one bank

12   statement $500,000 plus flowed in, $500,000 flowed out.

13   Another time he drew down and made transfers and payments of

14   $125,000.  He has received investor funds in hundreds and

15   hundreds of thousands of dollars, and they haven't been traced.

16   So he has -- he's represented having money in offshore

17   accounts, he's represented having money in virtually

18   untraceable accounts, and he represented he has tremendous

19   means.  And it's unclear if that's true, but again, the best

20   case for him is that he has been incredibly deceptive about his

21   resources and disingenuous.

22        And there are also some indications that there does

23   exist real wealth abroad.  He has family in Singapore who

24   appears to have the means to acquire a house in New Jersey that

25   they don't permanently live in, which suggests that there is

1    family wealth overseas, and that's a fact that we know.  And,

2    again, just to make the point about his ability to obtain funds

3    or easily utilize funds in his affairs, at the time he was

4    exiting -- he was exiting, there was a $30,000 negative balance

5    in a bank account but he had a $35,000 ring, a highly

6    transferable fungible asset, and he was leaving the country

7    with it.

8         And so you couple the representations of wealth with

9    some indicators of wealth and the absolutely massive flow of

10   cash through his bank accounts suggest that there may be

11   resources outside the country consistent with what he has said,

12   his own representations.

13        And the flow of funds through his accounts, making the

14   last point, which is the nature of the offenses here and the

15   nature of the way he has used his bank accounts, the way he has

16   written checks that draw down his balance hundreds of

17   thousands -- or in excess of $100,000 negative suggests a

18   flagrant disregard for financial commitments, a flagrant

19   disregard for honest dealing, and an entirely cavalier attitude

20   towards money and financial obligations.

21        He gets money from investors and uses it to pay credit

22   card debt.  He gets it from investors and uses it to purchase a

23   boat.  He uses it to pay off other debts, and he does this with

24   utter disregard to the commitments and promises he's made.  So

25   the notion that some financial obligation or bond would secure

1   his presence at trial is just fully inconsistent with the

2   evidence, with the nature of the offenses, with the way he has

3   treated bank accounts.

4         And with particular response to the bond amount that

5   defense counsel suggests in their motion, they suggest $50,000.

6   He will have to -- he left Brookline Bank holding the bag for

7   $76,000.  He was exiting the country with a negative balance of

8   $30,000 and a ring purchased for $35,000, likely with a bounced

9   check for another $35,000.  So the idea of $50,000 providing

10  any sense -- semblance of collateral is really meaningless.

11        His dealings -- his financial dealings demonstrate

12  utter disregard to financial commitments, and so there's no

13  financial bond, amount of collateral that secures appearance

14  given the way he treats these obligations.

15        THE COURT:  And am I not correct that he also faces a

16  civil suit at this time?

17        MR. LOONEY:  He does.  The SEC filed --

18        THE COURT:  I found this only when I was looking for

19  the docket.

20        MR. LOONEY:  Yes.  The SEC filed a suit against him

21  with claims of securities fraud, and they have sought to freeze

22  his assets and enjoin any transfers.

23        THE COURT:  Sought successfully, I think.

24        MR. LOONEY:  They have obtained such an order.  Again,

25  there is -- I would say with respect to that, there is a degree

1   of opaqueness regarding his financial status and the way he has

2   represented assets that we don't know whether they exist.

3          THE COURT:  All right.  Mr. Johnson?

4          MR. JOHNSON:  Thanks, Your Honor.

5          THE COURT:  You're welcome.

6          MR. JOHNSON:  I'll start with probable cause, Your

7   Honor, briefly.  With regard to the second charge, the bank

8   fraud charge, I would argue to the Court that the evidence in

9   the affidavit that was submitted is deficient in terms of the

10  knowledge aspect of that offense, proving that this individual

11  knew that there wasn't going to be sufficient funds in the

12  account.  I can see that there was -- you know, the affidavit

13  states there was zero dollars in the account, but the picture

14  is a much larger one than that, which is part of the reason why

15  I questioned the special agent regarding his knowledge as to

16  other transactions or business dealings in the month of March

17  or around that particular time with regard to an amount of

18  money that may be coming in to LaunchByte or the Kabra Group or

19  Mr. Kabra's possession at that time.  So I would suggest that

20  that particular charge would be deficient based on the

21  knowledge issue.

22         With regard to the money laundering, Your Honor, the

23  Commonwealth -- rather the prosecution has gone to great

24  lengths to take excerpts from the promissory notes that are

25  embedded in the complaint that was filed and was introduced I

1    believe as the first exhibit.  The picture is incomplete.  It

2    does not capture the entirety of the agreement between the

3    investors and my client.  One misstep in terms of the

4    investigation and one thing that came up not only through the

5    agent's testimony but also the prosecution's argument is with

6    regard to Investor C.  Investor C supposedly deposited $250,000

7    or invested $250,000 into the LaunchByte company.  However, the

8    prosecution has failed to actually show the Court that the

9    payment or the investment or the maturity of that loan has come

10   due.

11        The first couple of investors, they talk about this

12   four-month time period where the loan was going to be taken and

13   then paid back with varying percentage returns.  With regard to

14   Investor C, the deadline is still ongoing and it is not made

15   clear from the evidence that the loan is actually set to be

16   returned as of today's date or the date of the complaint,

17   rather.  And I think that that goes to the deception and

18   whether the loan or the investment actually was criminal as

19   part of the wire fraud charge that my client potentially faces.

20        With regard to flight, Your Honor, you heard not only

21   the testimony from the special agent, but also I would rely on

22   my memo with regard to my client's background.  He is 25 years

23   old.  He has absolutely no criminal record.  That goes to the

24   presumption that he is going to be returning to court.  In

25   addition to being 25, conceding the fact that he was born in

1    New Delhi and did spend some time during his high school years

2    in Singapore, he has spent, by my math, about 80 percent of his

3    life in either New Jersey or Massachusetts.

4            He has been in Massachusetts from 2012 when he

5    enrolled in Babson, completed college in four years, obtained a

6    bachelor's degree in 2016 and then stayed in the Boston area,

7    which is before the Court in the presentence -- or the Pretrial

8    Services report with the various addresses that he has held in

9    the Boston area, and it wasn't until I believe June of 2019

10   that he temporarily relocated to Weehawken, New Jersey, which

11   is that apartment that I had questioned the agent about as to

12   my client's family's --

13           THE COURT:  So when did he relocate to New Jersey?

14           MR. JOHNSON:  So he had -- he was spending time in

15   Massachusetts and his parents' condo in Weehawken.  He and

16   Ms. Tambone, his or was soon-to-be fiancé, had been spending

17   some time there as of June 1st of 2019, and that is a property

18   that is not leased or rented.  It is owned by Mr. Kabra's

19   parents.

20           THE COURT:  How much time was spent there?

21           MR. JOHNSON:  Well, he's been there for many years

22   going back and forth to visit family.

23           THE COURT:  Of the late, in the last six months, how

24   much time was spent in New Jersey?

25           MR. JOHNSON:  If I could have a moment, Your Honor.

1        (Attorney Johnson confers with the Defendant.)

2        MR. JOHNSON:  So over the course of the six months,

3   Your Honor, he was visiting New Jersey about two times per

4   month, and then in June, I believe June 15th or thereabouts of

5   this year, his lease on his most recent apartment in Boston

6   terminated, and so he and --

7        THE COURT:  Where was that?

8        MR. JOHNSON:  That was on Fairfield Street in Boston.

9   And he and Ms. Tambone were going between the apartment in

10  Weehawken and Ms. Tambone's parents' home in Wenham, which I

11  have detailed in the memorandum as to the location where my

12  client would reside if he were to be released by this Court;

13  and that is the home and the property where Ms. Tambone and her

14  family reside, and, as I stated, are willing to take my client

15  in.  They are also here in the courtroom in support of him.

16  Over my right shoulder is Ms. Tambone's mother, Ms. Alma

17  Tambone, who you've heard about, her sister and one of her two

18  brothers, and they are all out here in support of Mr. Kabra.

19        So in addition to obviously the Tambone family, my

20  client has since 2012, particular since he enrolled in Babson,

21  created a network of individuals that he is close with and

22  friendly with and spends time with in the Boston area.  I would

23  argue that his roots in this specific community are

24  substantial.  There is the guarantee that has been offered to

25  the Court that he does have a roof over his head to potentially

1    go to in the State of Massachusetts.

2         Initially there was discussions about whether he'd be

3    living in New Jersey or Massachusetts, but in order to be as

4    close as possible to this Court, Mr. Kabra has made the

5    commitment, if given the opportunity, to go to that home.

6         He, upon his arrest, the passport was seized.  What

7    has been represented to me is that that Indian card or the

8    travel permit that was testified to was disposed of by law

9    enforcement.  He has no ability to get his hands on any travel

10   documents, whether it's a U.S. passport, and would agree to not

11   make any attempts obviously to reapply for a U.S. passport or

12   apply for any foreign travel certificate like the one you heard

13   about throughout the testimony.

14        I've also proposed to the Court that Mr. Kabra be

15   placed on GPS monitoring; that is recognizing the fact that he

16   is facing serious charges.  The maximum penalties, as we know,

17   are significant, and there is a significant amount of money at

18   issue here.  And I think the GPS would do a strong and a good

19   job of tethering him to the Commonwealth.  Add a condition that

20   he's not allowed to leave the district, and also, in

21   recognition of the fact that his parents do live overseas.

22   They reside in Singapore.  My client went to a private academy,

23   the Singapore American School in Singapore for his high school

24   years.  From what I understand, it's a school --

25        THE COURT:  What is their citizenship?

1          MR. JOHNSON:  If I may, Your Honor.

2          (Attorney Johnson confers with the Defendant.)

3          MR. JOHNSON:  His mother naturalized at the same time

4     that my client did, in roughly 2009.  His father is a permanent

5     resident of this country and also a citizen of India, and his

6     brother, who's 14 years old, is a United States citizen born in

7     this country, Your Honor.

8          So, Your Honor, I understand, and Mr. Kabra

9     understands, the severity of the allegations that he's facing.

10    And the affidavit certainly spells out a significant amount of

11    money that was coming to him.  However, I think that the

12    evidence clearly contradicts that he has much access, if any,

13    to funds.  The Santander account that we heard about, the last

14    exhibit that was introduced, shows a negative balance of

15    $30,000.

16         I asked the special agent on cross-examination about

17    the existence of funds in the four other checking accounts that

18    we had heard about, and he was unable to give any information

19    as to any significant funds that were held in those accounts.

20    Likewise, for the investigation that was performed into my

21    client's net worth whether there were any overseas assets.

22    There simply is nothing other than a text message that dates

23    back to, if I may, April 3rd of 2018, and nothing since then to

24    reflect any assets anywhere outside of this country.  For all

25    we know, my client is in significant debt, has no ability to

1    reach any funds quickly, and the Government can only argue that

2    because he has a family that's located in Singapore, parents

3    that are in Singapore that also own property in New Jersey,

4    that that shows an ability to quickly access funds.  I would

5    argue that it does not, that my client, as a 25-year-old young

6    man, I think the evidence only shows that he is in the hole, to

7    say the least, and cannot go anywhere quickly.

8         If you add the conditions that I'm proposing in terms

9    of the GPS, the surrender of the passport, which has already

10   taken place, with family willing to take him in, willing to

11   supervise him, willing to report to Pretrial Services, and also

12   the fact that Pretrial Services did conduct their investigation

13   this morning, wrote the report and crafted a series of

14   conditions that would ensure my client's return to Court, I

15   would ask that Your Honor grant his release.  I would argue the

16   Government has not met its burden of showing that he is a

17   flight risk, and I would ask that my motion and the proposed

18   conditions be allowed.

19        THE COURT:  All right.  At this time -- do you want a

20   brief response?

21        MR. LOONEY:  Very brief, Your Honor, just on a couple

22   of points.  With regard to the bank fraud charge, there is a

23   suggestion that it was a mix-up, that there was money coming in

24   and it just didn't all click on time.  But the facts there are

25   that he was aware of the text messages, the e-mails show he was

1    aware of the negative balance immediately, and, as set forth in

2    the affidavit, for several months later that balance persisted

3    and it was closed with a negative balance of in excess of

4    $70,000.  It wasn't a mix-up.  And the check was written from

5    an account that had zero dollars and never had anything other

6    than zero dollars in it.

7           Defense counsel also suggested that the snippets from

8    the promissory notes don't capture the extent of the

9    agreements, but it's clear in each case that investors were

10   told that the money would be used for legitimate investments,

11   and they were used for other purposes.  And then, for example,

12   Investor C, he suggests that the maturity date hasn't occurred.

13   That's the nature of a Ponzi scheme is that -- we're not

14   required to wait for it to collapse before charging fraud.

15   He's using funds for other than what he represented he would

16   use the funds for, and that's the nature of that fraud.  We

17   don't have to allow him to keep attracting new investors and

18   keep his flow of money going until it collapses of its own

19   weight.

20          And then just briefly with regard to detention, I

21   don't think anything -- well, I don't think anything has

22   ameliorated the essential problem, which is there is this

23   opaqueness about the extent of funds, and he suggested that

24   there was just a transparent lack of funds, and that is true

25   except for the fact that his parents own an apartment in

```
 1   Weehawken.  We have no information about -- they live abroad
 2   but own a house in Weehawken.  We have no information about the
 3   extent of their resources.  We know about the existence of
 4   massive flows of cash through his accounts, $500,000 in a
 5   single month and his own representations.
 6         And counsel's suggestion is that you should just
 7   disregard what he said, and these weren't off-the-cuff things.
 8   They were put in a personal financial statement that he
 9   supplied to an investor.  That investor invested in December of
10   2018.  That is not stale information.  That was a statement
11   provided to an investor to induce an investment eight months
12   ago, and where he represented he had $19 million in wealth and
13   $1 million in cryptocurrency.  So I'd suggest he poses a
14   genuine flight risk.
15         THE COURT:  All right.  At this time I make a finding
16   that there's probable cause to believe that the Defendant has
17   committed the crimes as charged in the criminal complaint, and
18   I'll take the matter of detention under advisement.
19         The Defendant is remanded to the custody of the United
20   States Marshal Service.
21         We stand in recess.
22         (Recording ends at 3:54:25)
23
24
25
```

```
 1              CERTIFICATE OF OFFICIAL REPORTER

 2

 3         I, Linda Walsh, Registered Professional Reporter

 4    and Certified Realtime Reporter, in and for the United States

 5    District Court for the District of Massachusetts, do hereby

 6    certify that the foregoing transcript is a true and correct

 7    transcript of the stenographically reported proceedings held in

 8    the above-entitled matter to the best of my skill and ability.

 9              Dated this 26th day of August, 2019.

10

11

12         /s/ Linda Walsh_____

13         Linda Walsh, RPR, CRR

14         Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```