# EXHIBIT B

**AFFIDAVIT OF SPECIAL AGENT KEVIN M. SHEAHAN IN SUPPORT OF
A CRIMINAL COMPLAINT AND APPLICATION FOR A SEARCH WARRANT**

I, KEVIN M. SHEAHAN, state:

### *INTRODUCTION AND AGENT BACKGROUND*

1.     As a law enforcement officer of the United States, I am empowered by law to
conduct investigations of, and to make arrests for, offenses enumerated in the United States Code
("U.S.C."). I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I joined the
FBI in July 2006. In November 2006, I was assigned to the Bridgeport, Connecticut Resident
Agency of the FBI's New Haven Division, where I was assigned to a Safe Streets Task Force
squad. In February 2010, I was transferred to the Boston Division where I was assigned to the
Public Corruption Squad where I worked until February 2019 when I was re-assigned to the
Securities and Corporate Fraud Squad.

2.     As Special Agent with the FBI, I have conducted numerous investigations into
suspected violations of federal criminal law, including violations of 18 U.S.C. §§ 1341 (Mail
Fraud) and 1343 (Wire Fraud), and other statutes enforced by the FBI. In the course of these
investigations, I have been the affiant on and participated in the execution of numerous search
warrants of personal residences and businesses for evidence relevant to ongoing criminal
investigations. Through my training, education, and experience, including the debriefing of
witnesses, I have become familiar with, among other criminal activities, the manner in which
individuals and businesses can conduct fraud.

3.     As a federal agent, I am authorized to investigate violations of United States laws
and to execute warrants issued under the authority of the United States.

4.     I am currently investigating TANMAYA KABRA ("KABRA") and his company
LaunchByte.IO LLC, as well as other related companies and individuals, for a number of



offenses, including wire fraud, in violation of 18 U.S.C. § 1343, and bank fraud, in violation of

18 U.S.C. § 1344.

### PURPOSE OF AFFIDAVIT

5.      I submit this affidavit in support of a criminal complaint charging KABRA with

wire fraud and bank fraud, in violation of 18 U.S.C. §§ 1343 and 1344 (collectively, the "Target

Offenses").  Specifically, as set forth below, I have probable cause to believe that KABRA (i)

engaged in a scheme to defraud and mislead investors, and to obtain funds from them, based

upon false representations that the funds would be used for legitimate investment opportunities;

and (ii) engaged in a scheme to defraud and mislead, and to obtain moneys from, a federally

insured financial institution—Brookline Bank—as set forth below.

6.      I also submit this affidavit in support of an application for a warrant pursuant to

Federal Rule of Criminal Procedure 41 to search KABRA, who is described more specifically in

Attachment A, for the purpose of seizing evidence, fruits, and instrumentalities of the Target

Offenses, as more particularly described in Attachment B. I have probable cause to believe that

KABRA possesses evidence, fruits, and instrumentalities—including a mobile telephone—of the

Target Offenses identified above, as described in Attachment B.

7.      The facts in this affidavit are based upon my personal observations and review of

records, my training and experience, and information obtained from other agents, law

enforcement officers, and witnesses.  This affidavit is intended to show merely that there is

sufficient probable cause for the requested complaint and search warrant and does not set forth

all of my knowledge about this matter.

### PROBABLE CAUSE TO BELIEVE THAT FEDERAL
### CRIMES WERE COMMITTED

## I.      THE FRAUDULENT INVESTMENT SCHEME

8.      KABRA holds himself out as a successful serial entrepreneur, venture capitalist,

and angel investor in start-up companies.  KABRA has conducted his business individually and

through several limited liability companies, including LaunchByte.io, LLC (also known as The

Kabra Group, LLC) (collectively, "LaunchByte").  Open source research provided the following

description of LaunchByte:

> Founded in 2015 by Tan Kabra, LaunchByte is a unique startup
> hub that focuses on product design, development and marketing to
> help seed-stage startups, growth-stage entrepreneurs, and
> corporations succeed.  Kabra built a team of serial entrepreneurs
> who along with extensive industry knowledge have a combined
> 500M+ in exits.  LaunchByte is part startup incubator and part
> micro-fund, utilizing a proprietary Reverse Angel Fund method.
> Within 3 years, LaunchByte has enabled more than 86% of their
> portfolio (30+ companies) to build stellar products, raise their next
> round and even begin generating substantial revenue.

9.      KABRA attracted investors by holding himself out as a successful entrepreneur

and investor, and by offering lucrative and low or no-risk returns on investments.  KABRA

falsely represented to investors that their funds would be used to foster the growth and

development of start-up companies, to prepare those companies for sale, or for other legitimate

business opportunities, but KABRA instead used the money that he received from investors to

pay off existing debts to prior investors in his scheme and to fund his lavish personal expenses.

## A.      KABRA solicits $250,000 from Investor A and $100,000 from Investor B.

10.      Investor A met KABRA in or about December 2017.  KABRA presented himself

as a successful investor and entrepreneur who, through his work and business contacts, had

access to various lucrative investment opportunities.  During the first half of 2018, Investor A

made investments with KABRA—in amounts less than $50,000—which were repaid to Investor A with interest within a period of months.

11.    After these initial deals concluded, on June 20, 2018, KABRA sent two text messages from mobile telephone number ███████ to Investor A: The first read: "Do you want to go in with me on a bigger deal." The second read "It's 120 days and it's a fatter payout." Investor A responded on the same day, writing: "Possibly. What's the deal?"

12.    In a series of text messages to Investor A, KABRA outlined a financial proposal in which Investor A would invest $175,000 and receive a return of the $175,000 principal plus 30% interest (for a total return of $227,500) in installments over four months. Specifically, KABRA wrote to Investor A:

| June 20, 2018, 11:27 am: | 175 @ 30 points |
| June 20, 2018, 11:27 am: | In 120 days |
| June 20, 2018, 11:28 am: | But they're going to pay us back in 4 increments |
| June 20, 2018, 11:27 am: | So we have less cash outlay further every month |
| June 20, 2018, 11:27 am: | 227,500 back |
| June 20, 2018, 11:27 am: | In 4 months |

13.    After Investor A responded that "I would come in but might need a few weeks to come in," KABRA sent a series of text messages indicating both that he would be investing funds himself and that the money would be invested with a third party:



| June 20, 2018, 11:30 am: | I'm doing 125 on it now I think I can buy time from them |
| June 20, 2018, 11:30 am: | Or maybe I'll do 150 |
| June 20, 2018, 11:30 am: | How long do you need? I have a call with them in 30 mine[2] |

14.     Later that same day, KABRA sent a text message to Investor A representing that he had spoken with a third party about the investment ("Call was great … really solid") and that the investment would be backed by "tokenized collateral.  So secure."

15.     On June 25, 2018, KABRA and Investor A again exchanged text messages concerning the proposed investment.  In that exchange, KABRA again represented that he would be investing his own money alongside Investor A.  Specifically, KABRA wrote:

| June 25, 2018, 11:54 am: | Deal is 350 im doing 150 if you can do the 200 id like to keep it just us two. |
| June 25, 2018, 11:54 am: | Less people, less mess |
| June 25, 2018, 11:54 am: | 30% on the capital |
| June 25, 2018, 11:54 am: | 120 days |
| June 25, 2018, 11:54 am: | But instead of a lump sum payment like they usually are, its 3 increments |
| June 25, 2018, 11:54 am: | So like 85ish K per month back |
| June 25, 2018, 11:54 am: | Which is awesome, cuz then you can start putting it to work or put it away right off the bat |

16.     On or about June 25, 2018, Investor A committed to making an investment with KABRA, writing "I'm down … Let me see what the max I can do is … Def 100.  Prob 150.

---

[2] All apparent typos and other errors in the text messages quoted herein are reproduced as in the original.

Maybe 200." That same day, Investor A asked KABRA "[w]hat's the risk[?]" KABRA responded "[n]one remember...tokenized collate...And im backing you on it."

17.     On June 28, 2018, Investor A wrote a text message to KABRA and Investor B which read: "Tan meet [Investor B]. He is interested in coming on the debt deal @32%. Can you share some details?" KABRA responded that day by sending a series of text messages outlining an investment proposal:

| | |
|---|---|
| June 28, 2018, 4:52 pm: | Nice to meet you [Investor B] |
| June 28, 2018, 4:53 pm: | Sure – the details are quite simple. [Investor A], you've done this a few times before so both you and I can answers questions if need be!  Total round:  $500K Committed so far: [Investor A]: $200K Tan:  $150K |
| June 28, 2018, 4:55 pm: | Interest earned:  32 pts Timeframe:  120 days Repayment: Day 30: nothing Day 60: 220K Day 90: 220K Day 120: 220K |
| June 28, 2018, 4:55 pm: | My fund will back it / act as guarantor as well! |

18.     At around the same time, KABRA met on at least one occasion with Investor A. KABRA explained to him that the investments would be used as short-term funding for a company or portfolio of companies that would soon be sold—which justified the high interest rates. Ultimately, Investor A agreed to invest $250,000 with KABRA and Investor B agreed to invest $100,000.

19.     Investor A executed a $250,000 cashier's check from Santander Bank dated July 6, 2018 payable to the order of Tanmaya KABRA. That $250,000 check was deposited on July 6, 2018 in a personal checking account at Santander bank held in KABRA's name with an account number ending in -9382 (the "SANT-9382 Account"). Immediately prior to this deposit, the SANT-9382 account had a balance of $0.00.

20.     KABRA and Investor A executed a promissory note, dated July 7, 2018, that stated:

> FOR VALUE RECEIVED, the sufficiency of which is hereby acknowledged, LaunchByte.io LLC, with an address for purposes hereof in the city of Boston, MA (the "Investee") promises to pay to the order of [Investor A], with an address for purposes hereof at Boston, MA (the "Investor"), or such other place as the Investor may designate in writing, the principal sum of two hundred and fifty thousand ($250,000) United States Dollars, together with interest as described below, for the purpose of financing the startup.

21.     Under the heading, "Payment," the promissory note executed between Investor A and KABRA stated that "[t]he principal due hereunder shall be payable in one (1) installment four (4) months from the first day (kickoff) of the project, or three payments during the term not more than thirty (30) days apart from each other."

22.     Under the heading "Interest Rate," the promissory note executed between Investor A and KABRA stated that "[t]he interest rate shall be calculated at the rate of thirty-two (32%) percent simple interest per the duration of the note.  Interest will be calculated on the basis of the actual number of days elapsed since the signing of this agreement."

23.     On July 5, 2018, Investor B—through his business—transferred $30,000 via wire to an account at Brookline Bank held in the name of LaunchByte.IO LLC with an account number ending in -3538 (the "Brookline-3538 Account").  Investor B transferred an additional $20,000 and $50,000 to the Brookline-3538 Account on July 6 and July 9, 2018, respectively.

24.     KABRA and Investor B executed a promissory note, dated July 2, 2018, that stated:

> FOR VALUE RECEIVED, the sufficiency of which is hereby acknowledged, LaunchByte.io LLC, with an address for purposes hereof in the city of Boston, MA (the "Investee") promises to pay to the order of [Investor B], with an address for purposes hereof at Allston, MA (the "Investor"), or such other place as the Investor may designate in writing, the principal sum of one hundred and fifty

thousand ($150,000) United States Dollars, together with interest as described below, for the purpose of financing the startup.[3]

25.    Under the heading "Interest Rate," the promissory note executed between Investor B and KABRA stated that "[t]he interest rate shall be calculated at the rate of thirty-two (32%) percent simple interest per the duration of the note.  Interest will be calculated on the basis of the actual number of days elapsed since the signing of this agreement."

26.    Under the heading, "Payment," the promissory note executed between Investor B and KABRA stated that "[t]he principal due hereunder shall be payable in one (1) installment four (4) months from the first day (kickoff) of the project, or three payments during the term not more than thirty (30) days apart from each other."

27.    Both KABRA and Investor B executed the promissory note on July 2, 2018 electronically and the final note was transmitted to Investor B via email from DocuSign[4].

**B.    KABRA Uses the Funds from Investor A and Investor B to Pay off Existing Credit Card Debt and to Buy a Boat.**

28.    The money provided to KABRA by Investor A and Investor B was not used "for the purpose of financing the startup" as set forth in the promissory notes, nor was it used for any other investment purpose.  In addition, contrary to his representations, KABRA did not invest any of his own funds in any purported "deal" or investment.  Instead, he used the bulk of the funds received from Investors A and B to pay off pre-existing credit card debt and to buy a boat.

---

[3] Investor B actually invested $100,000 with KABRA—not $150,000 as indicated in the promissory note.

[4] DocuSign is an American company headquartered in San Francisco, California that helps organizations connect and automate how they prepare, sign, act on, and manage agreements. DocuSign offers customers the ability to sign documents electronically.

29.     On July 5, 2018, KABRA made three payments totaling $18,585.85 from the Brookline-3538 Account to pay off existing debt accrued on an American Express credit card.[5]

30.     On July 6, 2018, KABRA transferred $48,000 from the SANT-9382 Account to the Brookline-3538 Account.  That same day, KABRA wire transferred $40,000 from the Brookline-3538 Account to an account at Bank of America held in the name of LaunchByte LLC with an account number ending in -3276 (the "BOA-3276 Account") and used $10,893.25 from that account to pay off existing debt accrued on an American Express credit card.

31.     On July 9, 2018, KABRA wire transferred a further $53,200 from the Brookline-3538 Account to the BOA-3276 Account and then used $53,974.39 from the BOA-3276 Account to pay off existing debt accrued on an American Express credit card.

32.     Finally, also on July 9, 2018, KABRA wire transferred $201,500 (out of the $250,000 from Investor A) from the SANT-9382 Account to a marina in Peabody, Massachusetts to complete the purchase of a 2018 295 Pursuit DC powerboat ██████████

██████████

33.     Notably, KABRA entered into an agreement to purchase the Pursuit powerboat on July 3, 2018—even prior to receipt of the funds from Investor A that were used to pay for the boat.

34.     The activity in the SANT-9382 Account, the Brookline-3538 Account, and the BOA-3276 Account from July 5, 2018 through July 9, 2018 is summarized in the table below:

|  | SANT-9382 | Brookline-3538 | BOA-3276 | Total |
|---|---|---|---|---|
| Beginning Balance (July 5, 2018) | $0.00 | -$7,970.24 | $368.14 | -$7,602.10 |

---

[5] Also on July 5, 2018, KABRA attempted to pay off a further $14,454.73 in debt accrued on a Chase-issued credit card; however, that payment was rejected when the Brookline-3538 Account again became overdrawn.

| | | | |
|---|---|---|---|
| Credits (July 5, 2018 - July 9, 2018) | $250,000.00 | $170,674.51 | $93,200.00 | |
| Debits (July 5, 2018 - July 9, 2018) | -$249,550.00 | -$157,996.47 | -$88,354.67 | |
| **Final Balance (July 9, 2018)** | $450.00 | $4,707.80 | $5,213.47 | $10,371.27 |

35.    In sum, over the four day period from July 5, 2018 through July 9, 2019, KABRA used $284,953.49 of the funds received from Investors A and B to pay off existing credit card debt and purchase a boat—among other expenses.  At the end of July 9, 2018, despite having received $350,000 days before, KABRA retained a combined balance of only $10,371.27 in the SANT-9382, the Brookline-3538, and the BOA-3276 Accounts.

**C.    KABRA Fails to Pay Back Investor A and Investor B on Time, Strings Them Along with Misrepresentations – And Then Uses Funds from Investor C to Repay Investor B.**

36.    Despite representations in his text messages and in the promissory notes that Investors A and B would be repaid in monthly installments, and despite repeated assurances that payments would be made promptly, KABRA did not make any payments to Investors A or B through September 2018.

37.    On or about October 10, 2018, KABRA executed a check for $44,000 to Investor B from the Brookline-3538 Account with a notation on the memo line: "1/3 repay."

38.    Investor B attempted to deposit the check into his own bank account on October 12, 2018, but it was rejected because there were insufficient funds in the Brookline-3538 Account.  On October 15, 2018, KABRA sent a text message to Investor B stating:

> Unfortunately we received a notice today from SEC & IRS saying our main accounts are undergoing verification which is standard for a new fund.  They said any checks, ACHs, and wire transfers will be blocked during this time.  I think you might have put the check in on Friday so just to be safe can you provide me with your bank wire info

39.     This was false.  The Securities and Exchange Commission ("SEC") had not sent any notice to KABRA concerning any purported "verification" for a "new fund," and had not placed any hold on any bank accounts associated with KABRA or LaunchByte; this investigation has identified no evidence that the IRS did so either.

40.     On October 16, 2018, KABRA sent a text message to Investor B:  "We received half of the payout on the debt fund now just waiting on the other half."  He then sent Investor B a copy of a text message containing an image of a wire transfer notice which purported to show that a third party had transferred $1.35 million to the Brookline-3538 Account.  In fact, no such transfer had occurred and, on both October 16 and October 17, 2018, the Brookline-3538 Account had a balance below $1,000.

41.     On or about October 18, 2018, KABRA received a wire from a third-party ("Third-Party A") into the Brookline-3538 Account in the amount of $75,000 with a notation "loan."  That day, KABRA wired $34,500 to Investor B from the Brookline-3538 Account and delivered to Investor B a sum of cash.  When he delivered the cash, KABRA told Investor B that it had come from a pizzeria to whom KABRA had previously lent money.

42.     Through mid-December 2018, KABRA continued to put-off Investor B's requests for repayment of the remainder of the debt outstanding on the promissory note.  For example, on December 6, 2018, Investor B asked KABRA if he was "able to wire [a payment] today."  KABRA immediately responded "It's already done, I'm waiting for the email to pass on to you."  However, four days later, KABRA wrote to Investor B that "I mistyped your last name, it was rejected for improper account name."

43.     KABRA next promised to resend the wire transfer, but when Investor B did not receive any wire transfer, KABRA instructed Investor B to deposit a check for $88,000 written

on the Brookline-3538 Account that KABRA had provided to Investor B earlier. However, when Investor B attempted to deposit that check on or about December 13, 2018, it was rejected because there were insufficient funds in the Brookline-3538 Account.

44.     During this time, Investor B continued to request repayment of the outstanding debt—sending text messages to KABRA concerning repayment on December 10, 12, 13, 14, 16, and 17, 2018 with KABRA repeatedly assuring Investor B that the payments would be made.

45.     KABRA ultimately paid Investor B $80,000 via wire transfer on December 18, 2018, using $250,000 that KABRA solicited from Investor C—as described below. In addition to repaying Investor B, KABRA also used a portion of the $250,000 to make a payment of $88,500 to Third-Party A on the same day.

**D.     KABRA Used False Representations to Solicit $250,000 from Investor C.**

46.     Investor C was a social acquaintance of KABRA. At some point in 2018, KABRA approached Investor C about an investment opportunity. KABRA told Investor C that the investment would be backed by promissory note with KABRA personally guaranteeing the note. The term of the investment would be one-year and would return $300,000 on an investment of $250,000. KABRA explained to Investor C that the note was part of the process of LaunchByte taking on $1 million of debt in order for LaunchByte to be purchased by KV Ventures (another investment fund that KABRA told Investor C he was launching).

47.     On December 6, 2018, KABRA forwarded an email to Investor C describing the proposed investment:

> I wanted to take a few minutes to provide you with a quick background on the deal:
>
> There is a management company (LaunchByte) that will be taking on the $1M debt. That management company owns 20 investments that have a value of $2.5M at the time of acquiring them (now they have grown). Our new fund, KV Ventures I LP will be purchasing these investments from the management company at arms length, aka $2.5M.

The management company needs to take on the $1M ASAP to complete the SECOND close of KV Ventures I, LP. The first close has already been done at $7M and that cash will be coming into the fund within the next few weeks (documents are being signed right now by the investors and wires are coming in). The second close will be the remaining $18M, and requires significant travel, legal expenses, and a ramp up of the management company staff.

The $1M note will carry 20% interest on it, and the duration will be for 1 year. We anticipate the second close of KV Ventures I, LP to be at the latest by May of 2019. Promptly upon the second close, we will accelerate this debt note and still pay the 20% on top. So most likely, this will only be a 7 month term, but we would like to keep a buffer of an extra few months just in case.

48.     The representations in this email were false. Specifically, (i) KABRA had not and has not "close[d]" a $7 million round of financing for purposes of facilitating the acquisition of LaunchByte's investment portfolio; (ii) documents were not being "signed right now by investors"; and (iii) and wires worth $7 million were not "coming in" to any accounts associated with KABRA or LaunchByte.

49.     KABRA then sent to Investor C a draft promissory note that stated:

FOR VALUE RECEIVED, the sufficiency and receipt of which is hereby acknowledged, LaunchByte.io LLC, with an address of 715 Boylston Street, Boston, MA 02116 (the "Investee"), promises to pay to the order of [Investor C], with an address in Brookline, MA (the "Investor"), or such other place as the Investor may designate in writing, the principal sum of three hundred thousand (US$250,000) [sic] United States Dollars, together with interest as described below, for the purpose of financing the acquisition of the portfolio.

50.     Under the heading "Interest Rate," the promissory note executed between Investor C and KABRA stated that "[t]he interest rate shall be calculated at the rate of twenty (20%) percent simple interest per the duration of the note."

51.     Under the heading, "Payment," the promissory note executed between Investor C and KABRA stated that "[t]he principal and interest earned due hereunder ($300,000) shall be payable in one installment of $300,000 starting 12 months from the execution of this Agreement or receipt of funds, whichever is later ("Maturity Dates")."

13

52.     On or about December 17, 2018, Investor C executed a cashier's check in the amount of $250,000 from Citizen's Bank to LaunchByte.io, LLC and KABRA deposited the check in the Brookline-3538 Account the same day.

53.     Contrary to the representations in KABRA's December 6, 2018 email to Investor C and the terms of the promissory note, the funds provided by Investor C were not used "the purpose of financing the acquisition of the portfolio." Instead, as described above, KABRA used the funds to repay $80,000 of a debt owed to Investor B and to make a payment of $88,500 to Third-Party A—who had previously transferred $75,000 to KABRA.

54.     KABRA did not tell Investor C that his $250,000 investment would be used to pay off pre-existing debts owed by KABRA or LaunchByte.

**E.      KABRA Uses False Representations to Solicit $75,000 from Investor D**

55.     KABRA met Investor D at a Fourth of July party in 2018. Investor D was introduced to KABRA through Investor A. Soon after, KABRA described his business to Investor D over drinks in Boston. KABRA explained that he and LaunchByte worked with start-up companies—fostering their development to the point where they could be sold and LaunchByte's investors could realize a profit on their investments.

56.     KABRA told Investor D that one of the start-up companies in LaunchByte's portfolio had signed a letter of intent to be acquired by a large well-known company and convinced Investor D to enter into a $75,000 promissory note—which LaunchByte and KABRA himself would guarantee. Investor C understood that his investment would be used to facilitate the purchase of the start-up company.

57.     KABRA and Investor D executed a promissory note, dated August 1, 2018, that stated:

FOR VALUE RECEIVED, the sufficiency and receipt of which is hereby acknowledged, LaunchByte.io LLC, with an address of 715 Boylston Street, Boston, MA 02116 (the "Investee"), promises to pay to the order of [Investor d], with an address in Brookline, MA (the "Investor"), or such other place as the Investor may designate in writing, the principal sum of seventy-five thousand (US$75,000) United States Dollars, together with interest as described below, for the purpose of financing the startup.

58.    Under the heading "Interest Rate," the promissory note executed between Investor D and KABRA stated that "[t]he interest rate shall be calculated at the rate of eighteen (18%) percent simple interest per the duration of the note.  Interest during the note term is a fixed amount of 18% on the amount lent regardless of pre-payment."

59.    Under the heading, "Payment," the promissory note executed between Investor D and KABRA stated that "[t]he principal and interest earned due hereunder ($88,500) shall be payable in one (1) installment six (6) months from the date of this Agreement ("Maturity Date"). If the payment of principal and interest earned of $88,500 is not made on or before the Maturity Date, then interest will continue to run at the rate of twenty (20%) percent per annum until full payment of all principal and interest is made to Investor."

60.    On or about August 3, 2018, Investor D wired $75,000 to the Brookline-3538 Account.  The memo accompanying the wire identified the "purpose" of the payment as "investment."

61.    KABRA's representations to Investor D were false.  The co-founder of the start-up company had never heard of Investor D, the start-up did not receive any funds from Investor D, LaunchByte, or KABRA, and the start-up company never entered into any letter of intent with the larger well-known company.

62.     Under the terms of the promissory note, KABRA owed Investor D $88,500 due in March 2019. As of May 2019, however, KABRA had failed to repay the amounts owed to Investor D.

63.     To avoid paying Investor D, KABRA made a number of excuses. At one point, he told Investor D that LaunchByte would be acquired (potentially by a company based in Mauritius) and that Investor D would be paid when that occurred. KABRA also sent Investor D text messages indicating that money to make the repayment had been deposited into KABRA's accounts, but had not yet cleared.

64.     Despite the repeated representations that funds would be available, Investor D was not repaid until June 2019. KABRA ultimately paid Investor D $120,000 on June 12, 2019—using funds solicited from Investors E & F, as described below.[6]

**F.     Investors E & F**

65.     On June 10, 2019, Investor E and Investor F each wired $133,000 to a bank account at Santander Bank held in the name of LaunchByte Ventures, LLC bearing an account number ending in –2693 (the "SANT-2963 Account"). The two separate wire transfers were accompanied by memos stating: "services promissory note investment" and "services."

66.     Prior to the June 10, 2019 transfers, the SANT-2963 Account had a balance of $7,921.61. Immediately upon receiving the funds from Investors E and F, KABRA transferred $120,000 to pay off his pre-existing debts to Investor D—rather than using the funds for any legitimate investment purpose.

---

[6] The $120,000 repayment appears to include repayment of both the amount owed on the August 1, 2018 promissory note and repayment of other debts owed by KABRA to Investor D.

## II.   THE BANK FRAUD

67.     KABRA held a Northwestern Mutual Cash Management bank account in his name bearing an account number ending in -8976 (the "NW-8976 Account").  From June 19, 2018 through March 31, 2019, the NW-8976 Account was never funded and never held a positive balance.

68.     At the outset of March 11, 2019, the Brookline-3538 Account had a negative balance of $114.36.  That day KABRA executed and deposited a check for $125,000 from the NW-8976 Account (which had a zero balance) to the Brookline-3538 Account—bringing the balance in the Brookline-3538 Account to $124,885.64.

69.     Brookline Bank is a federally insured financial institution as defined by 18 U.S.C. § 20.

70.     On March 11, 2019 and March 12, 2019, from the Brookline-3538 Account, KABRA (i) transferred $5,000 to the SANT-9382 Account (a personal account); (ii) executed outgoing wire transfers in the amount of $70,070.36; (iii) wrote checks to third parties totaling $49,000;[7] and (iv) incurred wire transfer fees totaling $140.  As a result of these transactions, at the close of March 12, 2019, the Brookline-3538 Account had a remaining balance of only $675.28.

71.     On March 14, 2019, the $125,000 credit from the check written from the NW-8976 Account was charged-back due to insufficient funds in the originating account.  As a result, the balance in the LaunchByte Account fell to *negative* $124,324.72.  A summary of the

---

[7] Although debited from the Brookline-3538 Account on March 12, 2019, these checks were later rejected for insufficient funds and the $49,000 was credited back to the Brookline-3538 on March 26, 2019. These credits—along with other returned debits and the accrual of fees—brought the balance of the account to negative $76,091.72 as of May 10, 2019.

transactions taking place from March 11, 2019 through the return of the $125,000 check on

March 14, 2019 is below:

| BROOKLINE-3538 ACCOUNT – MARCH 11 – 14, 2019 | | |
|---|---|---|
| | Credits / Debits | Balance |
| **Beginning Balance (March 11, 2019** | - | **($114.36)** |
| $125,000 Check (March 11, 2019) | $125,000 | $124,885.64 |
| Transfer to SANT-9382 Account | ($5,000) | $119,885.64 |
| Wire Transfers | ($70,070.36) | $49,815.28 |
| Outgoing Checks | ($49,000) | $815.28 |
| Fees | ($140) | $675.28 |
| **Ending Balance (March 12, 2019** | - | **$675.28** |
| Returned Check (March 14, 2019) | ($125,000) | ($124,324.72) |
| **Balance (March 14, 2019)** | - | **($124,324.72)** |

72.    On March 14, 2019, KABRA wrote an email to an employee of Brookline Bank

stating that:

> Saw you called me. I am at the Northwestern Mutual office sorting out an issue
> with my brokerage account that has caused the issue with Brookline Bank.
> Working on getting it resolved asap and wiring in.  The other check tomorrow
> should also take care of it.  sorry & thanks

73.    The following day, March 15, 2019, KABRA wrote a text message to the

Brookline Bank employee stating that the account would be "[a]ll set.  My dad will send a wire

from Singapore.  I just talked to him."

74.    Despite his representation that the issue would be "resolved," that the "other

check tomorrow should take care of it," and that his "dad will send a wire from Singapore"

neither KABRA nor anyone else made a deposit or wired funds into the Brookline-3538 Account

after March 14, 2019.

75.    On or about March 31, 2019, KABRA sent a text message to the Brookline Bank

employee with a screen shot of another text message that suggested that KABRA would be

receiving a $1.5 million investment from a third-party.  Specifically, the text message read, in

part: "[t]ell Tan I left my financial advisor an email that I'll be investing $1.5M based on this promissory note. Let me know how tonight goes and you better kill it Brother. Scott."

76.    On April 11, 2019, KABRA sent an email to a Brookline Bank employee with the subject line "Note Signed." The email attached what purported to be a promissory note dated April 2, 2019 and signed by Scott Taylor as the "Lender." The promissory note purported to indicate that KABRA would receive an investment of $1.5 million. Subsequently, KABRA made repeated representations to an employee of Brookline Bank that funds would be wired to the Brookline-3538 Account. However, Brookline Bank never received any such wire transfer (or other deposit).

77.    By May 2019, Brookline Bank had charged-off and closed the Brookline-3538 Account, taking a loss of $76,091.072.

78.    More generally, I am aware through training and experience that individuals who engage in financial fraud schemes such as the one described herein often communicate with other individuals regarding investments and in order to direct the flow of funds. These communications often occur via smart phones, including by voice, email, text messages, and messaging apps. Because smart phones are both portable and a common means of communication in these types of fraud schemes, they are often carried on the person of individuals carrying out the Target Offenses. Indeed, as detailed above, KABRA accomplished his fraud on investors and Brookline Bank in large part through text message communications sent from his mobile phone.

79.    I am also aware that individuals frequently store additional records related to investments and the movement of funds derived from financial frauds on their smart phones and

mobile devices, including ledgers, records of purchases, travel arrangements, and other financial records.

80.     On August 3, 2019, agents learned that KABRA purchased a ticket to travel the following day, August, 4, 2019, from Boston, Massachusetts to the United Kingdom and had a return flight August 16, 2019.

### SEIZURE OF COMPUTER EQUIPMENT AND DATA

81.     Based on my training, experience, and information provided by other law enforcement officers, I know that many smart phones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers.[8]  Smart phones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, and web browser; sending and receiving text messages, e-mails, and other communications via specialized communication apps; and storing a vast range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

82.     As described above, KABRA has used at least one smart phone in furtherance of the Target Offenses.

83.     Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the internet.  This is true because:

---

[8]  References to "computers," "computer equipment," and "computer hardware" herein are intended to include smart phones.

a.      Electronic files that have been downloaded to a storage medium (including the memory of a smart phone) can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

b.      Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal drives contain electronic evidence of how the computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d.      Similarly, files that have been viewed over the internet are sometimes automatically downloaded into a temporary internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed internet pages or if a user takes steps to delete them.

84.    Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized.  This is true because of:

a.    The volume of evidence  storage media including memory cards and the internal memory of smart phones—can store the equivalent of thousands or, in some instances, millions of pages of information.  Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity.  This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

b.    Technical requirements analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications.  Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data.  Furthermore, data analysis protocols are exacting procedures, designed

to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files.  Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches. Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."  Smart phones can easily be remotely "wiped" removing all data and essentially returning a device to its original factory settings. Consequently, law enforcement agents may seize the computer equipment for subsequent processing elsewhere.

## *CONCLUSION*

85.     Based on my knowledge, training and experience, and the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that between December 2017 and June 2019 KABRA committed wire fraud, in violation of 18 U.S.C. §1343, by making misrepresentations to Investors A – F in order to solicit and obtain funds from them as set forth above, and bank fraud, in violation of 18 U.S.C. § 1344, by depositing a check for $125,000 into an account at Brookline Bank, while knowing that the originating account had insufficient (and in fact zero) funds, and then executing transactions resulting in Brookline Bank incurring a loss of $76,091.072.

86.     Additionally, based on the information described above, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of the Target Offenses, described in more detail in Attachment B, are located on the person of the Target Subject, described in Attachment A.

Respectfully submitted,

KEVIN M. SHEAHAN
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me

on August 4th, 2019.

HONORABLE MARIANNE B. BOWLER
United States Magistrate Judge

**ATTACHMENT A**

Tanmaya Kabra is a 25-year-old male (DOB: ▉▉▉▉▉ Kabra is approximately 6'0"
in height, with brown eyes and black hair.  Kabra is pictured below:



**ATTACHMENT B**

**ITEMS TO BE SEIZED**

I.      All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1343 (Wire Fraud) and 1344 (Bank Fraud) (collectively, the "Target Offenses"), including:

   A.      Records and tangible objects pertaining to the following individuals, entities, phone numbers, and email addresses:

   1. Current and former LaunchByte investors, payors, and clients;

   2. Current and former LaunchByte employees,

   3. Solicited LaunchByte investors,

   4. Vendors;

   5. Financial institution which LaunchByte and KABRA did business including, Santander Bank, Brookline Bank, Bank of America, and First Republic Bank;



   B.      Records and tangible objects pertaining to the payment, receipt, transfer, or storage of money or other things of value by Kabra, including:

   1. Bank, credit union, investment, money transfer, and other financial accounts;

   2. Credit and debit card accounts;

3. Money remittances through money service businesses (e.g., Western Union or MoneyGram);

4. Tax statements and returns;

5. Business or personal expenses;

6. Income, whether from wages or investments;

7. Loans;

C. Records and tangible objects pertaining to the existence, identity, and travel of any co-conspirators, as well as any co-conspirators' acts taken in furtherance of the Target Offenses;

D. Records showing the relationship between Kabra and any co-conspirators, including records of travel and meetings, calendars, address lists, contact lists, photographs, social media contacts, and identities and personal identifiers used by each (including telephone numbers, usernames, and social media profile information);

E. Records of communications between Kabra and any investors;

F. All negotiable instruments, including United States currency, if found in aggregate of $5,000 or more;

G. For any computer hardware, computer software, mobile phones, smart phones or storage media called for by this warrant or that might contain things otherwise called for by this warrant ("the computer equipment"):

1. evidence of who used, owned, or controlled the computer equipment;

B-2

2.  evidence of the presence or absence of malicious software that would allow others to control the items, and evidence of the presence or absence of security software designed to detect malicious software;

3.  evidence of the attachment of other computer hardware or storage media;

4.  evidence of counter-forensic programs and associated data that are designed to eliminate data;

5.  evidence of when the computer equipment was used;

6.  passwords, encryption keys, and other access devices that may be necessary to access the computer equipment;

7.  records and tangible objects pertaining to accounts held with companies providing internet access or remote storage; and

II.   All computer hardware, computer software, and storage media.  Off-site searching of these items shall be limited to searching for the items described in paragraph I.

## DEFINITIONS

For the purpose of this warrant:

A.   "Computer equipment" means any computer hardware, computer software, mobile phone, smart phone, storage media, and data.

B.   "Computer hardware" means any electronic device capable of data processing (such as a computer, smart phone, mobile phone, or wireless communication device); any peripheral input/output device (such as a drive intended for removable storage media); and any security device, (such as electronic data security hardware).

C.   "Computer software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

D.   "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a memory card).

E.   "Data" means all information stored on storage media of any form in any storage format and for any purpose.

F.   "A record" is any communication, representation, information or data.  A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

B-4

### RETURN OF SEIZED COMPUTER EQUIPMENT

If the owner of the seized computer equipment requests that it be returned, the government will attempt to do so, under the terms set forth below.  If, after inspecting the seized computer equipment, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all computer equipment seized pursuant to this warrant for as long as is necessary for authentication purposes.

B-5