UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | Case No. 19-cr-10335-DJC |
| TANMAYA KABRA, Defendant. | ) ) ) ) ) | |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT TANMAYA KABRA'S MOTION TO REVOKE ORDER OF DETENTION AND FOR PRETRIAL RELEASE**

The United States hereby opposes defendant Tanmaya Kabra's motion to revoke the Magistrate Court's determination that Kabra should be detained pending trial in this case.

**BACKGROUND**

Kabra was arrested on August 4, 2019 on a criminal complaint charging him with wire fraud, in violation of 18 U.S.C. § 1343, and bank fraud, in violation of 18 U.S.C. § 1344. At Kabra's initial appearance on August 5, 2019, the government moved for detention pursuant to 18 U.S.C. § 3142(f)(2)(A) on the ground that Kabra posed a serious risk of flight. The Magistrate Court held a hearing on the government's detention motion on August 7, 2019, took the matter under advisement, and issued an order of detention on August 23, 2019, finding by a preponderance of the evidence that there are no conditions or combination of conditions that will assure the appearance of the defendant at trial.

Kabra now appeals this order.

## APPLICABLE LEGAL STANDARD

Section 3142(e) provides that a defendant may be detained pending trial if, after a hearing, the judicial officer determines that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]"  18 U.S.C. § 3142(e).  Where, as here, there is no statutory presumption for detention, the government bears the burden of demonstrating that the defendant poses a flight risk by a preponderance of the evidence.  18 U.S.C. § 3142(f); *United States v. Samuels*, 436 F. Supp. 2d 280, 281 n.1 (D. Mass. 2006) ("[A] preponderance of the evidence standard applies to the proof of facts regarding the flight risk determination.").

In determining whether any conditions of release will reasonably assure the defendant's appearance and the safety of any other person and the community, the Court must consider the factors set forth in 18 U.S.C. § 3142(g), which include: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger that the defendant's release would pose to any other person or the community.  Of these, the weight of the evidence is the least important of the factors.  *See, e.g., United States v. Jones*, 2008 WL 2434131 at *5 (S.D.N.Y., June 12, 2008).

In reviewing a detention order of a magistrate judge, the "proper approach is for the district court to engage in *de novo* review of the contested order," giving appropriate deference to the magistrate judge's analysis and findings.  *United States v. Tortora*, 922 F.2d 880, 884 n.4 (1st Cir. 1990).

## ARGUMENT

The Magistrate Court found that: (i) the weight of the evidence against Kabra is strong; (ii) Kabra lacks stable employment, a stable residence, financially responsible sureties, and significant

community or family ties to this district; and (iii) Kabra has significant family and other ties outside the United States.  Doc. No. 18 (Order of Detention Pending Trial).  Based upon these findings, the Magistrate Court concluded that there are no conditions or combination of conditions that will assure the appearance of the defendant for trial.  *Id.*

The Magistrate Court's decision was correct on each point and her decision should be upheld for the following reasons.

First, during the detention hearing, the government introduced multiple examples of Kabra's own statements in which he claimed to possess significant financial resources, including cryptocurrency and assets held in offshore accounts.  The defendant now derides as "baseless"[1] the government's inference—based on these statements—that Kabra might actually have financial resources overseas that could be used to assist his flight.  To do so, however, requires the defendant to disavow as false his own prior statements and ask the Court to disregard them.  At best then, the defendant is left in the position of arguing that his own words cannot be believed.  But that, of course, substantially undermines any commitment that Kabra might undertake to appear for trial.

In addition to Kabra's own statements, the government produced other evidence regarding Kabra's financial resources.  The government demonstrated that Kabra has had access to significant sums of money in the past and that—even at times that he appeared essentially broke, with zero or negative balances in his bank accounts—Kabra repeatedly managed to make large payments to creditors, transfer of tens of thousands of dollars, and to acquire significant, valuable property.  All of which again suggests that Kabra may have access to, or the ability to obtain, significant financial resources if he fled.

---

[1] Defendant's Memorandum of Law in Support of Defendant's Motion to Revoke Detention Order and for Pretrial Release, Doc. No. 33, at 16 (hereinafter "Mem. at __").

Second, the government produced evidence that Kabra has ties outside the United States—specifically to Singapore, where his immediate family resides, and India, where he has extended family—that are far more substantial than his ties to this district, where, at this time, he has no residence, no employment, and no immediate family.

Third, not only do the serious, well-supported criminal charges provide Kabra with a motive to flee, but the nature of those charges demonstrate a flagrant disregard for financial obligations and honest dealing. As set forth in the indictment in this case (Doc. No. 28), and in greater detail in the affidavit of Special Agent Kevin Sheahan submitted in support of a criminal complaint (hereinafter "Sheahan Affidavit" or "Sheahan Aff."),[2] Kabra not only solicited investments based upon false pretenses, but also covered his fraud by using new investor funds to repay old debts, and strung along his investors[3] with false promises of immediate repayment and other falsehoods. In short, while the defendant paints a portrait of himself as a "young man filled with ideas on growing and generating a business … who often had to scramble to keep his vision afloat," Mem. at 19, the evidence shows that he turned to fraud and deception to do so, and repeatedly reneged on his financial commitments in order to prop up his scheme and to maintain his personal lifestyle. The deceptive nature of Kabra's crimes again undermines any expectation that he would abide by any commitment to appear for trial.

---

[2] The documents introduced into evidence as Exhibits 1-11 during the August 7, 2019 detention hearing are attached as Exhibit B to the Declaration of Mark A. Berthiaume (Doc. No. 36) and are referred to herein as "Hearing Exh. __." The Sheahan Affidavit is Hearing Exh. 1.

[3] The defendant argues that these individuals should be referred to as "lenders" rather than "investors." Mem. at 5-6; A. Kabra Decl. ¶¶ 9, 11-12. The promissory notes executed between Kabra and each of the victims identified in the indictment refer to these individuals as "Investor[s]" *see* Exhs. A-D to the Declaration of Christopher Looney, and so the government adopts that term.

### I. KABRA'S OWN STATEMENTS AND OTHER EVIDENCE SUGGESTS KABRA HAS ACCESS TO SIGNIFICANT FINANCIAL RESOURCES

The defendant labels the government's contention that he might have financial resources abroad as "baseless." But to reach that conclusion, the defendant wholesale ignores evidence introduced during Kabra's detention hearing—including Kabra's own representations regarding his wealth—and derides as "incredible" reasonable inferences from the government's evidence. *See* Mem. at 16-17.

The government introduced Kabra's own "Personal Financial Statement." Exh. 9. Kabra used this document, dated December 2017, to solicit LaunchByte investors. Hearing Tr. 28. The document identifies Kabra's 2017 annual income as $1,350,000 and his total assets as $19,762,500. Listed among Kabra's assets are: (i) $100,000 in cash and savings; (ii) $1,000,000 in "crypto"; (iii) $700,000 in "profit sharing and other vested retirement accounts"; and (iv) $150,000 in personal property. Exh. 9. Following the detention hearing, the government submitted a personal financial statement obtained from one of Kabra's victims, dated October 2017, purporting to list Atim Kabra's wealth. Doc. No. 12-1. According to this document, Atim Kabra had assets in excess of $14 million, including $3 million in cash or savings accounts in Singapore, $250,000 in cash or savings accounts in India, $9 million in equities held in India, and real estate worth $750,000 in Malaysia. *Id.*

The government also introduced representations made by Kabra in text messages that he had $2 million in his bank accounts as of December 2018 ("I'm down to my last 2M in the bank that means 5 months. That's personal savings etc.") and that he is "offshoring" assets in Mauritius. Exhs. 2-3. While the defendant casts this latter statement as "obscure" and "vague," Mem. at 11; Declaration of Atim Kabra (hereinafter "A. Kabra Decl.") ¶ 11, the context of Kabra's statement clearly shows that he was telling one of his investors that he had offshore funds in Mauritius:

5



Exh. 2.  The defendant's only response to Kabra's assertions of wealth is to ask the Court to disregard them—essentially arguing the Kabra's own statements cannot be taken seriously.  The defendant's papers nowhere mention Tanmaya Kabra's personal financial statement or his representation that he had $2 million in wealth, and the defendant now explicitly disavows his own statement that he had offshore funds in Mauritius.  Mem. at 11; A. Kabra Decl. ¶ 21.

In addition to asking the court to disregard Kabra's own claims to extensive financial wealth, defendant derides as "simply incredible" the government's suggestion that Kabra might be assisted by his parent's overseas wealth.  But there is real evidence that such wealth exists.  Atim Kabra is the principal of the investment manager to two private equity funds as well as the founder and CEO of a venture capital fund manager.  A. Kabra Decl. ¶ 4.  Kabra's parents have sufficient wealth to reside in Singapore while also owning a second home in Weehawken, New Jersey.  *Id.* ¶ 3.  There is nothing "incredible" about the notion that Kabra's parents would make this wealth available to Kabra in the event of his flight.

Finally, the government also introduced examples of evidence showing that Kabra has access to significant sums of money in the past.  Kabra's bank statements show that hundreds of thousands of dollars flowed through a single one of Kabra's accounts in a single month in

December 2018 to January 2019.  Hearing Exh. 4.  The government also introduced evidence (detailed further below, *infra* at 12-13) of an episode in which, over a two-day period, Kabra executed outgoing transfers from his Brookline Bank account totaling close to $125,000, resulting in Kabra bringing the balance in that account—which was ultimately closed by the bank—to negative $124,324.72.  *See* Sheahan Aff. ¶¶ 67-77; Exhs. 6-8.  Finally, the government introduced evidence of another episode, shortly before his arrest, in which Kabra purchased a $35,000 diamond ring using a check drawn on his Santander bank account—even though this account held a negative balance of approximately $30,000 at the time of the purchase.  Hearing Exhs. 10-11; Hearing Tr. 33-35.[4]

Taken together, this evidence shows that (i) Kabra has represented that he has extensive wealth, including wealth that is held in cryptocurrency and, in his words, "offshore[e]" in Mauritius; (ii) that he has had access in the past to significant sums of money; and (iii) that he has shown the repeated wherewithal to, in his words, "scramble" to keep himself "afloat," Mem. at 19, and to obtain money and purchase property even when his own bank accounts appear empty.

## II. KABRA TIES ABROAD OUTWEIGH HIS TIES TO MASSACHUSETTS

Kabra's immediate family—his parents and his younger brother—live in Singapore, where Kabra's father, Atim Kabra is the founder and manager a number of investment, venture capital, and private equity-related businesses.  A. Kabra Decl. ¶¶ 1, 4.  Kabra himself lived in Singapore from 2006 until 2012, when he moved to the United States to attend Babson College.  *Id.* ¶¶ 3, 5. In addition to his immediate ties to Singapore, Kabra maintains relationships with extended family

---

[4] In her declaration, Alma Tambone refers to "funds that were to have been deposited into Tan's account from which the check to the jeweler had been drawn," Declaration of Alma Tambone (hereinafter "Tambone Decl.") ¶ 8, but provides no details regarding the basis of her knowledge concerning such funds or the source of the funds themselves.

7

in India.  He has visited there twice in the past year and, at the time of his arrest on August 4, 2019, was traveling to meet his grandmother who lives in India.  Tambone Decl. ¶¶ 8-9.  Kabra also maintains Indian overseas citizenship status, which confers upon him the right to travel freely to and from India and to reside there indefinitely.  Hearing Tr. 7-8.  As also noted by the Magistrate Court, Kabra is well-versed in international travel, having recently traveled to twenty countries outside the United States according to the Pretrial Services report.  Doc. No. 18 at 3.

These overseas ties far outweigh Kabra's ties to the community in Massachusetts.  The Magistrate Court correctly found that Kabra lacks a stable residence in the district.  Doc. No. 18 at 2.  Kabra relinquished his apartment in Boston in June 2019 and has been moving between his own parent's apartment in New Jersey and his girlfriend's family home in Wenham, Massachusetts since then.  In requesting that his detention be revoked, the defendant proposes only that he be released to a "residence in the Boston metropolitan area," Mem. at 19, and Ms. Tambone's declaration states only that she and Kabra are "in the process of renting an apartment in Beverley with a twelve-month lease," Tambone Decl. ¶ 4.  The Magistrate Court also correctly found that Kabra lacks stable employment.  Doc. No. 18 at 2.  According to his father, Kabra founded LaunchByte in April 2015, A. Kabra Decl. ¶ 7, and Kabra has worked at LaunchByte since then.  Both LaunchByte and Kabra are now the subject of a temporary restraining order freezing Kabra and LaunchByte's assets, *SEC v. Kabra et al.*, 19-cv-11676, Doc. Nos. 11, 27, and Kabra faces criminal charges related to his operation of LaunchByte.  The Magistrate Court's observation that Kabra's business is now "defunct" is accurate.  Doc. No. 18 at 3.

At this point, Kabra's *only* significant tie to the district is through his relationship with Ms. Tambone—his girlfriend of two years to whom he intended to propose.  While that is a significant tie, it is far outweighed by Kabra's more substantial familial ties abroad.

8

## III. THE NATURE OF THE OFFENSE AND THE WEIGHT OF THE EVIDENCE SUPPORTS DETENTION

The indictment in this case alleges that Kabra solicited money from investors by falsely representing that their money would be used to foster the growth and development of start-up companies, to prepare those companies for sale, or for other legitimate business purposes. Instead of investing in legitimate business opportunities, Kabra used much of the money he received from investors for other purposes, including to pay for personal expenses or to pay off pre-existing debts. Doc. No. 28, ¶ 4. The indictment also alleges that Kabra executed a scheme to defraud Brookline Bank—ultimately leading that bank to close Kabra's account and take a substantial loss. *Id.* ¶¶ 34-39. Both the indictment itself and the Sheahan Affidavit identify specific examples of Kabra's fraudulent conduct—targeting multiple victims—and demonstrate that the government's allegations are well-supported by Kabra's own written communications, financial records, and other documentary evidence. Moreover, the indictment and Sheahan Affidavit not only show that the government has substantial evidence of Kabra's serious crimes, but also they demonstrate Kabra's repeated and flagrant disregard for his financial obligations and for any notion of honest dealing.

### The Wire Fraud Scheme

Kabra solicited an investment from the individual identified in the Sheahan Affidavit as Investor A[5] in June and July of 2018. In a series of text messages, Kabra indicated to Investor A that: (i) the money would be invested in a deal with a third-party ("they're going to pay us back in 4 increments"; "I have a call with them in 30 mine [sic]"); (ii) that the investment would be backed

---

[5] The individuals identified as Investors A-D in the Sheahan Affidavit correspond to the individuals identified as Victims 1-4 in the indictment.

by "tokenized collateral"; and (iii) that Kabra would be investing alongside Investor A ("I'm doing 125 on it now I think I can buy time from them"; "Deal is 350 im doing 150 if you can do the 200 id like to keep it just us two."). Sheahan Aff. ¶¶ 12-15. Soon after obtaining an investment commitment from Investor A, Kabra sent similar messages outlining an investment proposal to Investor B—including again representing that Kabra himself would be investing alongside Investors A and B ("Total round: $500K Committed so far: [Investor A]: $200K Tan $150K."). Sheahan Aff. ¶ 17. Kabra executed promissory notes with both Investor A and Investor B stating that the purpose of their investments was "financing the startup." Sheahan Aff. ¶¶ 20, 24.

Each of these statements was a misrepresentation. Kabra did not invest alongside Investors A and B; he did not invest their funds in any deal with a third-party; he did not use their money to "finance[] the startup"; and there was no "tokenized collateral" securing the investment—because there was no investment at all. Instead, immediately after receiving their money—$250,000 from Investor A and $100,000 from Investor B—Kabra used the bulk of that money to purchase a boat and to pay off pre-existing credit card debt. Sheahan Aff. ¶¶ 28-35.

Nothing in the defendant's submission rebuts these allegations or exculpates Kabra for this conduct. It could be true that purchasing a boat has a "legitimate business justification for an entrepreneur," or that it is "common … for owners of small businesses to intermingle personal and business expenses." A. Kabra Decl. ¶¶ 17, 19; Mem. at 9-11. But that is irrelevant in these circumstances—where Kabra specifically represented that Investor A and B's funds would be invested with a third-party, that Kabra would be investing along Investor A and B, and that their investment would be backed by collateral and used to finance a start-up. Similarly, Atim Kabra's statements that he "understand[s]" that Investors A and B sought early repayment of their loans and that this "forced Tan to scramble" A. Kabra Decl. ¶ 15, are again irrelevant—Kabra had

defrauded Investors A and B in July 2018 when he first misappropriated their money within days of receiving it.

Much the same is true for Investors C and D.  Kabra solicited an investment from Investor C in December 2018 based upon an email representation that the "first close" of his new fund, KV Ventures I, LP, "*has already been done at $7M* and that cash will be coming into the fund within the next few weeks."  Sheahan Aff. ¶ 47; A. Kabra Decl. ¶ 14 (emphasis added).  The defendant now all but admits this was untrue and characterizes the $7 million figure as Kabra's "estimate[]" of what Kabra hoped to raise for his new fund.  A. Kabra Decl. ¶ 14; Mem. at 7.  But that is simply not what Kabra told Investor C.  Kabra specifically told Investor C that the $7 million "first close" of his new venture fund had already been completed and that Investor C's funds would be used to complete a second round of fundraising, which Kabra estimated at $18 million.  Sheahan Aff. ¶ 47; A. Kabra Decl. ¶ 14; Mem. at 6.  Kabra solicited an investment of $250,000 from Investor C based on a patently false representation and then promptly used those funds to pay off prior investors—despite never telling Investor C that he would do so.  Sheahan Aff. ¶¶ 53-54.

In similar fashion, Kabra obtained a $75,000 investment from Investor D by telling him that one of the start-up companies in LaunchByte's portfolio had signed a letter of intent to be acquired by a large well-known company and Investor D understood that his investment would go to facilitate this acquisition.  Sheahan Aff. ¶ 56. But this too was false—the start-up company had never entered a letter of intent to be acquired, and never heard of, or received funds from, Investor D.  Sheahan Aff. ¶ 61.

Finally, the defendant attempts to obscure his fraud by pointing out that promissory notes executed by Kabra in 2019 contained this language:

> Lender agrees and acknowledges that the purpose of this Note is to provide funds to Borrower so that Borrower may, inter alia, consolidate creditors and support

11

>  Borrower's fees associate [sic] with the associated venture fund's setup and administration, fundraising, and closings, including, without limitation, professional services fees.

A. Kabra Decl. ¶ 13 & Exs. A & B; Mem. at 6. But that language appears in none of the promissory notes executed between Kabra and the victims identified in the indictment, *see* Looney Decl. Exhs. A-D, and none of those investors were told that their money would pay off LaunchByte or Kabra's pre-existing debts.

### The Bank Fraud Scheme

On or about March 11, 2019, Kabra executed a check from a Northwestern Mutual account—that has never been funded and never held a positive balance—in the amount of $125,000 and deposited that check into his account with Brookline Bank, bringing the balance into that account to $124,885.64. Sheehan Aff. ¶¶ 67-68. Over two days, March 11-12, 2019, Kabra executed transfers and wrote checks from his Brookline Bank account totaling approximately $124,000, bringing the balance in the Brookline Bank account to $675.28 by the end of March 12, 2019. *Id.* ¶¶ 70-71. When the deposit of $125,000 was reversed—because there was no money in the originating account—the balance in the Brookline Bank account fell to *negative* $124,324.72. *Id.* ¶ 71. Despite repeated representations by Kabra that funds would be wired or deposited into the account, neither Kabra nor anyone else made a deposit or wire into the account up to the time of Kabra's arrest on August 4, 2019, nearly five months later, and by May 2019, Brookline Bank had charged-off and closed Kabra's account, taking a loss of $76,091.72. *Id.* ¶¶ 74-77.

Kabra denies none of this, but instead attempts to blame his six-figure overdraft of his Brookline Bank account on a business dispute. According to Atim Kabra, Kabra expected a $125,000 deposit into his account on March 11, 2019. A. Kabra Decl. ¶ 22. As Atim Kabra tells it, Kabra had entered into a consulting agreement with Michael Cormier on behalf of his company,

Chef Dazzer LLC, for services in which LaunchByte would receive $125,000 in cash and $125,000 in equity. *Id.* It was in anticipation of this payment that Kabra deposited his $125,000 check from the Northwestern Mutual account to meet payroll and other expenses. *Id.* When Cormier "reneged on his commitment," Kabra was left "scrambling … until more bridge funding could be obtained." Mem. at 12.

Setting aside that Atim Kabra provides only scant basis for his "understanding" of information, his story fails to exculpate the underlying conduct and stand at odds with other known facts. First, despite his professed expectation of receiving a check on March 11, 2019, it remains crystal clear that, at the time that Kabra wrote and deposited a check from his Northwestern Mutual account, that account was not funded and never had been. Sheahan Aff. ¶ 67. Regardless of his expectations, Kabra knowingly wrote and deposited a check without the funds to cover it.

Second, the claim that the overdraft resulted from a good faith misunderstanding is at odds with Kabra's conduct after the $125,000 Northwestern Mutual check bounced. Rather than admitting to Brookline Bank (or to Northwestern Mutual) the supposed real reason for the overdraft of his account, Kabra resorted to a series of obfuscations and unfulfilled promises to repay his debt. On March 14, 2019, Kabra sent an email to a Brookline Bank officer stating that "I am at the Northwestern Mutual office sorting out an issue with my brokerage account that has caused the issue with Brookline Bank. Working on getting it resolved asap and wiring in." Hearing Exh. 6 at 6. But if, as Atim Kabra asserts, Cormier had reneged on a promise to provide funds, there is nothing to "sort[] out" with Northwestern Mutual, because no funds had or will exist in Kabra's Northwestern Mutual account. The next day, on March 15, 2019, Kabra sent a text message to a Brookline Bank employee stating: "All set. My dad will send a wire from Singapore. just talked to him. Then I'll wire back once the check I'm expecting comes in today

13

or mon." Hearing Exh. 8.  But this was false too.  Despite this and subsequent promises of repayment, no funds arrived in the Brookline Bank account over the nearly five months until Kabra's arrest.  Sheahan Aff. ¶¶ 73-77.

Both the wire and bank fraud schemes, not only make clear that the charges against Kabra are weighty and substantiated, but also that Kabra has a practiced ease with and proclivity to falsehoods and deceptions.  Repeatedly and routinely, Kabra deceived investors and banks, wrote bad checks, and made unfulfilled promises of repayment.  Taken together, and read fairly, Kabra's conduct is not that of a "young man … who often had to scramble to keep his vision afloat," Mem. at 19, but instead of a fraudster making persistent misrepresentations to maintain and cover-up his fraudulent scheme.

Kabra cannot be trusted to fulfill any commitment to appear for trial any more than he could be trusted to fulfill his many prior promises to his victims.

## CONCLUSION

The Court should uphold the Magistrate Court's determination and detain Tanmaya Kabra pending trial.

Respectfully submitted,

UNITED STATES OF AMERICA,

By its attorney,

ANDREW E. LELLING
United States Attorney

*/s/ Chris Looney*
Christopher Looney
Assistant United States Attorney
408 Atlantic Avenue, Suite 530
Boston, MA 02210
617.748.3287

Dated: September 18, 2019

## CERTIFICATE OF SERVICE

     Undersigned counsel certifies that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Chris Looney*
Christopher Looney
Assistant United States Attorney

Dated: September 18, 2019