UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> ) <br> v.  ) <br> ) <br> TANMAYA KABRA, ) <br> ) <br> Defendant. ) | Criminal No. 19-10335-DJC |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                       September 27, 2019

**Introduction**

Having made an independent, *de novo* review, see <u>United States v. Pierce</u>, 107 F. Supp. 2d 126, 128 (D. Mass. 2000); <u>United States v. Tortora</u>, 922 F.2d 880, 883 n.4 (1st Cir. 1990), of the more developed record than that before the Court at the initial detention hearing, the Court ALLOWS the motion to revoke detention order and orders pretrial release, D. 32, but subjects such release to a number of special conditions. The government sought detention on the ground that Defendant Tanmaya Kabra ("Kabra") poses a serious risk of flight pursuant to 18 U.S.C. §3142(g). For such ground to warrant pretrial detention, there must be a showing, upon a preponderance of the evidence, that no condition or combination of conditions will reasonably assure the Defendant's appearance. 18 U.S.C. § 3142(e); <u>United States v. DiGiacomo</u>, 746 F. Supp. 1176, 1180-81 (D. Mass. 1980). In determining whether detention is warranted, the Court must consider the factors under 18 U.S.C. § 3142(g) including the nature and circumstances of the offenses charged; the weight of the evidence; the history and characteristics of the defendant; and the nature

1

and seriousness of the danger that the defendant's release would pose. The Court addresses each of these factors in turn.

## Discussion

As to the first two considerations, it is undisputed that Kabra is facing serious charges: seven counts of wire fraud, one count of money laundering and one count of bank fraud. D. 28. Each charge carries the potential for significant imprisonment (e.g., the wire fraud and bank fraud counts alone carry maximum penalties of twenty and thirty years, respectively, D. 36-1 at 56, and the government estimates the advisory GSR as more than five years imprisonment, D. 45 at 3), and substantial fines and restitution to the alleged victims (Victim 1-4) along with the forfeiture of "any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses" charged. D. 28 at 13. (Kabra also faces a SEC action, D. 42 at 8). The weight of evidence as to these charges appears strong, particularly as to the bank fraud (involving Kabra's deposit of a $125,000 check for which there were no funds in the underlying account, but which once deposited at Brookline Bank, he swiftly withdrew almost the full amount in a day's time and, despite false promises to contrary to the bank, never repaid the insufficient funds). D. 36-1 at 22-25 and referenced exhibits. The Court understands that Kabra vigorously contests this charge and the other charges as well. The Court has considered Kabra's challenge to the weight of evidence as to this and the other counts, particularly whether he obtained the investments (or "loans" as Kabra has framed them) from Victims 1-4 by means of materially false and fraudulent pretenses, representations and promises about the purpose of such investments and the likely timing of any return on same. D. 33 at 18-19. Even so, the government has proffered a strong case as to the charges here even as both parties acknowledge that the "weight of the evidence is the least

important of the various factors" that this Court has to consider.  D. 33 at 18; D.42 at 2 (both citing United States v. Jones, 2008 WL 2434131, at *5 (S.D.N.Y. June 12, 2008)).

As to the third factor, the history and characteristics of the defendant, the parties would have the Court weigh this factor very differently even though the underlying facts (except as to his true financial condition) are largely not disputed.  Kabra is 25 years old, a naturalized citizen and has lived in the United States for most of his life, the past seven years in Massachusetts.  He was born in India, but immigrated here with his parents as a two-year-old and was raised here until 2006 when he was thirteen years old and his family moved to Singapore.  His parents and younger brother still live in Singapore, but Kabra returned to Massachusetts in 2012 to attend Babson College.  He graduated from the college in 2016 and remained in Massachusetts to build LaunchByte, the subject of these criminal charges.  Since September 2017, he has lived with his girlfriend (and intended fiancée), Alma Tambone ("Tambone") in Boston.  D. 35 at 1.  Since June 2019, when their most recent lease expired, Kabra and Tambone have lived in his parents' condo in New Jersey and her parents' residence in Wenham, Massachusetts and that the two have plans to rent an apartment in Beverly with assistance from Kabra's father.  D. 35 at 1.

Kabra has spent most of life in the United States and has not lived in India since he was two years old although he has some extended family there (including a grandmother) and has visited twice in the past year to visit his grandfather and then to attend his memorial service.  D. 35 at 3. Although Kabra was heading abroad for a two-week vacation with Tambone at the time of his arrest, D. 35 at 2, they had return tickets and such trip (or any other trip abroad) will be barred by his conditions of pretrial release.  Much was made of Kabra's status as an overseas citizen of India ("OCI") at the initial detention, but, as has been made clear on this appeal, travel as an OCI from the United States still requires a passport.  D. 45 at 1.  The conditions of release

limiting his travel to the district and requiring the continued seizure of his passport along with the continued confiscation of his OCI document (also seized at the time of his arrest) and the further condition that he may not seek, apply for or obtain a passport or any OCI or other travel document from any source, U.S. agency, Indian embassy or consulate or other source, will address this concern.  Although Kabra's family lives abroad, he has years-long ties here including to Tambone and her parents who live in the district.

As to Kabra's current financial resources, the Court agrees, to some extent with the government, that the picture of his current assets is not entirely clear.  Yet, the government appears to rely on the personal financial statement that Kabra provided to one of the Victims, D. 36-4 (Exhibit 9), to argue both that this financial information was false (to induce that investor into believing falsely that Kabra could guarantee his investment, D. 36-1 at 29-33) and that it was also true and indicates that he still has unaccounted for resources including cryptocurrencies that he readily can access if released.  D. 36-1 at 31.  Similar arguments are made about references Kabra made in texts with investors, referencing his "last 2M [two million] in the bank," D. 36-3, where, as the government also argues, their review of his bank records reveals nothing of the sort.  D. 36-1 at 16.  This review, coupled with the allegations regarding Kabra's alleged Ponzi scheme in which the government plausibly contends that he used funds obtained from some victims to pay others, see, e.g., D. 36-2 at ¶¶ 53,64, suggests that much of Kabra's own declared financial means may have been illusory.  Although there is a strong suggestion that Kabra's father has significant financial means, see D. 34 at 1-2 (description of work), it is not clear how any such means have been readily accessible to Kabra.  Compare D. 35 at 1 (indicating that Kabra's father will help with rent of Beverly apartment) with D. 36-1 at 24-25 & D. 36-4 at 17 (Kabra promising, but not delivering on, among other things, a wire from his father to Brookline Bank).  Lastly, that his

father actually has money abroad is different from Kabra referencing money in Mauritius to an investor, who according to government's theory, he was trying to lure into investing with him. D. 36-3 at 1. Unlike the evidence before the magistrate judge that perhaps was bolstered by reference to international wires of money by Kabra, D. 36-1 at 28; D. 36-3 at 9,11, the unredacted versions produced on appeal suggest that these wires were not going to Kabra's accounts. D. 36-5 at 8, 10.

Lastly, the government does not contend that Kabra poses a danger to the community, but seeks detention regarding his risk of flight. Having considered the full record and all of the factors under Section 3142(g), including the seriousness of the offenses, the Court concludes that a combination of conditions, beyond what Kabra's counsel has recommended, will assure his appearance.

## **Conclusion**

Accordingly, the Court ALLOWS the motion on the following conditions of release: release on surety bond of $250K; home confinement with GPS bracelet (with exceptions for employment interviews and employment with prior approval of PTS); report to PTS as directed; refrain from use and possession of controlled substances; submit to drug testing as directed by PTS; travel restricted to the District of Massachusetts; surrender of U.S. passport and OCI card to PTS; not seek, apply for, obtain or possess a passport or any other travel document from the U.S., Indian consulate or embassy or any other source, U.S. or foreign; seek and obtain employment, but refrain from self-employment or any employment with fiduciary responsibilities; report any contact with law enforcement within 24 hours; identify and maintain a residence in the District of Massachusetts acceptable to PTS (and suitable for GPS monitoring) and do not move without the prior permission of PTS; and any other conditions that PTS may recommend to the Court.

The Court will schedule a hearing for the imposition of release on conditions as soon as Kabra confirms a release plan with PTS that is consistent with these conditions.

**So Ordered.**

<u>/s/ Denise J. Casper</u>  
United States District Judge