UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 19-cr-10335-DJC |
| | ) | |
| TANMAYA KABRA, | ) | **PUBLIC REDACTED VERSION** |
| Defendant. | ) | |
| | ) | |

---

## GOVERNMENT'S MOTION FOR RESTITUTION

The Government, by and through undersigned counsel, moves this Court to order that defendant Tanmaya Kabra make restitution to the twenty-eight identified victims of his fraud scheme in the total amount of $1,847,106.24.

On April 8, 2019, Kabra pled guilty to four counts of wire fraud in violation of 18 U.S.C. § 1343. The Mandatory Victim Restitution Act of 1996 ("MVRA") requires that a defendant convicted of any crimes involving fraud or deceit make restitution to any victim of that offense. 18 U.S.C. §§ 3663A(a)(1), (c)(1)(A)(ii). The MVRA broadly defines victims in a fraud scheme to include "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2).

The Government has identified 28 victims directly harmed by Kabra's criminal scheme. The following table identifies these victims and the outstanding (unrepaid) principal amount that Kabra stole from each as part of his fraudulent scheme:

| Victim Number[1] | VNS ID | Victim Name | Principal[2] |
|---|---|---|---|
| Victim No. 1 | 6080388 | | $250,000 |
| Victim No. 2 | 6077657 | | $0 |
| Victim No. 3 | 6080389 | | $250,000 |
| Victim No. 4 | 6077659 | | $0 |
| Victim No. 5 | 6535193 | | $75,000 |
| Victim No. 6 | 6535190 | | $85,000 |
| Victim No. 7 | 6535189 | | $176,250 |
| Victim No. 8 | 6535265 | | $93,400 |
| Victim No. 9 | 6080397 | | $100,000 |
| Victim No. 10 | 6077631 | | $100,000 |
| Victim No. 11 | 6080396 | | $100,000 |
| Victim No. 12 | 6080373 | | $80,000 |
| Victim No. 13 | 6535242 | | $25,000 |
| Victim No. 14 | 6535218 | | $150,000 |
| Victim No. 15 | 6080392 | | $30,000 |
| Victim No. 16 | 6535213 | | $2,000 |
| Victim No. 17 | 6535241 | | $28,000 |
| Victim No. 18 | 6532924 | | $15,000 |
| Victim No. 19 | 6535210 | | $0 |
| Victim No. 20 | 6062623 | | $0 |
| Victim No. 21 | 6080387 | | $40,000 |
| Victim No. 22 | 6080390 | | $25,000 |
| Victim No. 23 | 6080391 | | $25,000 |
| Victim No. 24 | 6535192 | | $22,000 |
| Victim No. 25 | 6535243 | | $25,000 |
| Victim No. 26 | 6535243 | | $70,000 |
| Victim No. 27 | 6535243 | | $30,000 |
| Victim No. 28 | 6535214 | | $21,780 |
| TOTAL | | | $1,818,430 |

---

[1] Two of the victims, Victim Nos. 2 and 4, were repaid by Kabra prior to his arrest with funds that Kabra received from subsequent fraud victims. Following Kabra's arrest, two other victims, Victim Nos. 19 and 20 were repaid the full amount of their investment with Kabra by Atim Kabra, Kabra's father, and a third, Victim No. 21 who invested $60,000 with Kabra, was repaid $20,000 by Atim Kabra.

[2] In April 2021, the United States submitted questionnaires to identified victims of Kabra's fraud scheme to assist in identifying the amount of victim losses. Where discrepancies existed between a victim's questionnaire responses and information independently developed by the Government's investigation, the Government has contacted the relevant victim or their counsel. Based upon those discussions, the Government understands that these victims concur that amounts reflected in the table above accurately reflect the restitution amount to which each are entitled. The Government has provided copies of the restitution response questionnaires to the U.S. Probation Office and to counsel for Mr. Kabra.

Kabra admits that restitution is owed to twenty-three of the twenty-eight victims identified by the Government, but contests the amounts owed to one of these victims and denies that any restitution is owed to five.  Defendant's Objection to PSR ("PSR Objection") ¶ 184.  In each of these six cases, the defrauded victim provided funds to Kabra based on Kabra's false representations that the money would be used to build mobile-applications for start-up companies or other business development services.  Kabra misrepresented the cost of these services to these victims, and he misrepresented that Kabra and/or LaunchByte would be investing in the companies.  And instead of using the funds for their dedicated purposes, Kabra diverted the money to pay-off his mounting debts, for his own lavish personal spending, and for other improper purposes unrelated to these victims' businesses.  Because he diverted these victims' funds from their intended purpose, inevitably, Kabra failed to provide the promised services to these victims—providing instead non-working apps and slipshod work of no meaningful value.

Kabra denies this and argues that, even though he was operating a Ponzi-scheme and defrauding dozens of investors, his business, LaunchByte, was "legitimate" and provided real value to his defrauded victims.  PSR Objection ¶ 9.  Kabra claims that his disputes with these victims, to whom he repeatedly lied, are "civil matter[s] where there is only a small amount of money in dispute," PSR Objection ¶ 48, and blames the victims themselves for the delays and failures of their projects because they "constantly changed [their] idea for the product," *id.*, had only a "vague concept" for the business, *id.* ¶ 53, or expanded the "scope of work" of their projects, *id.* ¶ 112.

Kabra's objections hold no water.  Kabra lied to these victims repeatedly to get money from them and failed to provide the agreed upon services to the victim's businesses—because he

stole the money that should have been used to do just that. Each of the individuals identified by

the Government are victims of Kabra's offense and Kabra should be required to pay restitution

equal to the full amount he stole from them.

In addition to the return of funds invested with Kabra, the Government requests that the

Court order Kabra to relinquish any stake in the company co-founded by Victim No. 8. As

described more fully below, Kabra's claim to any stake in this business is property obtained

through his fraudulent criminal conduct and so should be returned.

Finally, four victims have submitted requests for the reimbursement of legal expenses

incurred "during participation in the investigation or prosecution of the offense or attendance at

proceedings related to the offense," which are eligible for restitution under the MVRA. 18 U.S.C.

§ 3663A(b)(4). The amount of these legal fees and expenses are listed below:

| Victim Number | VNS ID | Victim Name | Legal Expenses |
|---|---|---|---|
| Victim No. 1 | 6080388 | | $12,438 |
| Victim No. 3 | 6080389 | | $8,589 |
| Victim No. 8 | 6535265 | | $2,635.24 |
| Victim No. 12 | 6080373 | | $5,014 |
| TOTAL | | | $28,676.24 |

## LEGAL FRAMEWORK FOR RESTITUTION PURSUANT TO THE MVRA

Because Kabra has pled guilty to an offense "committed by fraud or deceit," the MVRA

requires the Court to order Kabra to "make restitution to the victim[s] of the offense." 18 U.S.C.

§§ 3663A(a)(1), (c)(1)(A)(ii). In a case involving a fraudulent scheme—as charged here—

restitution is not limited solely to the victims of the individual charged fraud counts, but is

available to "any person directly harmed by the defendant's criminal conduct in the course of the

scheme." *Id.* § 3663A(a)(2). As the First Circuit has explained:

> [T]he district court may order restitution to every victim directly harmed by the
> defendant's conduct "in the course of the scheme, conspiracy, or pattern of
> criminal activity" that is an element of the offense of conviction, without regard to
> whether the particular criminal conduct of the defendant which directly harmed

4

the victim was alleged in a count to which the defendant pled guilty, or was even
charged in the indictment.

*United States v. Hensley*, 91 F.3d 274, 277 (1st Cir. 1996).

Under the MVRA, the government bears the burden to establish the amount of loss

sustained by a victim and must do so by a preponderance of the evidence. *See* 18 U.S.C.

§ 3664(e). Reliable hearsay, including both sworn and unsworn statements, is admissible. *See*

Fed. R. Evid. 1101(d) (rules of evidence do not apply to sentencing); *see also United States v.*

*Naphaeng*, 906 F.3d 173, 180 (1st Cir. 2018), cert. denied, 139 S. Ct. 1233 (2019) (affirming

restitution award). The First Circuit has consistently held that the government's restitution

calculation need not be precise, so long as it is not speculative or unreasonable. *See, e.g., United*

*States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) ("[A]bsolute precision is not required."). In

determining restitution, "a sentencing court is not expected to undertake a full-blown trial"; to

the contrary, "a restitution award requires only a *modicum of reliable evidence*." *Naphaeng*, 906

F.3d at 179 (1st Cir. 2018) (internal quotations omitted; emphasis added). *See also United States*

*v. Sanchez-Maldonado*, 737 F.3d 826, 828 (1st Cir. 2013) ("As long as the court's order

reasonably responds to some reliable evidence, no more is exigible.").

## BACKGROUND TO KABRA'S SCHEME

On April 8, 2021, defendant Tanmaya Kabra pled guilty to a superseding Information (Dkt.

No. 133) charging him with four counts of wire fraud in violation of Title 18, United States Code,

Section 1343. As set forth in the charging documents and as Kabra admitted during his plea

colloquy, beginning in or about at least August 2017, Kabra attracted investors by holding himself

out as a successful entrepreneur and investor, and by offering lucrative and low-risk or no-risk

returns on purported investments. Kabra conducted his business individually and through

LaunchByte.io, LLC (also known as The Kabra Group, LLC), which he wholly owned, and other affiliated companies.  PSR ¶ 8.

Kabra solicited money from investors by falsely representing that their money would be used to foster the growth and development of start-up companies, to prepare those companies for sale, or for other legitimate business opportunities.  Instead of investing the funds he received in legitimate business opportunities, however, Kabra used much of the money that he received for other purposes, including to pay personal expenses.  PSR ¶ 9.

The PSR details the fraudulent means through which Kabra perpetrated his scheme:

- falsely representing the extent of his wealth and his ability to guarantee repayment of investor funds;

- providing falsified bank statements and wire transfer notices purporting to show either that Kabra and his company had received large sums of money (which would be available to repay investors) or that Kabra had made payments to investors to whom he owed money;

- falsely representing that LaunchByte had entered an agreement to be acquired by a private equity company for a payment in excess of $10 million (that would then be available to repay LaunchByte investors); and

- falsely representing that funds received from investors would be used for specified business purposes, but instead diverting those funds for personal use or to repay previously defrauded investors.

PSR ¶ 34.  The PSR also details steps Kabra took to avoid detection of his scheme, including:

- making Ponzi-like payments using funds from new investors to repay previously defrauded investors;

- writing bad and unfunded checks to defrauded investors;

- falsely representing that he had wire-transferred funds to defrauded investors;

- falsely representing to investors that KABRA and LaunchByte were themselves the victims or theft and/or fraud; and

- threatening to take legal action against LaunchByte employees, investors, and contractors.

PSR ¶ 35.

## ARGUMENT

***Victim No. 7 (***               ***)***

Kabra and Victim No. 7 entered into two agreements pursuant to which Victim No. 7 agreed to pay a total of $235,000 to Kabra and Kabra agreed to use those funds for the development of a mobile-app for two businesses, ▮▮▮▮▮▮▮ and ▮▮▮▮▮▮ ("Company A" and "Company B") and for other business development services.  Kabra falsely represented to Victim No. 7 that her money would be maintained in a sub-account dedicated to Victim No. 7's business.  PSR ¶ 46-47; Exh. A (email dated April 24, 2018 from Kabra to Victim No. 7 stating: "We are setting up the [Company A] sub account with our bank now so everything will be all set for tomorrow.").

Victim No. 7 executed a check to LaunchByte in the amount of $80,000 that was deposited in the Brookline-3538 Account to pay for the services for Company A on May 1, 2018. *See* Exhs. B, C.  Victim No. 7's funds were not deposited into a sub-account dedicated to Company A nor were they used for any services provided to Company A.  Instead, on May 1, 2018, the Brookline-3538 bank account had a balance of *negative* $68,634 and the vast majority of Victim No. 7's funds were used to pay off this negative balance—and not for any activity related to Victim No. 7's business.  *See* Exh. C.

Subsequently, Kabra used money from Victim No. 7 to pay off an unrelated loan. Specifically, in a separate transaction, on September 6, 2018, Kabra received a $115,00 loan from a third-party, Elite Time Inc, ("Third Party A"), which Kabra promptly used to pay off pre-existing debts.  *See* Exh. D.  To obtain this loan, Kabra promised to repay $126,500 to Third Party A no later than September 10, 2018 and offered as collateral the boat he purchased with

funds stolen from Victim No. 1.  *See* Exh. E.  After failing to pay back this loan on time, Kabra

strung Third Party A along with a phony wire transfer receipt and then with promises that Kabra

would make payment no later than September 18, 2018 or lose his "brand new boat."  *Id*.  To

avoid losing his boat, Kabra convinced Victim No. 7 to transfer the remaining $155,000 balance

due on the development agreements on September 18, 2018.  Again, rather than using Victim

No. 7's funds for any legitimate purpose, Kabra used her funds to pay off his personal loan.  Exh.

F.  Despite receiving $235,000 from Victim No. 7, by October 2018, Kabra failed to pay the

overseas developers that he had hired to work on Company A's project, resulting in a stoppage

of work.  *See* Exhs. G, H.

Kabra failed to perform the services required by the two agreements that he had entered

with Victim No. 7.  As documented in emails from Victim No. 7 to Kabra and a demand letter

from her attorney, Kabra developed a mobile-application for Company A that failed to work.

*See* Exhs. I (email from Victim No. 7 to Kabra, Jan. 29, 2019: "you have not delivered a 1)

working product 2) even if you fix the bugs the key functionality is missing, 3) any of the

services that you promised (buzz feed promotion , sales strategy , marketing etc etc etc ) just to

name a few."); Exh. J (letter from Victim No. 7's counsel to Kabra, Feb. 26, 2019:  "After

entering the [Company A] and [Company B] Service Agreements, you breached those

agreements by failing to provide the agreed-upon services."); Exh. K (email from Kabra to

Victim No. 7, Jan. 24, 2019, acknowledging the Company A mobile-application was non-

functional).  Kabra provided no work of any value for Company B.  *See* Exhs. I, J.  Though she

was then-unaware of the diversion of her funds into Kabra's Ponzi-scheme, Victim No. 7

catalogued Kabra's further lies and misrepresentations regarding, *inter alia*, the qualifications

and capabilities of LaunchByte and the location of her development team.  *Id.*[3]

Victim No. 7 has estimated the value of the work actually performed by Kabra to be

$58,750.  PSR ¶ 48; Exh. J.  Victim No. 7 has not received repayment of any of the amount paid

to Kabra.  The difference between the amount she paid Kabra ($235,000) and the value of the

services she received ($58,750) is $176,250.  PSR ¶ 49.  The Court should enter an order

awarding restitution to Victim No. 7 in the amount of $176,250.

***Victim No. 8 (*** █████████ ***)***

Kabra does not deny that he defrauded Victim No. 8 nor does he deny that the Court

should order restitution to her in the amount of $93,400.  *See* PSR ¶ 184; PSR Objection ¶ 184.

Kabra, however, "disputes that LaunchByte never completed the development services for

█████████," a company founded by Victim No. 8 ("Company C").  *Id.* ¶ 53.  As described

below, this denial is false and, in addition to awarding $93,400 to Victim No. 8, the Court should

order that any stake obtained by Kabra (or any entity affiliated with him) in Company C should

be relinquished.

In early 2018, Kabra, his then-girlfriend, and Victim No. 8 discussed forming a company

together.  During these discussions, Kabra represented that he was savvy and experienced in

building multi-million dollar companies.  As he explained to Victim No. 8, "[s]ome people ride

bikes, others collect stamps…I build multi-million dollar companies.  It's a hobby, a passion, and

---

[3] Characteristically, Kabra responded to Victim No. 7's email with further lies, including falsely denying that LaunchByte had investors ("I have zero investors in LaunchByte") and representing that his need for funds in September 2018 related to a bogus reporting requirement ("You were so panicked about me wiring the money even texting me very late and meeting me at my bank very nervous - I should have run then - a big red flag"; "I don't see this as being a red flag, I had mentioned to you several times that when we sign those agreements and take equity, we need to show that the entire contract was fulfilled and I had already reported that we received your capital. When it was held for 16 days by the bank, I just became nervous about misreporting something. That is all.").  *See* Exh. L.

something I'm quite good at." Exh. M. In or around May 1, 2018, this trio entered into an agreement to form a web and mobile application-based travel company, Company C. Pursuant to the formation agreement for this company, Victim No. 8 was required to contribute $93,400 for a 28% ownership stake in the newly formed entity, Kabra's girlfriend was to contribute $170,000 for a 48% ownership stake, and an entity controlled by Kabra called Purple Monkey Venture Partners, LLC was to contribute $85,000 for a 24% ownership stake. The funds were intended to be used by LaunchByte for the development of an online platform and application for Company C, as well as other business services. As required by the parties' agreement, Victim No. 8 wired $93,400 to the Brookline-3538 account in early May 2018—but Kabra and his girlfriend did not make their required payments. PSR ¶¶ 50-51.

Instead, Kabra falsely represented to Victim No. 8 that both Purple Monkey Ventures and his girlfriend had made their contributions and, when Victim No. 8 requested confirmation from Kabra that the payments from Purple Monkey Ventures and Kabra's girlfriend had been sent, Kabra responded by providing falsified receipts for wire transfers in the amount of $84,985 (from Purple Monkey) and $169,985 (from Kabra's girlfriend). PSR ¶ 51; Exh. N.

Kabra "disputes that LaunchByte never completed the development services for [Company C]" and claims that "LaunchByte created an MVP for [Company C]" and then "hired a U.S. based developer to refine the app to improve upon it." PSR Objection ¶ 53. Kabra's objections are false; LaunchByte never completed work on the Company C app. As Victim No. 8 explains: "███████████ was never completed as a working App in a format that could be launched in the App Store … I have been left with *nothing* to show for my efforts, time, or money." Exh. O (emphasis added). Specifically, though Kabra represented to Victim No. 8 that the development of the Company C mobile-app would cost hundreds of thousands of dollars,

Kabra retained an overseas developer to develop the mobile-app for a fraction of the cost.
*See* PSR ¶ 53, Exh. P, Q.  Because this developer failed to provide an adequate product at that
cost, Kabra retained another U.S.-based developer for $10,000 to develop the mobile-app "from
scratch" (in Kabra's own words) in February 2019.  *See* Exh. R (email from Kabra, Feb. 11,
2019: "[Developer] just joined the [Company C] team as their lead dev.  He is going to be
writing the app from scratch.").  Months later (and roughly one-year after Victim No. 8 had
delivered $93,400 to Kabra), the mobile-app continued to be non-functional.  *See* Exh. S.[4]  After
this new developer resigned in June 2019 without being able to complete the mobile-app (*see*
Exh. T), Kabra repeatedly sent messages to the developer threatening to sue him and to destroy
his professional reputation (*see* PSR ¶ 54; Exh. U), but, as described above, work on the mobile-
app for Company C was never completed and Victim No. 8 has never received repayment of the
$93,400 she sent to Kabra.  PSR ¶¶ 53-55.[5]

***Victim No. 15 (*** ▬▬▬▬▬▬ ***)***

Kabra hired Victim No. 15, an undergraduate college student, as a summer intern for the
period of May 6, through July 5, 2019, promising to pay him $2,000.  Exh. W.  In May 2019,
Kabra obtained a $5,000 investment from Victim No. 15.[6]  Kabra represented to Victim No. 15
that the funds would be used as an investment in one of Kabra's portfolio companies and would

---

[4] Kabra's girlfriend also made clear that Kabra failed to deliver on his promises to build Company C.  *See*
Exh. V ("You haven't held up your end of the deal.").  *See also* Exh. QQ (email from Victim No. 8 to Kabra, June
30, 2019: "I [m]ay be seeing [a potential Company C investor] soon and I just can't believe I don't have anything to
show him.").

[5] Kabra makes the contradictory claims both that LaunchByte adequately provided development services to
Company C, but that the developer hired to perform exactly those tasks "failed to deliver on his contract."
PSR Objections ¶¶ 53-54.  And Kabra's denial that this developer resigned is simply another lie.  *See* Exh. T.

[6] Kabra denies that he "solicited" an investment from Victim No. 15—contending that Victim No. 15 came
to Kabra with the funds.  Kabra otherwise does not deny the content of PSR ¶ 81.  *See* PSR Objections ¶ 81.

be repaid from proceeds of the acquisition of the company.  PSR ¶ 81.  Rather than invest these

funds in any manner, Kabra stole them and used the money to pay off credit card debt and an

extravagant night club bill.  *See* PSR ¶ 82; Exh. X.[7]

Later in May 2019, Kabra and Victim No. 15 entered into a "Consulting Agreement"

pursuant to which Victim No. 15 agreed to pay $125,000 to Kabra for business development

services and Kabra agreed to invest a further $125,000 in Victim No. 15's business, ████

("Company D").  Pursuant to the consulting agreement, these funds were to be used for the

development of Company D.  PSR ¶ 83; Exh. Y.  Victim No. 15 caused to be wired a total of

$25,000 to Kabra.  PSR ¶ 84.  Kabra used these funds to pay off debts to previously defrauded

investors (including paying $20,000 to Victim No. 28, discussed below) as well as personal

expenses.  *See* Exhs. X, Z, AA.

Victim No. 15 never received repayment of his $5,000 investment, was not paid the

$2,000 owed for his internship, and never received repayment of the $25,000 paid for the

development of his business.  PSR ¶ 85; Exh.  BB (Victim No. 15 Loss Statement).  Kabra

contends, however, that LaunchByte "designed much of the UI/UX for [Victim No. 15]'s app,

created an investor slide deck, had more than five hour plus planning/strategy meetings with

[Victim No. 15], and created advisory documents for him to give to friends and family"—and so

he owes nothing to Victim No. 15.  PSR Objection ¶ 85.

Kabra is wrong.  First, Victim No. 15 himself, when asked for his "best estimate of the

value" of what he received from Kabra, states simply:  "Nothing provided."  Exh. BB.  Second,

what material Kabra did produce for Victim No. 15 was plainly just a lure to get more cash into

---

[7] At the same time that he was stealing Victim No. 15's money and spending it at a night club, Kabra wrote
a bad check to the developer hired to build the mobile application for Victim No. 8's business.  Exh. X.

Kabra's scheme. Specifically, the "investor presentation" created by Kabra contemplates Victim No. 15 borrowing $125,000—to be guaranteed by LaunchByte Ventures—and includes the false representation that the Company D had "[p]reviously raised $125,000 from Vanguard Venture Group [another Kabra-affiliated entity]." Exh. CC. Soon after creating this presentation and barely more than two weeks before his arrest, Kabra continued to press Victim No. 15 for more money. Exh. DD (email from Kabra to Victim No. 15, July 17, 2019: "Remainder capital raise: need to grab even some portion, another 25K or something so we can continue on without fail."). Far from assisting Victim No. 8 in developing his business, Kabra simply wanted Victim No. 15 to obtain more funds to fuel Kabra's Ponzi-scheme.[8]

Victim No. 15 paid Kabra $30,000 and worked as his intern for a summer. He received nothing whatsoever of value in exchange for his time, effort, and money. Victim No. 15 should be awarded $30,000 in restitution.

***Victim No. 25 (*** █████ ***), Victim No. 26 (*** █████ ***), Victim No. 27 (*** █████ ***)***

On or about January 29, 2018, Kabra, on behalf of LaunchByte LLC, executed a consulting agreement with █████ ("Company E") (a start-up cofounded by Victim No. 25's daughter) pursuant to which, among other things, LaunchByte was required to provide specified consulting and business-development services in exchange for a payment of $124,630. Company E's founder solicited funds to fulfil this contract from outside investors—Victim Nos. 25-27. PSR ¶¶ 105-106.

Over the course of 2018 and 2019, Victim No. 25 paid Kabra a total of $25,000, Victim No. 26 paid Kabra a total of $30,000, and Victim No. 27 paid Kabra a total of $70,000.

---

[8] The notion that the Court should attribute any value to "five hour plus planning/strategy meetings," PSR Objection ¶ 85, held between Victim No. 15 and Kabra, a felon and fraudster, is absurd on its face.

PSR ¶¶ 107-108.  These funds were intended to be used by LaunchByte and Kabra for the

development of Company E.  Kabra failed to use these funds to provide the promised services to

Company E and instead spent much of the funds on personal expenses and unrelated business

expenses.

By December 2019, despite having signed a development agreement nearly a year earlier

and having received more than $95,000 from the Company E investors, Kabra did not even have

a development team available to work on the Company E project.  *See* Exh. EE.  Eventually,

Kabra outsourced the work on Company E to an India-based developer, but by March 2019, this

developer refused to perform work for Company E (as well as other projects for Kabra), because

Kabra failed to pay the developer's invoices for the last three months.  Exh. FF (email to Kabra,

Mar. 1, 2019: "Just FYI, we'll now stop sending build and stop attending the calls from Monday

until 3 months dues are clear.").  *See also* Exh. GG (email to Kabra, Apr. 17, 2019:  "This is the

last week we'll be working on … [Company E]. From Monday, if we don't receive any payment,

we'll be stopping the work.").  When the founder of Company E raised concerns about the lack

of progress, Kabra did not disclose that he had diverted the funds of the investors in Company E

and that their developers had not been paid and, instead, responded with obfuscation: "[W]e were

facing some issues resource wise but the work was constantly going on, just builds were not

being received."  Exh. HH.  Kabra failed to provide the promised services to Company E and has

never repaid Victim Nos. 25 – 27.  PSR ¶ 109.  Following Kabra's arrest, Company E's lawyer

sent a letter to Kabra documenting his failures to perform the services required by the consulting

agreement:

> Pursuant to the Consulting Agreement LaunchByte was obligated to design,
> engineer, and develop … the [Company E] application (the "App"), provide
> marketing, financial and business development consulting and operate as co-
> founder…. [Company E] paid LaunchByte and Mr. Kabra $124,630.00 … [A]s of

September 22, 2019, LaunchByte failed to Develop and deliver the APP and
failed to perform the Co-Founder Support Services…. As a result, [Company E]
has suffered in launching its business, developing its customer base, generating
revenues, fund raising, entering the market, loss of investor capital and confident
and remains without ownership of the APP.

Exh. II.  The Court should order Kabra to pay restitution of $25,000 to Victim 25, $30,000 to

Victim No. 26, and $70,000 to Victim No. 28.

***Victim No. 28 (*** ██████████ ***)***

On June 27, 2017, Kabra, on behalf of LaunchByte, executed a "Development

Consultancy Agreement" with ███████ ("Company F") (a start-up founded by Victim No. 28)

pursuant to which, among other things, LaunchByte was required to provide specified business-

development services in exchange for a payment of $41,780.  PSR ¶ 110; Exh. JJ.  Kabra also

agreed that LaunchByte would provide an investment of $83,560 in order to fund the total cost of

the work, which Kabra represented was $125,340.  The development Agreement also specified

that LaunchByte's services under the agreement "are to be performed at [LaunchByte's]

location."  *Id.*[9]

Victim No. 28 paid the full amount owed under the contract.  He executed a check to

LaunchByte for $10,000 dated June 27, 2017, a second check for $10,000 on June 28, 2017, and

a third check for $21,780 on September 1, 2017.  PSR ¶ 111; Exh. KK.  The two $10,000 checks

from Victim No. 28 were deposited into LaunchByte's account at First Republic Bank on June

28, 2017.  At that time, the account had a negative balance and funds from Victim No. 28 were

used to pay off this negative balance.  Exh. LL.  Kabra likewise used the payment of $21,780 to

pay off other debts, rather than for any project associated with Company.  PSR ¶ 112.

---

[9] Kabra's objections to the PSR "clarif[y]" that this language "does not bar LaunchByte from hiring outside
developers or contractors."  This distinction makes no difference; the language plainly contemplates that the
"services" under the agreement were required to be performed at LaunchByte's location in Boston, Massachusetts.

Rather than spend the money received from Victim No. 28 on the development services promised to Company F, Kabra retained an India-based developer to provide the required development services to Company F—in violation of the terms of the development agreement. PSR ¶ 112, Exh. JJ.  Kabra transferred $5,000 to this developer, but insisted that $3,000 be credited to a different project for a different client—valuing the work performed for Victim No. 28 at under $2,000.  *See* Exh. MM.[10],[11]  Kabra and LaunchByte failed to provide the promised services to Victim No. 28 and to Company G.  PSR ¶ 111-112; Exh. NN (letter to Kabra from Victim No. 28's counsel, Dec. 4, 2017:  "We are now almost 25 weeks past the Agreement completion due date … and more than 80% of the Deliverables required under the Agreement have not been provided by LaunchByte and those Deliverables that have been received have been provided in a manner that makes them useless and unacceptable."); Exh. MM (email from Kabra, Nov. 10, 2017, acknowledging the project "failed").

In April 2019, Kabra and Victim No. 28 executed a settlement agreement requiring Kabra to pay Victim No. 28 $20,000 no later than May 24, 2019.  Kabra paid Victim No. 28 $14,000 on May 31, 2019—using funds obtained from Victim No. 15 (described above)—and a further $6,000 on June 7, 2019.  PSR ¶ 113.[12]  Victim No. 28 has not received repayment of the

---

[10] Email from Kabra, Nov. 10, 2017: "[S]ince [Company F] is no longer a client, let's look at the payment that was made here. 113 hours was provided by you guys for design. At $17.50 / hour which is our agreed upon rate, That comes to just under $2K ($1,977.50 to be exact). We have paid you a $5K initial fee because you asked for it to be heavy in the beginning to assist with cash flows for the project and then smaller payments as we near completion. Since just design was done (not fully completed but since there were some small secondary changes, I will let it count as done), that is only $1,977 out of $5,000 that was used. Instead of asking you to wire it back, you can take the remainder $3K and apply it to [another company]."

[11] Kabra knew that his retention of an India-based developer at such a miniscule cost was improper—as demonstrated by his angry reaction to learning that Victim No. 28 had become aware he paid the Indian developer only $5,000.  *See* Exh. OO.

[12] A civil settlement cannot, as a matter of law, extinguish Kabra's restitution obligations under the MVRA. *See, e.g., United States v. Gallant*, 537 F. 3d 1202, 1250 (10th Cir. 2008) ("The MVRA requires the sentencing court to provide restitution to victims…. A private settlement cannot abrogate that language."); *United States v.*

additional $21,780 investment with Kabra.  PSR ¶ 114.  As Victim No. 28 wrote in a Victim

Impact Statement:

> In my role as Founder and CEO … I spent more than two years of my life fighting
> with Tan Kabra and Launchbyte.io to try to have him correct the wrongs he had
> done to me… Tan may never understand how he damaged my life and my
> household. Or rather, he may, but he is great at pretending, so I would never
> expect him to admit to anything.

Exh. PP.  The Court should order Kabra to pay restitution in the amount of $21,780 to

Victim No. 28.

### Legal Expenses "Incurred During Participation in the Investigation or Prosecution of the Offense or Attendance at Proceedings Related to the Offense" Under 18 U.S.C. § 3663A(b)(4)

In addition to return of property to a defrauded victim, the MVRA also requires

defendants convicted of fraud offenses to reimburse victims for "lost income and necessary child

care, transportation, and other expenses incurred during the investigation or prosecution of the

offense or attendance at proceedings related to the offense."  *Id.* § 3663A(b)(4).  The First

Circuit has approved, as necessary and foreseeable, attorney's fees and costs incurred for tasks

such as compiling and producing documents to the government in connection with a criminal

investigation, costs incurred in preparation for interviews with government investigators, and

costs incurred as part of the restitution process.  *See In re Akebia Therapeutics, Inc.*, 981 F.3d 32,

34 (1st Cir. 2020).

Victim Nos. 1, 3, 8 and 12 have each submitted records of the attorney's fees that they

have incurred "during the investigation or prosecution" of Kabra's offenses.  *See* Exh. RR

(Victim No. 1); Exh. SS (Victim No. 3), Exh. TT (Victim No. 8), and Exh. UU (Victim No. 12).

---

*Bearden*, 274 F.3d 1031, 1041 (6th Cir. 2001) ("[A] private settlement between a criminal wrongdoer and his victim releasing the wrongdoer from further liability does not preclude a district court from imposing a restitution order for the same underlying wrong."); *United States v. Edwards*, 595 F.3d 1004, 1014 (9th Cir. 2010) ("Criminal restitution is mandatory under the MVRA and cannot be waived by a prior civil settlement.").

Based upon these records, the Government submits that legal expenses in the amounts below were a necessary and foreseeable result of Kabra's conduct and therefore reimbursable under the MVRA:

| Victim Number | VNS ID | Victim Name | Legal Expenses |
|---|---|---|---|
| Victim No. 1 | 6080388 | ███████████ | $12,438 |
| Victim No. 3 | 6080389 | | $8,589[13] |
| Victim No. 8 | 6535265 | | $2,635.24 |
| Victim No. 12 | 6080373 | | $5,014 |

## CONCLUSION

Wherefore, the Government respectfully requests that, as part of the sentence to be imposed in this case, the Court order defendant Tanmaya Kabra to make restitution to the twenty-eight identified victims of his fraud scheme in the total amount of $1,847,106.24 and that Kabra relinquish without consideration any ownership stake in ████████████ —whether held by himself or through LaunchByte, Purple Monkey Ventures, LLC, or any affiliated entity—to ████████ .

Respectfully submitted,

UNITED STATES OF AMERICA,

By its attorney,

NATHANIEL R. MENDELL
Acting United States Attorney

/s/ Christopher Looney
Christopher Looney
James D. Herbert
Assistant U.S. Attorneys

Dated: August 20, 2021

---

[13] Victim No. 3 submitted invoices to the Government for legal fees and expenses totaling $10,767.00. The Government has excluded from this restitution request entries—highlighted on Exhibit SS—that appear to pertain solely to civil matters, an investigation conducted by the Securities & Exchange Commission, or otherwise did not pertain to the criminal investigation or prosecution of Kabra's offenses.

## **CERTIFICATE OF SERVICE**

Undersigned counsel certifies that this document filed will be sent electronically to counsel of record for defendant, Tanmaya Kabra.

/s/ *Christopher Looney*
Christopher Looney
Assistant United States Attorney

Dated: August 20, 2021