# EXHIBIT AA
# (Public Redacted)

# PAYMENT ARCHIVE AND RESEARCH CENTER

## Query Results Report

Printed On : 9/6/2019

| | |
|---|---|
| **BNF ADDR1** | 715 BOYLSTON STREET |
| **BNF ADDR2** | SUITE 120 |
| **BNF ADDR3** | BOSTON MA 02116 US |
| **BNF ID** | ▇2693 |
| **Branch ID** | 0418 |
| **Country Code** | US |
| **Currency** | USD |
| **Fee** | 0.00 |
| **IMAD** | 20190530B1QGC01C016086 |
| **Ins Amount** | 5000.00 |
| **Ins Currency** | USD |
| **Msg Status** | COMPLETE |
| **Msg Subtype** | 00 |
| **Msg Type** | 10 |
| **Office** | 001 |
| **OMAD** | 20190530C1QAE01X00108805301230FT03 |
| **ORG ADDR1** | ▇▇▇▇▇▇▇▇▇▇ |
| **ORG ADDR2** | ▇▇▇▇▇ |
| **ORG ID** | ▇▇▇ |
| **ORG ID Code** | AC |
| **Originator** | ▇▇▇▇▇▇ |
| **Paymt Method** | FED |
| **Pavmt Source** | FLS |
| **Recv ABA** | 231372691 |
| **Recv Name** | SANTANDER BK |
| **Reference** | 4597500150ES |
| **Sender ABA** | 021000021 |
| **Sender Name** | JPMORGAN CHASE |
| **Time** | 12:30:09 |
| **BBI** | {6400}PROMISSORY NOTE INVESTMENT |

| | |
|---|---|
| **MSG_SOURCE_TYPE** | PPUSA |
| **Account No** | ▇2693 |
| **Amount** | 14,000.00 |
| **Wire Date** | 05/31/2019 |
| **Direction** | O |
| **MID** | 190531110719H301 |
| **Value Date** | 05/31/2019 |
| **Beneficiary** | ▇▇▇▇▇▇▇▇▇ |
| **BNF ADDR1** | ▇▇▇▇▇▇▇▇▇ |
| **BNF ADDR2** | ▇▇▇▇▇▇▇▇▇ |
| **BNF ADDR3** | ▇▇▇▇▇▇▇▇▇ |
| **BNF ID** | ▇▇▇▇▇▇▇▇▇ |
| **Branch ID** | 0418 |
| **Country Code** | US |
| **Currency** | USD |
| **Fee** | 0.00 |
| **IMAD** | 20190531C1QAE01X000571 |
| **Msg Status** | COMPLETE |
| **Msg Subtype** | 00 |
| **Msg Type** | 10 |
| **OBI** | ATT: ▇▇▇▇▇▇ |
| **Office** | 001 |
| **OMAD** | 20190531C1B76E1C00482805311107FT03 |
| **ORG ADDR1** | 715 BOYLSTON ST STE 120 |

# PAYMENT ARCHIVE AND RESEARCH CENTER

## Query Results Report

Printed On : 9/6/2019

| | |
|---|---|
| ORG ADDR2 | BOSTON, MA 02116- |
| ORG ID | ████2693 |
| ORG ID Code | AC |
| Originator | LAUNCHBYTE VENTURES,LLC |
| Paymt Method | FED |
| Pavmt Source | BRI |
| Recv ABA | 211370545 |
| Recv Name | TD BANK, NA |
| Reference | 190531110719H301 |
| Sender ABA | 231372691 |
| Sender Name | Santander |
| Time | 11:07:19 |

| | |
|---|---|
| MSG_SOURCE_TYPE | PPUSA |
| Account No | ████2693 |
| Amount | 5,000.00 |
| Wire Date | 05/31/2019 |
| Direction | I |
| MID | 190531135118F100 |
| Value Date | 05/31/2019 |
| Beneficiary | LAUNCHBYTE VENTURES LLC |
| BNF ADDR1 | 715 BOYLSTON STREET SUITE 120 |
| BNF ADDR2 | BOSTON, MA, 02116, US |
| BNF ID | ████2693 |
| Branch ID | 0418 |
| Country Code | US |
| Currency | USD |
| Fee | 0.00 |
| IMAD | 20190531B6B7HU3R021005 |
| Msg Status | COMPLETE |
| Msg Subtype | 00 |
| Msg Type | 10 |
| OGB | BANK OF AMERICA, N.A. |
| Office | 001 |
| OGB ADDR1 | 222 BROADWAY |
| OGB ID | BOFAUS3NXXX |
| OMAD | 20190531C1QAE01X00180305311351FT03 |
| ORG ADDR1 | ██████████████ |
| ORG ID | ██████████ |
| ORG ID Code | AC |
| Originator | ████████████ |
| Paymt Method | FED |
| Pavmt Source | FLS |
| Recv ABA | 231372691 |
| Recv Name | SANTANDER BK |
| Reference | 2019053100475442 |
| Sender ABA | 026009593 |
| Sender Name | BK AMER NYC |
| Time | 13:51:18 |

| | |
|---|---|
| MSG_SOURCE_TYPE | PPUSA |
| Account No | ████2693 |
| Amount | 5,000.00 |
| Wire Date | 06/05/2019 |

# EXHIBIT BB
# (Public Redacted)



**U.S. Department of Justice**

*Nathaniel R. Mendell*
*Acting United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

April 12, 2021

Re: United States v. Tanmaya Kabra, 19-cr-10335

 Dear Sir or Madam,

As you may be aware, on April 8, 2021, Tanmaya Kabra pled guilty to charges of wire fraud in violation of Title 18, United States Code Section 1343. He is presently scheduled to be sentenced on August 31, 2021 at 2:00 PM. At this time we anticipate that the proceedings to be in person, however we will notify everyone if circumstances change.

Enclosed you will find a questionnaire form which we ask you to complete and return by **May 8, 2021**. The information in the questionnaire will be used to assist in the determination of losses and restitution resulting from criminal offenses committed by Tanmaya Kabra.

Please send your response to:
United States Attorney's Office
Attn: Jessica Pooler
1 Courthouse Way, Suite 9200
Boston, MA 02210

If you would prefer to email your information, you may send your completed questionnaire and any supporting documents to USAMA.VictimAssistance@usdoj.gov. An adobe PDF fillable copy of the questionnaire can be provided by contacting Jessica Pooler at Jessica.Pooler@usdojoj.gov.

If you have questions regarding the questionnaire, please contact Special Agent James Bedsole at (857) 386-2492 or Assistant U.S. Attorney Chris Looney at (617) 748-3287.

Sincerely,

Jessica Pooler
Victim Assistance Specialist
United States Attorney's Office
District of Massachusetts

## United States v. Tanmaya Kabra

This questionnaire is being requested to aid the United States Attorney's Office and the Federal Bureau of Investigations in determining correct loss amounts for individuals identified as victims of Tanmaya Kabra.

---

**NAME**: ███████

**HOME ADDRESS**: ███

███████████

███████████

███

**TELEPHONE NUMBER**:

███████

**EMAIL ADDRESS:**

███████@gmail.

com

---

1. Please list the date(s) and dollar amounts of any investment or other payment made by you to Tanmaya Kabra, LaunchByte.io LLC, KV Ventures, or any affiliated entities.

   1. Tan had not paid me internship money $2000
   2. Tan had signed a promissory note for $5000 with interest that he did not pay.
   3. Tan charged me $25000 in the context of financing my startup and helping build the platform.

2. Please identify any goods or property that you transferred or conveyed ownership of to Tanmaya Kabra, LaunchByte.io LLC, KV Ventures, or any affiliated entities as a result of Kabra's fraudulent scheme.

   -

3. Please list the date(s) and amounts of any repayment, refund or investment return paid to you by Tanmaya Kabra, LaunchByte.io LLC, KV Ventures, or any affiliated entities.

   No repayment

4. Please provide your best estimate of the fair market value of any goods or services provided to you by Tanmaya Kabra, LaunchByte.io LLC, KV Ventures, or any affiliated entities and identify any such goods or services.

**Documentation for your losses may be requested at a later date. The case agent or a member of the United States Attorney's Office will be in contact if documentation or additional information is needed.**

## United States v. Tanmaya Kabra

This questionnaire is being requested to aid the United States Attorney's Office and the Federal Bureau of Investigations in determining correct loss amounts for individuals identified as victims of Tanmaya Kabra.

---

Nothing provided

5.  Please provide any additional information that you feel is important concerning the amount of any monetary loss or loss of property that you incurred as a result of Tanmaya Kabra's criminal offenses.

**Documentation for your losses may be requested at a later date. The case agent or a member of the United States Attorney's Office will be in contact if documentation or additional information is needed.**

## <u>United States v. Tanmaya Kabra</u>

This questionnaire is being requested to aid the United States Attorney's Office and the Federal Bureau of Investigations in determining correct loss amounts for individuals identified as victims of Tanmaya Kabra.

---

**Due to the criminal conduct of the defendant, have any of the following occurred:**

☐ Have you become insolvent?

no

☐ Have you filed for bankruptcy?

no

☐ Have you suffered a substantial loss of retirement, education or other savings or investment fund?

no

☐ Were you required to make substantial changes to your employment such as postponement of retirement?

no

☐ Were you required to substantially change your living arrangements, such as relocating to a less expensive home?

no

☐ Have you had difficulty obtaining credit, or had your credit score reduced.

*Is there any additional information that you feel is important for the government to know? Please attached additional pages if required.*

---

**Send your completed questionnaire to:**

**Jessica.Pooler@usdoj.gov**

**If you would prefer to mail your return, please send to:**

**United States Attorney's Office**
**Attn: Jessica Pooler**
**1 Courthouse Way, Suite 9200**
**Boston, MA 02210**

**Questions can be directed to Special Agent, James Bedsole, at (857) 386-2492 or by email, jdbedsole@fbi.gov.**

---

**Documentation for your losses may be requested at a later date. The case agent or a member of the United States Attorney's Office will be in contact if documentation or additional information is needed.**

# EXHIBIT CC
# (Public Redacted)

**From:**     [Tan Kabra](#)
**To:**       ███████ Deck
**Subject:**
**Date:**     Wednesday, May 29, 2019 1:00:10 PM
**Attachments:** Investor Deck ██████████

Here is the deck. back from design team. I made some changes to the information too

Best,

Tan Kabra
**Founder + Managing Director**



**The LaunchByte Group**
715 Boylston Street Suite 120, Boston, MA 02116
[https://launchbyte.io](https://launchbyte.io) | ████████████



Student housing is made easy

# Executive Summary



## Company Overview

- We are an interactive app-based platform enabling college students to find sublets for their housing, potential roommates, new apartments, and an on-demand real-estate agent to answer all your queries and assist in your search in any possible way

- Serving a $10B+ student housing market



## Current Raising

- $125,000 as a convertible debt for a period of 12 months at a 10% interest rate per annum, guarantor by LaunchByte Ventures.

- Previously raised $125,000 from Vanguard Venture Group, a micro-PE firm



| When student housing is made easy

2

3

# About the Founder

and has an extensive background in Finance and Accounting and has previously worked on four startups, and is currently working at a micro-venture fund.

He is a rising junior at the Kelley School of Business studying Finance and Accounting with a minor in theatre

At school he is involved in the Investment Management Workshop, Kelley Student Government, Portfolio Management Club, and Peer tutor for BUS-K303

When student housing is made easy

# The Market

Distribution of university students living in the United States in 2018, by accommodation type



- Modern, purpose-built student housing within walking distance of campus
- On-campus dormitories, mostly more than 50 years old
- Other rental housing*

**0.23, 23%**
**0.22, 22%**
**0.55, 55%**

Vacancy rate of student housing units in the United States from 2016 to 2019



Vacancy rate

2.8%
2.6%
2.4%
2.2%
2.0%
1.8%
1.6%

1.7%
2.5%
2.6%
2.3%

2016   2017   2018   2019*

Student housing market has continued to grow and we can see a need for off-campus housing in order to fulfil the students needs. Moreover, the vacancy rate has declined in the last year as well due to the increase in the number of students

When student housing is made easy

4

# Rent growth in student housing markets in primary metropolitan areas in the United States from 2015 to 2017



Rent growth in student housing markets in primary U.S. metros 2017

When student housing is made easy

# Problem

(X) Currently students and universities are using Excel Spreadsheets and Facebook groups, which do not serve as a long-term solution to this growing problem in the student housing market.



(X) An increasing number of students are able to find housing when moving to new places in search of internships, full-time jobs, and summer schools

As a result students have to pay higher rents, live in hotels, or choose to Airbnb, which is not a cost effective solution.

(X) Many students sign a 12-month lease, in which they are unable to sublet their house for the summer period, fall semester, or spring semester.

Already in student debt or increased financial pressure, the payment for rent during the vacant months creates an additional burden on them.



student housing is made easy

6

# Proposed Solution

We propose to build an application which will help create an interactive platform on which students can put in their information regarding sublet



We will create a separate platform for homeowners and incentivize them so that they do not hinder in the sublet process



We will also require students to upload their I-20s, government issued IDs for verification process and create a centralized system for student housing



We propose a login through the university ID and background check which will eliminate the fake profiles and will serve as a genuine an authentic way to sublet your apartment



We will have an agreement signed by both the interested parties, with the rent due on the first move-in day to eliminate any last minute surprises

student housing is made easy

7

- Person X lists the information regarding the housing he wants to sublet by creating an account on ▮ by entering his university email

- After the registration is complete, Person X will have to go through a background check and upload a valid government issued ID

- Person Y is moving to a new city and is in search for a housing in the same city as Person X

- Person Y undergoes the same process and by creating his/her own filters is able to match with Person X

- Person X and Person Y agree to all the terms and condition and sign a binding agreement protecting the interests of both the parties

- As soon as the agreement is signed, the homeowner will receive a confirmation email to approve the sublease

- No rent is paid until the move-in date and the rent will automatically deducted from the Person Y's account on the move-in date



How ▮

When student housing is made easy

# Market Differentiation

We do not have any direct competitors in this market, who are focused towards creating a single platform to solve student's problems when it comes to student housing.

There are a few indirect competition from apps like sublet.com, flip.lease, renthop.com, roomies.com but do not pose a threat to us / our model since they do not market to the target audience and do not have the appropriate functions to make the process easy.

We should be able to achieve a competitive edge through building an app only focused towards college students with no outsiders, keeping the homeowners in loop throughout the entire process, guarantying the genuineness of the apartment being subleased through our verification process, interactive map to showcase the best nearby place

9

student housing is made easy



# Timeline

**May 2019** — Accepted into LaunchByte Ventures Incubator (Boston, NYC)

**Jun 2019** — Begin MVP development

**Dec 2019** — MVP complete, beta universities onboard

**Feb 2020** — Seed round funding secured, mvp beta feedback implemented, V1 development commences

**Apr 2020** — V1 deployed to app store, platform live with 20 universities and 10K users

When student housing is made easy

10

# Revenue Model

## 10% service fee



Charging a one-time 5% fee from each of the parties based on the first months rent for every listing

## Advertisements related to need of college students



Like nearby grocery stores, clubs, gyms etc.

When student housing is made easy

# Fundraising Terms

- 10% simple interest
- 12 month term
- Guarantor by LaunchByte Ventures

Seeking an additional $125K to close out the round.

When student housing is made easy

# EXHIBIT DD
# (Public Redacted)

**From:** Tan Kabra
**To:** ███████
**Subject:** Few Things
**Date:** Wednesday, July 17, 2019 9:01:04 AM

Hi ███████

Hope you had fun watching the cricket matches...now let's get back to ███████ and get it out there!

Please update me on the following:

- Remainder capital raise: need to grab even some portion, another 25K or something so we can continue on without fail

- Invision: did you go through the screens and make the comments / check it out?

- Next Call: When can you do the next ███████ strategy session with me

Best,

Tan Kabra
**Founder + Managing Director**



**The LaunchByte Group**
715 Boylston Street Suite 120, Boston, MA 02116
https://launchbyte.io | ███████

# EXHIBIT EE
# (Public Redacted)

**From:** [Tan Kabra]
**To:** ██████████
**Subject:** Re: Development
**Date:** Wednesday, December 12, 2018 3:49:33 PM

Okay let me think. Might switch them with ██████ since he hasn't fundraised it all

On Wed, Dec 12, 2018 at 1:15 PM ██████████████████████████ wrote:
██████ - I had addressed this earlier with you. We don't have teams for ██████████████████,
██████████████ (evaluating ██████████████)

- ██████████ team will move to ██████
- ██████████ team moving to ██████
- ██████████ team to ?? (██████ to let us know by Jan 4 + trying to understand scope to finish the project (you are speaking with them))

We have ██████ (India and Brazil) options but need to get caught up on payments etc.

It probably doesn't make sense to have a conversation with ██████ till we have a plan for development.

Let me know how you want to proceed.

██████

> On Dec 12, 2018, at 12:33 PM, ██████████████████████ wrote:
>
> Cc'ing ██████ here. ██████ and I spoke about this as soon as the email came in. ██████ would you be able to follow-up with Tan accordingly?
>
> On Wed, Dec 12, 2018 at 12:31 PM Tan Kabra <tan██████████████> wrote:
> Has this been set up?
>
> > On Tue, Dec 11, 2018 at 10:01 AM <██████████████████ wrote:
> > Hi ██████
> >
> > Hope all is well! Tan mentioned I should send you an email to see what the next steps are for starting development.
> >
> > I believe an initial development meeting is necessary? Please let us know. Thanks!
> >
> > ██████
> >
> >
> > --
> > ██████████████

--

██████████

**Director of Growth**

715 Boylston Street Suite 120, Boston, MA 02116
https://launchbyte.io | ███████████


Read about us in the news: LaunchByte | APPIO

# EXHIBIT FF
# (Public Redacted)

**From:** ██████████
**To:** Tan Kabra
**Subject:** Re: Invoice - Jan-2019
**Date:** Sunday, March 3, 2019 9:47:51 PM

I spoke to him about the importance of the ████ build and he produced in that day itself by having people stay late.
I have not spoken to him about any deferrals. I was trusting you have good news from Scott or someone else that you could share with him prior to him taking this step.
You would need to talk to him to let him know where you are at and convince him to continue one if you want ████████████████████ to continue. We already went through a no communication situation before and it didn't end well.

> On Mar 3, 2019, at 9:41 PM, Tan Kabra <tan@████████ wrote:
>
> I did not send anything to him. You said you spoke to him but i have not sent anything further
>
>> On Sun, Mar 3, 2019 at 7:44 PM Anmol Wassan <████████████ wrote:
>> Were you able to come to an agreement with ████
>>
>>
>>     Begin forwarded message:
>>
>>     **From:** ████████████████
>>     **Subject: Re: Invoice - Jan-2019**
>>     **Date:** March 1, 2019 at 9:27:42 AM EST
>>     **To:** Tan Kabra <tan@launchbyte.io>
>>     **Cc:** ████████████████
>>
>>     Hey Tan████
>>
>>     Just FYI, we'll now stop sending build and stop attending the calls from Monday until 3 months dues are clear. I will send you Feb invoice tomorrow.
>>
>>     Thank you,
>>     ████
>>
>>>     On Mon, Feb 25, 2019 at 1:45 PM ████████████████ wrote:
>>>     Tan,
>>>
>>>     By when you will get the funds?
>>>     We'll have to stop sending build and communication from 4th Mar, 2019 if we don't receive funds by end of this month.
>>>
>>>     Thank you,
>>>     ████
>>>
>>>>     On Fri, Feb 15, 2019 at 2:10 PM Tan Kabra <tan@████████ wrote:
>>>>     Hey ████
>>>>
>>>>     We plan to take care of this with the funds we are receiving from the new investor.
>>>>     We will make the payment in one shot ~ $65K
>>>>
>>>>>     On Wed, Feb 13, 2019 at 1:34 PM ████████████████ wrote:
>>>>>     Hi Tan,

Can you update me about Dec/Jan invoice?

Thank you,

█████████

On Tue, Feb 5, 2019 at 11:57 AM ████████████████████████ wrote:

Dear Tan█████████

Please find invoice for Jan-2019 attached.

Thank you,

███████

--



# EXHIBIT GG
# (Public Redacted)

| | |
|---|---|
| **From:** | ███████ |
| **To:** | Tan Kabra |
| **Cc:** | ███████ |
| **Subject:** | Re: Invoice - Mar - 2019 |
| **Date:** | Wednesday, April 17, 2019 4:00:06 AM |

Tan,

Any update on this?

This is the last week we'll be working on the ████████████ . From Monday, if we don't receive any payment, we'll be stopping the work.

Thank you,

████████

On Wed, Apr 10, 2019 at 7:54 PM Tan Kabra <tan@███████ wrote:

> Hi ████████
>
> So we have ████████ who is waiting for his financial advisor to return from vacation. He has confirmed he is doing the deal, just waiting for his money guy to send our way.
>
> We also have another individual who will give us the commitment on Saturday. If this should take longer than a week, I will liquidate some items in my Axis bank and send it internally
>
> Best,
>
> Tan Kabra
> **Founder + Managing Director**
>
> **The LaunchByte Group**
> 715 Boylston Street Suite 120, Boston, MA 02116
> https://launchbyte.io | ████████
>
>
> On Wed, Apr 10, 2019 1:26 PM, ████████████████ wrote:
>> Hey Tan,
>>
>> Any update about payment?
>>
>> Thank you,
>>
>> ████████
>>
>> On Sat, Apr 6, 2019 at 6:43 PM ████████████ wrote:
>>> Is the total now 73427?



Best,

Tan Kabra
**Founder + Managing Director**

**The LaunchByte Group**
715 Boylston Street Suite 120, Boston, MA 02116
https://launchbyte.io |

On Sat, Apr 6, 2019 10:31 AM,                                        wrote:

Hi Tan,

Please find the invoice attached. Kindly manage to pay Jan/Feb/Mar invoices ASAP.

Thank you

--
photo

--
photo

--
photo

# EXHIBIT HH
# (Public Redacted)

**From:**
**To:**        Tan Kabra
**Subject:**   Re:
**Date:**      Friday, May 3, 2019 6:09:17 PM

Hey Tan,

Thanks for the update.

Eager to see the changes so we know how many bugs/edits are left to address

If we want this live by May 17, does the timeline look doable from your end? For an Apple approval we prob need to submit by May 12?

Again, goal of May 17 is event-based for NYC marathon relationships.

Sent from my iPhone

On May 3, 2019, at 4:31 PM, Tan Kabra <tan@ wrote:

> Hi
>
> I met with         and we sorted out a solution - we were facing some issues resource wise but the work was constantly going on, just builds were not being received. By Monday/Tuesday latest the build should be released.
>
> Best,
>
> Tan Kabra
> **Founder + Managing Director**
>
> 
>
> **The LaunchByte Group**
> 715 Boylston Street Suite 120, Boston, MA 02116
> https://launchbyte.io |
>
>
>
> On Fri, May 3, 2019 1:24 PM,                              wrote:
>> Yes that works thanks
>>
>> Sent from my iPhone
>>
>> On May 3, 2019, at 9:09 AM, Tan Kabra <tan@launchbyte.io> wrote:

Hey █████,

I'm meeting with ██████ just to circle up on a few things today including ███ so I can give you a call later today?

Best,

Tan Kabra
**Founder + Managing Director**

**The LaunchByte Group**
715 Boylston Street Suite 120, Boston, MA 02116
https://launchbyte.io | 617.259.8145

On Fri, May 3, 2019 at 6:53 AM ████████████
████████████████ wrote:

> Hi Tan,
>
> Checking in for the ████ update. I know you've been busy these last few days - I'm getting concerned as I haven't seen any activity from the dev team over the last week according to our trello board. We have events we're looking forward to May 18th, on.
>
> ████

# EXHIBIT II
# (Public Redacted)



90 CANAL STREET, SUITE 400
BOSTON, MASSACHUSETTS 02114

(570) 262-9584
WWW.PAKROOHLAW.COM
darius@pakroohlaw.com

October 1, 2019

<u>VIA Certified Mail; Return Receipt Requested and Email.</u>
# 9590 9402 3020 7124 3735 63 / 7018 1130 0001 1762 0233
   9590 9402 3020 7124 3735 56 / 7018 1130 0001 1762 0257
   9590 9402 4729 8344 8559 15 / 7016 1370 0001 0980 1778

LaunchByte, LLC
715 Boylston Street. #120
Boston, MA 02116
Tan@launchbyte.io

Tanmaya Kabra
715 Boylston Street. #120
Boston, MA 02116
Tan@launchbyte.io

LaunchByte.io, LLC
715 Boylston Street. #120
Boston, MA 02116
Tan@launchbyte.io

RE:            Inc. Demand Pursuant to M.G.L. c. 93A; Consulting Agreement.

LaunchByte, LLC, LaunchByte.io, LLC and Mr. Kabra:

Please be advised this office represents                          concerning its claims
against LaunchByte, LLC ("LaunchByte"), LaunchByte.io, LLC ("LaunchByte.io") and
Tanmaya Kabra ("Mr. Kabra") to recover damages            suffered in connection with
LaunchByte, LaunchByte.io and Mr. Kabra's unfair and deceptive practices when LaunchByte,
LaunchByte.io and Mr. Kabra fraudulently sold consulting services to            Demand is
hereby made pursuant to Mass. Gen. Laws c. 93A §9 ("Chapter 93A") as set forth in this letter.
Chapter 93A allows for the recovery of both direct and consequential damages and attorney's
fees. In addition, where the conduct at issue is both willful and knowing, as is the case here,
multiple damages may be awarded.

Please be advised that when a reference is made to LaunchByte, LaunchByte.io, or Mr. Kabra,
            intends for the reference to be attributed to the others. This letter in no way abrogates
            from pursuing any claims against Mr. Kabra in his personal capacity.
maintains the position that Mr. Kabra has orchestrated the fraudulent scheme described below, is

1



**PAKROOH.**

90 CANAL STREET, SUITE 400
BOSTON, MASSACHUSETTS 02114

(570) 262-9584
WWW.PAKROOHLAW.COM
darius@pakroohlaw.com

personally liable to ███████ and any reference to a legal entity is a reference to the legal fiction created by Mr. Kabra behind which he attempts escape liability for the damage he caused ███████

## FACTS

On January 29, 2018 Mr. Kabra induced ███████ to enter a consulting agreement ("Consulting Agreement") with LaunchByte. A copy of the Consulting Agreement is attached at Exhibit A. Pursuant to the Consulting Agreement LaunchByte was obligated to design, engineer and develop ("Develop") the ███████ application (the "App"), provide marketing, financial and business development consulting and operate as co-founder (collectively, "Co-Founder Support"). ███████ paid LaunchByte and Mr. Kabra $124,630.00 (the "Monetary Fee") pursuant to the Consulting Agreement. In addition to the Monetary Fee, ███████ attributed Mr. Kabra's LB Group Investment with an equity investment valued at $125,000.00 contingent upon full performance on the Consulting Agreement and ███████ raising additional capital.

LaunchByte's performance on the Consulting Agreement was secured by a promissory note ("Promissory Note") from LaunchByte.io to ███████ The Promissory Note immediately granted Hollarhype the right to demand the return of the Monetary Fee from LaunchByte.io should LaunchByte fail to perform under the Consulting Agreement.

LaunchByte fraudulently induced ███████ into the Consulting Agreement to defraud ███████ of the Monetary Fee, and unfairly attempt to gain an equity stake in ███████ LaunchByte represented it had a team of seasoned executives who had a combined exit of more than $500M+ and helped 30+ portfolios build stellar products and raise their next round of funding. LaunchByte attempted to make itself appear able and experienced to perform under the Consulting Agreement. From ███████ experience with Launchbyte, it has become clear that neither the claims of an executive team nor the claims of success of the portfolio companies is true.

Furthermore, as of September 22, 2019, LaunchByte failed to Develop and deliver the APP and failed to perform the Co-Founder Support Services. Mr. Kabra took the Monetary Fee and abandoned the Consulting Agreement entirely. As a result, ███████ has suffered in launching its business, developing its customer base, generating revenues, fund raising, entering the market, loss of investor capital and confidence and remains without ownership of the APP. These violations by LaunchByte and Mr. Kabra are compounded by Mr. Kabra's dissolution of LaunchByte.io. Mr. Kabra's unfair and deceptive dissolution of LaunchByte.io damages ███████ by eliminating the security it relied upon to enter the Consulting Agreement. As a result, ███████ has been unfairly stripped of the very assurances Mr. Kabra used to induce the payment of the Monetary Fee and is left without recourse to Launchbyte.io.

2



90 CANAL STREET, SUITE 400
BOSTON, MASSACHUSETTS 02114

(570) 262-9584
WWW.PAKROOHLAW.COM
darius@pakroohlaw.com

Additionally, LaunchByte, Mr. Kabra and LaunchByte.io breached the covenant of good faith and fair dealing which is implied in every contract in Massachusetts. *Fortune v. National Cash Register Co.*, 373 Mass. 96 (1977). The court in *National Cash Register* found that a termination of a contract not made in good faith constitutes a breach of contract. ██████ maintains that the actions of Mr. Kabra go far beyond a mere breach. Mr. Kabra was aware of the circumstances and legal obligations surrounding the parties' engagement, negotiated the terms of the Consulting Agreement and Promissory Note with ██████ Despite these realities and the obligations to ██████ under Promissory, Mr. Kabra dissolved LaunchByte.io. Thus, Mr. Kabra, Launchbyte and Launchbyte.io acted in concert and in bad faith subjecting them to the teeth of Chapter 93A.

Even if LaunchByte and Mr. Kabra dismiss ██████ Chapter 93A demand, they will be liable to ██████ under the theory of unjust enrichment. "The fundamental substantive basis for restitution is that the defendant has been unjustly enriched by receiving something, tangible or intangible, that properly belongs to the plaintiff. Restitution rectifies unjust enrichment by forcing restoration to the plaintiff." *Santagate v. Tower*, 64 Mass. App. Ct. 324 (2005). LaunchByte and Mr. Kabra failed to provide the APP and Co-Founder Support Services despite their possession of the Monetary Fee. LaunchByte and Mr. Kabra have become unjustly enriched by providing nothing to ██████ yet retaining the Monetary Fee. LaunchByte and Mr. Kabra owe, at minimum, the return of the Monetary Fee to ██████

## DEMAND

██████ has been required to expend resources and incur significant damages, costs, and delays in connection with LaunchByte, LaunchByte.io and Mr. Kabra's fraudulent scheme to sell the Consulting Agreement. The damages ██████ has sustained include, but are not limited to, the payment of the $124,630.00 Monetary Fee, Hollarhype's delays to entering the market, cost associated to investigate and mitigate the damages, and loss of Hollaryhype's reputation with its investors.

██████ hereby demands payment of $175,000.00. Failure to receive payment in settlement of this claim in a prompt and timely manner will leave ██████ no choice but to pursue all available legal remedies. Please be advised that if forced to pursue litigation on this matter pursuant to the provisions of Chapter 93A, ██████ may recover up to treble damages for LaunchByte's unfair and deceptive trade practices along with attorney's fee and costs.

This demand will not be admissible against, nor deemed to be an admission of any sort by, ██████ Nothing herein is intended to limit ██████ claims against LaunchByte, Mr. Kabra and LaunchByte.io.

3



**P A K R O O H .**

90 CANAL STREET, SUITE 400
BOSTON, MASSACHUSETTS 02114

—————————————

(570) 262-9584
WWW.PAKROOHLAW.COM
darius@pakroohlaw.com

██████████ ooks forward to a prompt resolution of this matter. Please direct your response to the undersigned.

Sincerely,

Darius Pakrooh, Esq.

Enclosure

4

# EXHIBIT JJ
# (Public Redacted)

## DEVELOPMENT CONSULTANCY AGREEMENT

**This Development Agreement** ("Agreement") is made and effective this 5th day of June, 2017, by and between

**LaunchByte.io LLC,** a Massachusetts limited liability company ("Developer")

And

█████████ a Delaware corporation ("Client")

In consideration of the mutual promises contained in the Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

**1.    Duties and Responsibilities.**
Developer shall develop and provide the services (each, a "Deliverable," and collectively, the "Deliverables") from the date of signing, according to the functional specifications and related information, attached hereto as Exhibit A-1 and incorporated herein by this reference (collectively, "Specifications") and as more fully set forth in this Agreement. The Deliverables shall be delivered to Client as set forth in the Specifications.

**2.    Ownership of Deliverables.**
A.    Developer agrees that the development of the Deliverables is "work for hire" within the meaning of the Copyright Act of 1976, as amended from time to time, and that the Deliverables shall be the sole property of Client.  To the extent that a Deliverable is not a "work for hire," Developer hereby assigns to Client, without further compensation, all of its right, title and interest in and to such Deliverable and any and all related patents, patent applications, copyrights, copyright applications, trademarks and trade names in the United States and elsewhere.  Developer will keep and maintain adequate and current written records with respect to the Deliverables (in the form of notes, sketches, drawings and as may otherwise be specified by Client), which records shall be available to and remain the

sole property of Client at all times.  Upon reasonable request, Developer will sign all applications, assignments, instruments and papers and perform all acts reasonably necessary or desired by Client to assign the Deliverables fully and completely to Client and to enable Client, its successors, assigns and nominees, to secure and enjoy the full and exclusive benefits and advantages of the Deliverables.

B.    Notwithstanding anything contained in this Agreement to the contrary, (i) any routines, methodologies, processes, libraries, tools or technologies created, adapted or used by Developer in its business generally, including all associated intellectual property rights, (ii) any and all other intellectual property rights that Developer created, licensed, or otherwise acquired by Developer before entering into this Agreement or which were acquired or developed outside the scope of this Agreement, or (iii) any confidential or proprietary information of Developer (items (i – iii) are collectively referred to as the "Development Tools"), shall be and remain the sole and exclusive property of Developer, and Client shall have no interest in or claim to the Development Tools, except solely to the extent necessary to exercise its rights in the Deliverables. In addition, notwithstanding any provision of this Agreement to the contrary, Developer shall be free to use any ideas, concepts, or know-how developed or acquired by Developer during the performance of this Agreement to the extent obtained and retained by Developer's personnel as impression and general learning. Subject to and limited by Client's intellectual property rights described in Section 2. A. above, nothing in this Agreement shall be construed to preclude Developer from using the Development Tools for use with third parties for the benefit of Developer.

C.    In addition to any other fees set forth in this Agreement, Client shall be required to purchase any applicable third party licenses for any third party products that are necessary for Developer to design and

develop the Deliverables. Such third party products may include, but are not limited to: Web & Mobile Development suites, stock imagery, advertising spend, influencer payouts, or any other copyrighted work which Developer deems necessary to purchase on behalf of Client to design and develop the Deliverables. In the event of any such third party product, Developer shall obtain Client's prior written consent before incorporating such third party product into the Deliverables.

**3.   Compensation**

**A.**   Client shall pay Developer as set forth in Exhibit A-1.

**B.**   Subject to Client's prior approval, Client will reimburse Developer for all reasonable out-of-pocket expenses, including, but not limited to, air fare, lodging, meals and rental of automobiles incurred by Developer during the development of the Deliverables on behalf of Client, if any of these activities are deemed necessary.

**C.**   Since Client is receiving an investment from LaunchByte or an affiliated party in their current round of financing, payment shall be due in one payment upon the execution of this agreement.

**4.   Independent Contractor.**

Developer is acting as an independent contractor with respect to the services provided to Client. Neither Developer nor the employees of the Developer performing services for Client will be considered employees or agents of Client. Client will not be responsible for Developer's acts or the acts of Developer's employees while performing services under this Agreement. Nothing contained in this Agreement shall be construed to imply a joint venture, business, partnership or principal-agent relationship between the parties, and neither party by virtue of this Agreement shall have any right, power or authority to act or create any obligation, express or implied, on behalf of the other party.

**5.   Development Staff-Monitoring.**

**A.**   Developer will utilize employees and/or contractors capable of designing and implementing the Deliverables to be developed per this Agreement. All work shall be performed in a professional and workmanlike manner. Developer shall arrange for such employees and/or contractors, if any, to execute and deliver any document or instrument reasonably requested by Client to reflect Client's ownership of the Deliverables or in connection with any application for patent or copyright.

**B.**   Client shall have the right to reasonably observe and monitor all aspects of the performance by Developer of its obligations hereunder and Developer shall use reasonable efforts to facilitate such observation and monitoring. Information, functions and operations of Developer not directly related to its obligations hereunder shall not be subject to observation and monitoring.

**6.   Change in Specifications.**

Client may, request that changes be made to the Specifications, or other aspects of the Agreement and tasks associated with this Agreement. If Client requests such a change, Developer will use reasonable efforts to implement the requested change at no additional expense to Client and without delaying delivery of the Deliverables. Notwithstanding the foregoing, in the event that the proposed change will, in the opinion of Developer, require a delay in delivery of the Deliverables or would result in additional expense to Client, then Client and Developer shall confer and Client shall, in its discretion, elect either to withdraw its proposed change or require Developer to deliver the Deliverables with the proposed change and subject to the delay and/or additional expense. Any such changes shall be agreed upon in writing to the extent additional time or expense is required.

**7.   Confidentiality.**

**A.**   Developer acknowledges that all material and information supplied by Client which has or will come into Developer's possession or knowledge of Developer in connection with its performance hereunder, is to be considered Client's confidential and proprietary information (the "Confidential Information"). By way of illustration, but

2

not as a limitation, Confidential Information includes trade secrets, processes, data, know-how, program codes, documentation, flowcharts, algorithms, Web & Mobile Development plans, forecasts, unpublished financial statements, budgets, licenses, prices, costs, and employee and customer lists. Developer's undertakings and obligations under this Section will not apply, however, to any Confidential Information which: (i) is or becomes generally available to the public through no action on Developer's part, (ii) is generally disclosed to third parties by Client without restriction on such third parties, (iii) was in Developer's possession prior to disclosure by Client, (iv) was or is independently developed by Developer with use of the Confidential Information, or (v) is approved for release by written authorization of Client.   Upon termination of this Agreement or at any other time upon request, Developer will promptly destroy or deliver to Client all notes, memoranda, notebooks, drawings, records, reports, files, documented source codes and other documents (and all copies or reproductions of such materials) in its possession or under its control, whether prepared by Developer or others, which contain Confidential Information. Notwithstanding the foregoing, Developer may retain electronic copies of Confidential Information to the extent that (i) such information is stored on backup systems in connection with its customary practices for backup storage of electronic information generally and it is not practical to access and erase such information and (ii) such information remains subject to the terms and conditions of this Agreement and is not thereafter accessed or used in violation of this Agreement. Developer acknowledges that Confidential Information is the sole property of Client. Developer agrees to use best efforts to hold Confidential Information in the strictest confidence, not to make use of it other than for the performance of its obligations hereunder, to release it only to the Developer's employees or contractors with a need to know such information and not to release or disclose it to any other

party.   Developer will notify Client in writing of any circumstances within its knowledge relating to any unauthorized possession, use, or knowledge of such Confidential Information.

**B.**   Developer agrees to keep the performance of its obligations hereunder strictly confidential and not to disclose any information to any third party or entity without the prior written permission of Client.   In no event shall Developer or any of its employees use Client as a reference in Web & Mobile Development Developer's services to any third party or entity without Client's prior written permission.

**8.   Training; Maintenance.**

**A.**   Developer shall provide Client and its employees with any training consultations with respect to the use of the Deliverables as explicitly set forth Exhibit A (as applicable), at such time as may reasonably be requested by Client from time to time for after acceptance at no additional costs to Client. All training that Developer is required to provide hereunder shall be performed at such locations and at such times as are mutually agreed to by the parties hereto.

**B.**   Upon Client's request, Developer will provide any maintenance services (including without limitation, bug fixes) requested by Client (that are otherwise outside the scope of the Specifications listed in Exhibit A and the Payment Schedule in Exhibit B).   Such services will be performed on a time and material basis at Developer's then current hourly rates for such services, which is currently $125.00 per hour (subject to change to mutually agreed upon figure by Developer and Client).

**9.   Representations and Warranties.**

**A.**   Developer represents and warrants that, for a period of 90 days following acceptance in accordance with Section 11, a Deliverable will operate substantially according to the Specifications.   In the event of any breach of the representation and warranty in this Section 9.A., in addition to any other remedy to which Client may be entitled, Developer shall take reasonable actions necessary at its

3

expense to cause the Deliverable to operate according to the warranty.

**B.** Developer represents and warrants that the Deliverables will not infringe upon any copyright, patent, trade secret or other intellectual property interest of any third party. Client represents and warrants that no material provided to Developer in connection herewith will cause Developer or the Deliverables to infringe upon any copyright, patent, trade secret or other intellectual property interest of any third party.

**10. Warranties, Limitations.**

**A.** EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, (I) EACH DELIVERABLE IS PROVIDED AS IS AND AS AVAILABLE AND (II) TO THE MAXIMUM EXTENT PERMITTED BY LAW, DEVELOPER DISCLAIMS ANY AND ALL WARRANTIES WITH RESPECT TO EACH DELIVERABLE, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF TITLE, NON-INFRINGEMENT, MERCHANTABILITY, AND FITNESS FOR A PARTICULAR PURPOSE.

**B.** IN NO EVENT SHALL DEVELOPER BE LIABLE TO THE CLIENT, OR ANY THIRD PARTY, FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES ARISING OUT OF OR RELATED TO THIS AGREEMENT (INCLUDING LOSS OF PROFITS, USE, DATA, OR OTHER ECONOMIC ADVANTAGE), HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY INCLUDING NEGLIGENCE, AND EVEN IF DEVELOPER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**C.** DEVELOPER'S AGGREGATE LIABILITY TO CLIENT (OR ANY THIRD PARTY) FOR ALL CLAIMS ARISING OUT OF OR RELATED TO THIS AGREEMENT WILL NOT EXCEED THE FEES ACTUALLY PAID TO DEVELOPER PURSUANT TO THIS AGREEMENT.

**11. Delivery and Acceptance of Deliverables.**

**A.** Developer will deliver the Deliverables to Client in accordance with the Specifications.

**B.** Client will examine and test the Deliverables promptly upon delivery to determine whether the Deliverables conform to the Specifications and with the terms and conditions of this Agreement. Within the time specified in the Specifications, Client will provide Developer with a written statement that Client accepts the Deliverables or a written statement of errors setting forth in detail each specific instance in which the Deliverables do not conform to the Specifications. Any Deliverable not accepted or rejected in the manner set forth in the immediately preceding sentence within the applicable time period will be deemed accepted. Within the time specified in the Specifications, Developer will either (i) correct each instance of nonconformance set forth in the statement of errors, (ii) notify Client that Developer has determined that the Deliverable conforms to the Specifications, setting forth in detail the basis for such determination or (iii) notify Client that Developer does not have sufficient information or materials to determine whether the Deliverable conforms to the Specifications or to make any necessary changes or corrections, setting forth in detail the additional information or materials needed by Developer.

**12. Term and Termination.**

**A.** This Agreement shall commence on the date set forth above and continue until all of the obligations of the parties have been performed or until earlier terminated as provided herein.

**B.** Developer's appointment as Developer pursuant to this Agreement and this Agreement shall terminate upon the occurrence of any of the following events: (i) in the event either party defaults in any material obligation owed to the other party pursuant to this Agreement, then this Agreement may be terminated if the default is not cured following at least sixty (60) days written notice to the defaulting party, or

2621645.1/14431.2

(ii) either party is bankrupt or insolvent, or bankruptcy or insolvency proceedings are instituted against a party and the proceeding is not dismissed within thirty (30) days after commencement. In the event of early termination by Developer or Client in accordance with this Agreement, Developer agrees to deliver the Deliverables then completed. Developer, in that instance, shall be paid a pro rata share for the Deliverables then completed.

**C.** Section 2, Ownership of Deliverables, Section 7, Confidentiality, and Section 10, Warranties, Limitations, shall survive the expiration or termination of this Agreement.

### 13. Notices.
Any notice required by this Agreement or given in connection with it, shall be in writing and shall be given to the appropriate party by personal delivery or a recognized overnight delivery service such as FedEx.

If to Developer:   LaunchByte.io
715 Boylston Street Suite 120
Boston, MA 02116
Attn: Tan Kabra



### 14. No Waiver.
The waiver or failure of either party to exercise in any respect any right provided in this agreement shall not be deemed a waiver of any other right or remedy to which the party may be entitled.

### 15. Entirety of Agreement.
The terms and conditions set forth herein constitute the entire agreement between the parties and supersede any communications or previous agreements with respect to the subject matter of this Agreement. There are no written or oral understandings directly or indirectly related to this Agreement that are not set forth herein. No change can be made to this Agreement other than in writing and signed by both parties.

### 16. Governing Law.

This Agreement shall be construed and enforced according to the laws of the Commonwealth of Massachusetts and any dispute under this Agreement must be brought in this venue and no other.

### 17. Headings in this Agreement.
The headings in this Agreement are for convenience only, confirm no rights or obligations in either party, and do not alter any terms of this Agreement.

### 18. Severability.
If any term of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, then this Agreement, including all of the remaining terms, will remain in full force and effect as if such invalid or unenforceable term had never been included.

IN WITNESS WHEREOF, the parties have executed this Web & Mobile Development Consultancy Agreement as of the date written below.

DEVELOPER:

LaunchByte.io LLC



By: _____
Name: Tan Kabra
Title: Chief Executive Officer
Date: 6/27/17

CLIENT:

2621645.1/14431.2

**Exhibit A-1**

The following project will be incorporated into Web & Mobile Development Consultancy Agreement between ████████████████ and LaunchByte.io, LLC ("Developer"), originally dated April 24th, 2017. This amendment reflects the new filing to the state for the investment by LaunchByte, with regards to a new equity position. All other terms and conditions will remain in full force for the contract period and any extension thereof.

**A.   Scope and Deliverables**

The objective and scope of the project, under this Exhibit, is to provide development support to the Client



**B.   Project Pricing**

The key components of the project price are broken out on the table below:

| Description | Timeline | # of Staff | Cost / Week / Staff | Total Cost | Running Total |
|---|---|---|---|---|---|
| Initial Liftoff Consultancy | 4 weeks | 1 | $3,750 | $15,000 | $15,000 |
| UX / Dynamic Prot. Mods | 4 weeks | 1 | $1,850 | $7,400 | $22,400 |
| Front End [Web] | 8 weeks | 1 | $2,460 | $19,680 | $42,080 |
| Front End [React] | 12 weeks | 1 | $2,380 | $28,560 | $70,640 |
| Back End [System Arch] | 10 weeks | 2 | $2,675 | $53,500 | $124,140 |
| Media Storage | - | - | $1,200/year | $1,200 | $125,340 |
| Server Costs | - | - | 1st Year Free | - | **$125,340** |

Total Development Time: **14-16 weeks**
Total Development Cost: **$125,340**
Invested Capital [See SAFE Note]: **$83,560**
Total Capital Due: **$41,780**

**C.   Billing and Payment**

LaunchByte agrees to defer costs until any investment tranche comes into the company, upon which day LaunchByte will send an invoice with this amount due.

**D.   Project Assumptions and Contingencies**

6

2621645.1/14431.2

The project assumptions and contingencies that are critical to meeting the project objectives and completing the deliverables in the designated time frame are outlined below:

1. Client will provide access to relevant documents, templates and related material, personnel and other resources necessary for performing the services outlined in this proposal.
2. Documents generated as part of this project will be in a format that will be mutually agreed upon by Client and Consultant at project initiation.
3. Client will review and provide feedback on deliverables to Consultant within <u>2 complete business days of submission</u>. Once deliverables are accepted by Client for review, Consultant assumes a <u>maximum of one round of review</u> by Client before finalization of deliverables.
4. Consultant has priced this Exhibit based on an estimated 14-16 week elapsed time to produce the deliverables, and has not included any contingency in the pricing provided. Consultant will work with the Client project manager to establish project related meeting schedules, timelines and identify issues at a kickoff meeting at the Start of the project.
5. The scope, timelines and deliverables of this project will be managed very tightly by Consultant, so if the total elapsed project time exceeds 14 - 16 weeks from the start of the project for reasons beyond Consultant's control (e.g. Change in scope of Project, change in Project assumptions, delays in providing necessary documentation or software, delays in setting up appropriate meetings etc.), such changes will be handled per section E below.
6. The services outlined in this proposal will be provided on a fixed fee basis.
7. Client and Consultant will proactively manage the risk arising out of incorrect assumptions related to the delivery of the services outlined in this proposal.
8. Services are to be performed at Consultant's location.

**E.** Project Changes

Any changes to the project scope and objectives that impact the project cost or the project deliverables will be adjusted by written and signed agreement.


IN WITNESS WHEREOF, the parties have executed this Exhibit to the Business Development Consultancy Agreement as of the date written below.

**CONSULTANT:**

LaunchByte.io LLC



By: _____
Name: Tan Kabra
Title: Chief Executive Officer
Date: _____6/27/2017_____

**CLIENT:**

2621645.1/14431.2

# EXHIBIT KK
# (Public Redacted)



Account: ▉
Amount: 10,000.00
PostDate: 20170629
Tran_ID: 516896281
CheckNum: 98
DIN: 516897771
ReturnReasonDescription:
ECEItemSeqNum: 8286570912

Credit to the account of
within named payee
absence of endorsement
guaranteed.
FIRST REPUBLIC BANK

Account: ▉
Amount: 10,000.00
PostDate: 20170629
Tran_ID: 516896281
CheckNum: 98
DIN: 516897771
ReturnReasonDescription:
ECEItemSeqNum: 8286570912



```
Account:
Amount: 10,000.00
PostDate: 20170629
Tran_ID: 516896281
CheckNum: 100
DIN: 516897776
ReturnReasonDescription:
ECEItemSeqNum: 8286570915
```

```
Account:
Amount: 10,000.00
PostDate: 20170629
Tran_ID: 516896281
CheckNum: 100
DIN: 516897776
ReturnReasonDescription:
ECEItemSeqNum: 8286570915
```



**EDSO INC**
**15 QUARRY LN APT 6203**
MALDEN MA, 02148

177

55-136/212
4855

9/1/2017  Date

Pay to the
Order of    *LaunchByte.10 LLC*   | $ 21,780.0

*Twenty-One Thousand Seven Hundred and Eighty* Dollars

**TD Bank**
America's Most Convenient Bank®

For _____

0177

Account: ▉▉▉▉▉
Amount: 21,780.00
PostDate: 20170901
Tran_ID: 553110006
CheckNum: 177
DIN: 553110411
ReturnReasonDescription:
ECEItemSeqNum: 9232709854

Credit to the account of
within named payee
absence of endorsement
guaranteed.
FIRST REPUBLIC BANK

Account: ▉▉▉▉▉
Amount: 21,780.00
PostDate: 20170901
Tran_ID: 553110006
CheckNum: 177
DIN: 553110411
ReturnReasonDescription:
ECEItemSeqNum: 9232709854