UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | Case No. 19-cr-10335-DJC |
| TANMAYA KABRA, | ) ) | **Leave to File Exhibits Under Seal** |
| Defendant. | ) ) ) | **Granted Sept. 8, 2021 (Dkt No. 163)** |

## GOVERNMENT'S SENTENCING MEMORANDUM

For nearly two years at least, Tanmaya Kabra perpetrated a scheme to defraud his victims. He told them that their money was invested in lucrative business opportunities, that he personally would guarantee their investments, and that their investments were "risk-free." In fact, Kabra was stealing their money to fuel his decadent lifestyle—routinely spending thousands of dollars at nightclubs, jetsetting around the globe, and on other extravagant luxuries. His crime was fueled by nothing other than greed and avarice and deserves a serious punishment.

Given the seriousness of his offense and the harm imposed on dozens of victims, the United States, by and through undersigned counsel, respectfully requests that this Court impose a sentence of 41 months incarceration, 12 months of supervised release, restitution in the amount of $1,842,106.24, a fine of $15,000, and a mandatory special assessment of $400.[1] The Government respectfully submits that such a sentence is necessary and appropriate to fulfill the objectives of 18 U.S.C. § 3553(a).

---

[1] The Government's Motion for Restitution incorrectly identified the amount of restitution owed to the victim with VNS ID. No. 6080396 as $100,000 and the total restitution figure as $1,847,106.24. The correct figures are $95,000 (*See* PSR ¶¶ 56-64) and $1,842,106.24, respectively. An appendix is attached setting forth the accurate restitution amounts for each identified victim.

1

## FACTUAL BACKGROUND

For at least two years, from August 2017 through the date of his arrest on August 4, 2019, Kabra operated a fraudulent scheme, duping dozens of individuals into investing funds with him based upon fraudulent representations that their money would be invested in start-up companies or in other legitimate business opportunities.  PSR ¶¶ 8-9.  Instead, again and again, Kabra stole money from his victims and used it to maintain his lavish lifestyle.  Over the course of his scheme, Kabra victimized at least 28 individuals identified by the Government, who together lost more than $2.2 million to his scheme.  PSR ¶¶ 120, 126.[2]

The PSR accurately details the fraudulent means through which Kabra perpetrated his scheme, including:

- falsely representing the extent of his wealth and his ability to guarantee repayment of investor funds;

- providing falsified bank statements and wire transfer notices purporting to show either that Kabra and his company had received large sums of money (which would be available to repay investors) or that Kabra had made payments to investors to whom he owed money;

- falsely representing that LaunchByte had entered an agreement to be acquired by a private equity company for a payment in excess of $10 million (that would then be available to repay LaunchByte investors); and

- falsely representing that funds received from investors would be used for specified business purposes, but instead diverting those funds for personal use or to repay previously defrauded investors.

PSR ¶ 34.

The PSR also details steps Kabra took to avoid detection of his scheme:

- making Ponzi-like payments using funds from new investors to repay previously defrauded investors;

---

[2] The incorporates by reference the facts as set forth in the Presentence Investigation Report as well as those set forth in the Government's Motion for Restitution, Dkt. No. 154.

- writing bad and unfunded checks to defrauded investors;

- falsely representing that he had wire-transferred funds to defrauded investors;

- falsely representing to investors that Kabra and LaunchByte were themselves the victims or theft and/or fraud; and

- threatening to take legal action against LaunchByte employees, investors, and contractors.

PSR ¶ 35.

## CALCULATION OF THE SENTENCING GUIDELINES RANGE

The Government concurs with the sentencing guidelines set forth by the Probation Department in the PSR:

| | Offense Level |
|---|---|
| Base Offense Level (USSG § 2B1.1(a)(1)) | 7 |
| - Gain or Loss from the Offense is Great than $1.5 million, but not more than $3.5 million (USSG § 2B1.1(b)(1)(I)) | +16 |
| - More than Ten Victims (USSG § 21.1(b)(2)(A) | +2 |
| - Acceptance of Responsibility (USSG § 3E1.1(b)) | -3 |
| **Total Adjusted Offense Level** | **22** |

Kabra has no criminal history, placing him in criminal history Category I. Kabra's sentencing guidelines range is therefore 41-51 months. PSR ¶ 172.

## THE SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

### The Nature and Circumstances of the Offense

*Kabra's Sole Motive was Greed*

The motive for Kabra's crimes was nothing but greed and avarice: He simply wanted to live a luxurious lifestyle—and felt entitled to spend his victims' money to do so. Over the course of his scheme, he spent hundreds of thousands of dollars—stolen from his victims—on extravagant travel, a boat, nightclubs, and other luxury items. As examples, in June 2018, Kabra negotiated to purchase a speed boat. He could not afford the boat himself and his application for

credit to buy the boat was denied.  Exh. A.  So Kabra instead sent a text message to his friend, Victim No. 1, inviting him to invest in a purported "bigger deal" and making promises about the security of the investment.  PSR ¶ 12.  These were lies, there was no such deal, and Kabra used $201,500, stolen from Victim No. 1, to purchase the boat.  PSR ¶ 18.[3]

At approximately the same time that he was negotiating to buy a boat, Kabra took extravagant trips to Mikonos, Majorca, Ibiza, Chicago, and London and used his LaunchByte credit card to spend more than $20,000 on flights for himself and his girlfriend, and at nightclubs, restaurants, and hotels.  Exh. B.  Kabra paid off this credit card debt with funds stolen from Victim No. 2.  *See* PSR ¶ 18.  In September 2018, Kabra again spent thousands of dollars on nightclubs, hotels, and on flights for himself and his girlfriend to London, Rome, Munich, Palm Beach, Dubai, and San Francisco.  Exh. C.  Kabra paid off this credit card bill with funds stolen from Victim No. 12.  Exh. D.[4]  Kabra did not steal to feed his family; he did not steal to feed an addiction.  He stole because he was greedy and felt entitled to expensive clothes, extravagant travel, indulgent meals, and other luxuries.

*Kabra's Crimes were Premeditated and Intentional, Not Impulsive*

Though fueled by greed, Kabra's conduct was not impulsive or opportunistic.  This is not a case where Kabra acquired money with good intentions, and only afterwards diverted the funds to personal use or where his offense is explained by some business setback which forced him to scramble to keep his business afloat.  To the contrary, Kabra's conduct was premeditated to the extreme.  Before Kabra enticed Victim No. 1 into his scam, Kabra had already decided to buy a boat, but knew he lacked the money to do so, and so came up with a ruse to steal the money from

---

[3] Throughout this memorandum, victims are identified using the numbering system set forth in the Government's Motion for Restitution, Dkt. No. 154.
[4] *See also, e.g.,* Motion for Restitution, Exh. Z (Dkt. No. 154-26) (account statements showing Kabra spending funds from Victim Nos. 22-23 for multi-day trip to Nantucket).

Victim No. 1. *See supra,* pp. 3-4. When he harangued Victim No. 7 to make a payment of $155,000 in September 2018, Kabra already knew he would use this money to pay off his Ponzi-scheme debts, rather than to perform work on her companies as he promised. *See* Motion for Restitution (Dkt. No. 154), pp. 7-9. When he executed an agreement with Victim No. 8 and promised to pay tens of thousands of dollars to cofound a company, he took her money knowing he would contribute none of his own. *See id.*, pp. 9-11. And his scheme only grew bolder and more blatant, culminating in the summer of 2019, when he convinced seven victims to pay him more than $400,000 based on the patently false representations that he was about to sell his company, LaunchByte, to a private equity firm for $10 million. PSR ¶¶ 89-100.

The steps that Kabra took to cover up his fraud were equally flagrant. When Victim No. 8 asked for proof that Kabra and his girlfriend had paid funds into their jointly founded company—as both had promised to do—Kabra forged fake electronic receipts showing wire transfers that had never been sent. *See* Motion for Restitution (Dkt. 154), pp. 9-11. In similar fashion, Kabra doctored a wire transfer notice showing a transfer of $30,000 from Victim No. 12 to falsely show a transfer of $1.35 million from a fictitious third-party and then sent that forged notice to another victim to string them along with the belief that Kabra had adequate funds to pay his debts. PSR ¶ 69.

Kabra did not stumble into his fraudulent scheme, he was a deliberate, planned, and intentional fraudster.

*Kabra's Persisted in his Criminal Conduct, Even After Being Warned of Its Wrongfulness*

As described in the PSR, Kabra defrauded at least 28 individuals over a period of two years. In each instance, Kabra communicated directly with the individual victim on multiple occasions, peddling falsehoods and flashing his purported wealth and success to impress his

5

victims and convince them of the security of their investments.  After they gave him money, Kabra strung along his victims with more lies—that work was being performed, that LaunchByte was on the verge of being sold, and that the return of their money was imminent.  *See, e.g.,* PSR ¶¶ 34-35.  Far from being a "marked deviation by the defendant from an otherwise law-abiding life," USSG § 5K2.20, *United States v. Germosen*, 473 F. Supp. 2d 221, 230 (D. Mass. 2007), or "the foolish and thoughtless act of a man pushed over the brink," *United States v. Langille*, 324 F. Supp. 2d 38, 43 (D. Me. 2004), Kabra's lies and other criminal conduct were pervasive and persistent; he engaged in the same wrongful, deceitful, and criminal conduct on a regular basis, with dozens of individuals, over a period of years.

Remarkably, Kabra persisted in his criminal acts even after being repeatedly warned that he was committing "fraud," that his business was a "scam," and that he needed to stop the "abuse" of his victims.  As examples of these unheeded warnings:

- In February 2018, Victim No. 28 emailed Kabra (and employees at LaunchByte) stating plainly:  "Tan is a thief and a fraud.";  Exh. E;

- In January 2019, Victim No. 7 told Kabra:  "You have misrepresented and lied about your fund too many times to count, the numbers you say are lies - you mislead people and this is all [a] scam.  You have extorted a quarter of a million dollars from me and lied - I am sure that is the tip of the iceberg."  Motion for Restitution, Exh. I (Dkt. No. 154-9);

- In April 2019, Victim No. 14 wrote to Kabra:  "I am starting to believe you are not an honest well meaning man as I hoped and to certain point in time believed you to be.  [You] put in front of [me] a worthless Promissory note with no[] proof of any collateral guaranteeing my principal.  You must have done this to many people…."  Exh. F; and

- In April 2019, Victim No. 5 wrote to Kabra:  "It's passed [sic] time to abuse your friends and people who have been supportive to you in business and beyond."  Exh. G.

For Kabra, knowing, bald-faced fraud was simply business as usual.

## *The Characteristics of the Defendant*

*Kabra Had an Entitled Upbringing and No Reason to Turn to Crime*

Nothing in Kabra's upbringing or background justifies or even mitigates his offense. To the contrary, Kabra has led a privileged life. His family is wealthy and stable. PSR ¶¶ 144-151. His parents are professionals who have regularly provided financial support to Kabra, both before and after his offense. Kabra attended an elite, expensive private school in Singapore and graduated from a prestigious college in the Boston area. PSR ¶¶ 148-149. Kabra committed his criminal offenses despite all these advantages.

*Even After His Arrest, Kabra Denied His Crimes and Blamed His Victims*

Prior to his arrest and during the course of his criminal scheme, Kabra deflected requests for repayment from his victims with denials of wrongdoing and further lies, and by casting *himself* as the victim, rather than perpetrator, of fraud. *See, e.g.,* PSR ¶ 35. After his arrest, Kabra continued to do the same—denying his guilt and claiming victim status. Specifically, after his arrest and release from pre-trial detention, Kabra created a website, tkabra.com, on which he held himself out as a "Founder. Board Member. Advisor. Mentor. Growth Hacker. Product Evangelist. Venture Capitalist." Exh. H. One page of that website contained a letter from Kabra in which he described himself as a victim of "awful circumstances and the betrayal of my trust and kindness by people, who went to such lengths to frame me in an attempt to save face." *Id.* In that note, Kabra offered to "forgive … those who crossed me, defrauded me, and cheated me out of my years of hard work to make me look like some type of monster." Kabra's note continues:

> Aside from the legal actions, I will soon begin to take against each of these individuals, I have no need for revenge. They no longer have access to me & my helping hand, and that is punishment enough … Since some proceedings are still ongoing, I am choosing not to go into detail at this moment about how certain

7

>individuals came in, lied, took advantage of me, and spun the whole thing back on me when I discovered their charade.

*Id.*

Finally, *even after pleading guilty to fraud*, Kabra continues to minimize his conduct and suggest that he is a victim here. Kabra maintains that his business was "legitimate" and "provided valuable services and products to its customers." Defendant's PSR Objection ¶ 9. According to the PSR, Kabra believes that unidentified parties breached contracts with LaunchByte (rather than *vice-versa*) and he "anticipates [receiving] an unknown amount due to breach of contract claims held by Kabra Group LLC." PSR ¶ 168. He also claims that the business hardships his victims faced were because they "constantly changed [their] idea for the product," PSR ¶ 48, had only a "vague concept" for the business, *id.* ¶ 53, or expanded the "scope of work" of their projects, *id.* ¶ 112—not because he stole the money that should have been used to build their businesses.

According to Kabra, he is the real victim here; after all, for him "one of the hardest things about this situation was watching something [*i.e.* LaunchByte] crumble which he started from the beginning." PSR ¶ 164.

### *The Need to Promote Respect for the Law, Provide Just Punishment, and Afford Adequate Deterrence to Criminal Conduct*

A sentence at the low end of the guidelines ranges is also necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and deter criminal conduct. *See* 18 U.S.C. § 3553(a)(2)(A). An insubstantial sentence would send the wrong message: "that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006).

In this case, a significant punishment is necessary not only to achieve general deterrence—the deterrence of other would-be criminals—but to ensure Kabra himself understands the seriousness of his offense: After his arrest, Kabra has continued to blame victims for his own wrongdoing and minimize the scope of his own culpable conduct, as described above, and he has sought to modify the terms of his pre-trial supervision based upon bogus representations to the Probation Department (*see* Dkt. No. 98). Even after his guilty plea, he continues to minimize the scope of his wrongdoing. *See supra*, pp. 7-8. In short, Kabra continues to show a total disregard for honesty and fair-play; he refuses to come to grips with the scope of his wrongdoing, and he thereby needs to be deterred from committing further crimes and engaging in further deception.

### *The Impact of Kabra's Crimes on His Victims*

Kabra's offenses harmed dozens. His victims included his friends, friends of his friends, and myriad others who had the misfortune to enter his orbit. Some of them knew him well, working with him and trusting him for years. Their words capture his character and the harm he inflicted:

- "I spent more than two years of my life fighting with Tan Kabra and Launchbyte.io to try to have him correct the wrongs he had done to me.… Tan may never understand how he damaged my life and my household. Or rather, he may, but he is great at pretending, so I would never expect him to admit to anything. He is a lying piece of trash." Victim Impact Statement, VNS ID No. 6535214.

- "[H]e deserves to rot in jail.…Based on my understanding of his wealthy family background, he has no financial need to engage in such fraudulent activity, meaning he was likely defrauding investors for the thrill and excitement of it. I have several mutual friends with Tan, and the fact he would intentionally steal from friends/family means he will likely do it again." Victim Impact Statement, VNS ID No. 6080391.

- "Tan Kabra is one of the most fraudulent human beings I have ever dealt with and has little concern for anyone else but his own financial well being.…He does not deserve anything but the harshest consequences. If one can be such a crook prior to even turning 30, what are they possible of later in life." Victim Impact Statement, VNS ID No. 6535242.

- "As a result of my involvement with Tan Kabra.…I was lied to, taken advantage of, and victimized.…What I hope Tan Kabra will understand is how this all, in its entirety, has impacted and absolutely devastated me.…[I] lost a business that I was excited to bring to fruition.…[and I] lost a sense of pride in myself in what I believed I would have achieved." Victim Impact Statement, VNS ID No. 6535265.

## CONCLUSION

For the reasons above, the United States respectfully requests that this Court impose a sentence of 41 months incarceration, 12 months of supervised release, restitution in the amount of $1,842,106.24, a fine of $15,000, and a mandatory special assessment of $400.

Respectfully submitted,

UNITED STATES OF AMERICA,

By its attorney,

NATHANIEL R. MENDELL
United States Attorney

/s/ Chris Looney
Christopher Looney
James Herbert
Assistant United States Attorneys
1 Courthouse Way, Suite 9200
Boston, MA 02210
617.748.3100

Dated: September 8, 2021

## CERTIFICATE OF SERVICE

      Undersigned counsel certifies that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Chris Looney*
Christopher Looney
Assistant United States Attorney

Dated: September 8, 2021