UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Action No. 19-cr-10335 |
| | ) | Leave To File Exhibits Under Seal (Granted 9-10-21) |
| TANMAYA KABRA | ) | Leave To File With Excess Pages (Granted 9-13-21) |

**SENTENCING MEMORANDUM IN SUPPORT OF TANMAYA KABRA**

Tanmaya Kabra ("Mr. Kabra") submits this Sentencing Memorandum and request for the Court's consideration in connection with his sentencing on September 15, 2021. Mr. Kabra has also filed a Motion for Downward Departure or Variance for the Court's consideration, which he incorporates by reference.

## I.      INTRODUCTION

The Government is correct to highlight in its Sentencing Memorandum that Mr. Kabra engaged in fraudulent misrepresentations to secure funds through lenders and clients over the course of an eighteen month period, and that victims were harmed as a direct result. Mr. Kabra admits his guilt, accepts full responsibility for his criminal conduct, is genuinely remorseful, and is committed to fully repaying the victims for their losses, as is demonstrated by the $800,000 already deposited in the Court's escrow account for that purpose.

But the Government is wrong to characterize Mr. Kabra as a one-dimensional thief consumed solely by avarice and greed. While he has broken the law, Mr. Kabra is a talented young entrepreneur who has spent very significant parts of his very young adult life trying to do good, worthy and valuable work. Mr. Kabra conceived of and implemented an ambitious business plan involving the provision of software application design, development and marketing services to start-

up businesses that had limited or no resources.  While in college, Mr. Kabra formed LaunchByte

LLC ("LaunchByte") and hired a team of experienced managers, designers, and engineers to design

and build apps and provide marketing services to the company's clients.  Mr. Kabra and his team

performed valuable work, as the following sample of compliments (among many more) from

LaunchByte's client's reflect:

- "Thanks [], looking really good." 8/29/17 email to the Managing Partner & Operations Director of LaunchByte from principal of *Worthee*, upon his review of a User Interface wireframe, designed and developed by the LaunchByte engineering team (Exh. A);

- "Thank you for a great meeting yesterday - very exciting to see the wire frames and initial branding - so awesome" 6/19/18 email to the LaunchByte Director of Growth from the CEO & Founder of *MobilMani* (Exh. B);

- "Congrats to all of us! Thank you [] for letting us know!" 11/8/18 email to the CTO of LaunchByte from the CEO & Founder of BondApp, upon acceptance into the Apple App Store of the *Bond App* developed by LaunchByte (Exh. C);

- "As my way of saying thanks to you for believing in this platform from day 1, I'll like to open up a door for you and LaunchByte. I'll like to open up the island as a testing ground for other startups who are part of the Launchbyte family." 10/27/17 to Mr. Kabra from the CEO of *EDSO* (Exh. D);

- "The look so far is great! We are excited to keep moving forward." 8//9/17 email to the Chief Operating Officer of LaunchByte from the *Nutre* team following its review of the design mock ups of the *Nutre* app prepared by LaunchByte engineers (Exh. E);

- "Thank you for taking the time to do some pre-work design here. Looks great so far!" 7/21/17 email to the LaunchByte Director of Growth from the CEO & Founder of *Host*, following her review of screen and logo designs prepared by the LaunchByte team (Exh. F);

- "Looks good, thanks for tweaking my designs." 4/27/17 email to Mr. Kabra from the President & CEO of *Rezzit21* following his review of a slide deck of proposed app designs prepared by the LaunchByte team (Exh. G).

*See* Exh. H for additional examples of compliments from LaunchByte clients.

Mr. Kabra also formed a venture capital firm, ultimately renamed to KV Ventures, to invest

in start-up tech companies, including but not limited to clients of LaunchByte.  Mr. Kabra's

intentions were genuine and his business ideas were viewed by many to be promising, as several of the accompanying character letters attest. *See* Exh. I.

LaunchByte achieved some success, as the company designed and developed numerous functional apps and provided a wide variety of other start-up support services to clients. But Mr. Kabra lacked significant business experience, and when the pressure to finance his growing business concerns mounted he panicked and resorted to fraudulent misrepresentations that led to his guilty plea. Mr. Kabra's criminal actions were not a result of a thoroughly corrupt criminal scheme, as the Government asserts. Rather, they were the actions of a young and inexperienced businessman who morally lost his way when the pressures of a growing business overwhelmed him and he succumbed to fraudulent conduct.

Mr. Kabra made fraudulent misrepresentations and, in the process, financially harmed several clients and lenders. Mr. Kabra accepts full responsibility for his criminal conduct. Mr. Kabra is fully dedicated to do all that he can to right the wrongs he committed, including making full restitution.[1] Mr. Kabra has used his business talents, working with his father's company since he was released from pretrial detention, to generate $800,000 to date, all of which will go toward restitution payments to his victims.[2] Exh. J.[3]

Mr. Kabra recognizes that his serious criminal offenses warrant serious punishment. Mr. Kabra served sixty days of incarceration at the Plymouth House of Corrections following his arrest in August of 2019. Mr. Kabra also has been subject to significant conditions of confinement during

---

[1] Mr. Kabra acknowledges that he is indebted to certain clients of and lenders to LaunchByte where there was no criminal conduct. Mr. Kabra fully intends to make whole all such individuals. Mr. Kabra has a continuing disagreement with the Government as to whether some of those debts involve criminal conduct, but nonetheless has agreed to include such individuals in the restitution order because of his desire to resolve all legitimate business disputes, in addition to making restitution to the victims of his criminal conduct.

[2] Mr. Kabra also plans to apply all of his bail, $250,000, towards restitution.

[3] Exh. J includes logs tracking the work Mr. Kabra completed on a project while working at his father's company and emails evidencing work submitted on projects for clients. These documents show that Mr. Kabra completed the work necessary to raise these funds.

the twenty three months since his release from prison, including a period of almost three months of home confinement followed by the remaining period being subject to a curfew and wearing an electronic monitoring bracelet.  Mr. Kabra has suffered physical discomfort and mental stress and anxiety arising from wearing an electronic monitoring for twenty-three months. In addition, Mr. Kabra's reputation has been permanently destroyed, as he has been vilified in the extensive press coverage this case has received.  Mr. Kabra will carry the stigma of being a convicted felon for the rest of his life, which is particularly burdensome given that he is a very young man.  In short, Mr. Kabra has already incurred very substantial punishment, and will continue to face the effects of his conviction for the rest of his life, both professionally and socially.

Mr. Kabra respectfully urges the Court to grant a downward departure or a variance, pursuant to a separately filed motion.  It is respectfully submitted that, in light of the punishment already imposed, Mr. Kabra's manifest remorse and acceptance of responsibility, and the value to the victims that will be served by allowing Mr. Kabra to continue in his work with his father's company, a sentence of home confinement would be most appropriate in this case.

## II.   RELEVANT BACKGROUND

### A.   Personal and Family Circumstances

Mr. Kabra was born on December 28, 1993 in New Delhi, India. PSR ¶ 144.  He lived there until age two, when he moved with his parents to New Jersey.  *Id.*  Mr. Kabra was raised by loving parents who always emphasized the importance of hard work, community, and family values.  When Mr. Kabra first arrived in the United States his family had very modest means.  They lived in a variety of places, as his parents worked to establish themselves.  *Id.*  Over the course of ten years, Mr. Kabra lived in eight different locations.  His family often lived in shared living spaces with extended family.  His parents worked long hours, and Mr. Kabra spent a lot of time in child care.

*Id.*  Accordingly, contrary to the Government's contentions, Mr. Kabra's early years were not always stable.  Gov. Sentencing Mem. (Dkt. 164).

Mr. Kabra's brother was born in 2004.  In 2006, Mr. Kabra's father moved his family to Singapore for his job.  PSR ¶ 144. Though Mr. Kabra returned to the U.S. in 2012, his parents and brother have remained in Singapore to this day.  *Id.* at ¶¶ 145-147.  Despite the distance between them, Mr. Kabra is very close to his family and they are totally committed to helping him stay on course to become a fully rehabilitated and productive member of society, and work through his mental health issues.

**B.      Education and Employment History**

Mr. Kabra attended pre-kindergarten through sixth grade in the U.S.  His family moved to Singapore when he was in seventh grade, and he attended grades seven through twelve in Singapore at an academically rigorous international school.  *Id.* at ¶ 148.  Mr. Kabra did well in school and participated in school clubs and community organizations such as the Boy Scouts.  Mr. Kabra earned good grades notwithstanding the fact that he had learning challenges that went undiagnosed. It was not until this year that he was diagnosed with Attention Deficit Disorder.

Mr. Kabra moved back to the United States at age 18 to attend Babson College in Wellesley, Massachusetts, which he attended from 2012 to 2016.  *Id.* at ¶ 162.  Far away from his family, Mr. Kabra worked hard to adjust.  He became involved in school activities, joining Babson's radio station and a fraternity, and was elected to the Steering Committee (Babson's equivalent of student counsel).  He also had jobs on campus during the last three years of school, including work in the mail room and assisting to plan and run events in the student center.  *Id.* at ¶ 163.  During the summers, he had internships at KPMG as a Management Intern; the Trade Desk, Inc. as a marketing analyst; and Dassault Systems as a Digital Marketing Intern.

**C.      Mr. Kabra's Entrepreneurship**

Mr. Kabra ventured into the world of business at a young age.  In his junior year of high school, Mr. Kabra started a wholesale distribution company that bought and sold cell phones in bulk.  The business was successful and Mr. Kabra ran it until he graduated from high school and left Singapore for Babson.

In 2015, Mr. Kabra started his second company, VetX, Inc. ("VetX").  The startup developed an application that connected pet owners with veterinarian clinics 24 hours a day. *Id.*  Over a short period, Mr. Kabra grew the company to the point where it had four to five in-office employees in a rented WeWork space in Boston.  The company's app was launched on the Apple store and the Android store.  VetX developed a community of users and relationships with veterinary clinics.  Ultimately, despite early success, Mr. Kabra shut down the company to focus his attention on a new venture, LaunchByte, after his business partner in VetX started a competing app called Guardian Vets.

As mentioned above, LaunchByte was formed by Mr. Kabra while he was a student at Babson.  *Id.* at ¶ 164.  While working on projects with other students, Mr. Kabra realized that business founders faced common hurdles when trying to grow an idea into a marketable/fundable business.  Founders required various technical resources to develop a software app or website and oftentimes struggled to make ends meet during the non-revenue producing, development stage.  The idea behind LaunchByte was that, for one set price, founders could receive all the resources they needed to develop their idea into an app and/or website that would be ready to be launched and be suitable to attract investor funding.

**D.      Mr. Kabra Built a Legitimate Business Venture that Provided Material Benefits to Clients**

The business model for LaunchByte was not part of a scheme, conspiracy, or pattern of criminal behavior driven by greed.  Rather, it was a real business plan that was designed to provide

real value to its clients.  LaunchByte had a "reverse angel model," meaning clients signed Consulting Agreements that provided for payment of a set fee by the client and obligated LaunchByte to invest the resources necessary to build an "MVP" stage app, or a minimally viable product.  Clients were informed both at the time of engagement and via the Consulting Agreement and Term Sheet that LaunchByte's investment would be provided in the form of services.  In exchange for its investment of resources, LaunchByte retained a percentage ownership of the client's company.  Part of Mr. Kabra's plan was that LaunchByte would develop a portfolio of early-stage companies that could be monetized in the future via a venture capital fund.  Mr. Kabra's strategy was to take on all of the risk initially to prove his concept worked, before raising outside capital in the form of a fund.

A.  *LaunchByte*

LaunchByte's services were performed by employees and outside contractors overseen by a management team that was experienced in building startups.  LaunchByte's management team was based in its Boston office.  The core Boston staff consisted of: a Managing Partner & Operations Director ("Operating Director"), who had extensive experience in the startup industry; a Managing Partner, who had executive leadership experience at various startups prior to joining LaunchByte; a Chief Technology Officer, who had extensive experience in development and translating business requirements into buildable systems; a Director of Growth, who had previous experience as a marketing and business development growth strategist; a User Interface/User Experience Designer; an Office Assistant; [4] as well as Mr. Kabra, who served as the Managing Director.  LaunchByte also had an internship and co-op program for students from nearby Universities, where the participants

---

[4] These individuals received salaries and benefits as follows: Operating Director $225,000, Chief Technology Officer $100,000, Managing Partner $60,000 plus commission, Director of Growth $75,000, User Interface/User Experience Designer $68,000, and Office Assistant $48,000.

worked on the portfolio companies.  LaunchByte's Boston-based team worked with contractors from around the United States and abroad.

Before engaging a client, Mr. Kabra provided examples of prior work and put potential clients in contact with current clients.  Exh. K (April 22, 2018 email from Mr. Kabra to Victim No. 7 providing introductions to other individuals working with LaunchByte); Exh. L (April 23, 2018 email from Mr. Kabra to Victim No. 7 providing examples of prior work); Exh. M (Oct. 31, 2018 email between Victim No. 7, founder and Mr. Kabra.  Mr. Kabra putting founder in touch with Victim No. 7 to discuss LaunchByte process).  Mr. Kabra also encouraged founders to have counsel review the Consulting Agreements and Term Sheets.  Exh. N (Feb. 10, 2018 email between Mr. Kabra and founder stating that will pass documents on to lawyer to review); Exh. O (April 25, 2018 email chain between Mr. Kabra and Victim No. 7.  Victim No. 7 makes reference to her lawyer's review of the documents).

Once a client contracted LaunchByte, the LaunchByte process involved five stages of development that was designed to transform an idea into a functional application and/or website.  The five stages were: discovery and strategy; flowcharts and wireframes; user interface/user experience ("UI/UX"); requirements; and development.  Exh. P (LaunchByte Standard Operating Procedure).

During the first stage, discovery and strategy, LaunchByte had regular meetings with the client to learn about the client's value proposition, assess the state of its business, understand the problem it sought to address, and propose a solution.

Stage two involved creating flowcharts and wireframes.  Flow charts are diagrams developed to show the user flow for an app or website.  Designers use these to visualize interactions in design and present a map of the app and/or website design to stakeholders.  Wireframes are used to design an app or website at a structural level.  LaunchByte needed wireframes in the early stage of

development to help establish the basic structure of each page of an app or website before visual design and content was added.  Creating flow charts and wireframes is a labor-intensive process. Salaried employees on the LaunchByte team spent hundreds of hours working on these products and then meeting with clients to perfect their vision.  It often took multiple iterations of wireframes before the next stage could begin.

The third stage involved creating UI/UX.  UI/UX is an interactive prototype that allows a client to visualize and understand the flow of a product.  This stage was also completed by salaried staff in the Boston office and involved creating an interactive prototype for each client that helped it visualize and perfect the initial user experience and work through user scenarios.  The deliverable was high resolution wireframes and landing pages for the clients.

The fourth stage consisted of creating requirements.  Requirements, also known as product specification documents, incorporate the work product of the previous stages to create a document that sets forth a guide for the development/coding team.  LaunchByte created comprehensive requirement documents for each client's review and approval before moving to the next stage. The initial four stages of the LaunchByte Process often took more than the anticipated, allotted time period, i.e., multiple months instead of the projected eight weeks.  This resulted from the fact that LaunchByte regularly received client requests to expand and/or change the scope of work.

Once the requirements were approved, the development stage began.  The developers used the requirement document to translate the app into code.  LaunchByte used in house developers and outside contractors for the development work.  LaunchByte employees worked closely with contracted developers to create MVPs that could be sent to beta test groups of users to identify bugs and provide feedback on the apps.  Once the identified bugs and feedback were addressed and the client was satisfied with the MVP, LaunchByte would launch the website and/or app.  Apps were launched on the Apple App Store and/or Android store.  These stores have independent

requirements that must be met before an app can be loaded onto the store. As such, they provide

independent verification that the work created by LaunchByte had value and was functional.

The goal of every agreement was to develop an MVP. An MVP is a version of a product

that has enough features to be usable by early customers, but which is understood to require further

refinement. An implicit understanding with an MVP is that it is in its developmental phase.

LaunchByte did not promise to provide perfectly functioning apps, nor could it. By virtue of their

nature, apps are never one hundred percent complete; they are constantly reviewed and updated,

especially if and when apps become more popular. "Bugs" are a normal and expected part of the

app development process, as they are detected by developers and users who provide feedback,

leading to corrections and design enhancements.

LaunchByte's objective was to create a product for its customers that could support initial

users and attract additional investment at a valuation that was higher than when LaunchByte entered

the picture. This was its key metric of success. Over the course of four years, LaunchByte worked

with approximately 50 clients, although not all were a part of the reverse angel investment program.

Clients expressed satisfactions with LaunchByte's work throughout the process. Exh. H (emails

with clients expressing satisfaction with LaunchByte's work). LaunchByte launched approximately

22 apps and/or websites.[5]

LaunchByte grew rapidly. It generated business by word of mouth and hosting founder

events, such as dinners, nightclub events, and other social gatherings, alongside positive publicity.

Some of these expenses for these events, as reflected on LaunchByte's credit card statements, are

improperly characterized as extravagant expenses by the Government. Gov. Sentencing Mem. Exh.

---

[5] Not all 50 clients went through the LaunchByte process. In the initial years, as the company was growing, Mr. Kabra worked on discrete projects for clients. As LaunchByte grew and Mr. Kabra and his team developed the LaunchByte process/reverse angel model, he began contracting with clients to take an idea and develop it into an MVP. This explains why LaunchByte worked with approximately 50 clients, yet developed approximately 22 apps or websites.

B, Exh. C. (Dkt. 164). Instead of paying expensive employees or outside contractors for marketing services, LaunchByte hosted social events, oftentimes outside the country in places such as London, Mikonos, Munich, and Dubai.[6] Exh. Q (emails and calendar invites evidencing business meetings) Mr. Kabra acknowledges that these expenses were large and, given the early phase of his business and his own personal financial status, he should have been more judicious in spending. Though misguided, these expenditures were driven by the desire to raise awareness for LaunchByte and generate business for LaunchByte and KV Ventures. Marketing for a new business and a venture capital fund is an expensive proposition. Mr. Kabra had to be in front of prospective clients and investors, which required many meetings and continuous conversations.

In 2018 LaunchByte's business expenses totaled well over $ 1 million. The largest expense was for salaries, approximately $770,000, plus payroll taxes. LaunchByte paid approximately $250,000 to coding contractors. The remaining expenses were for legal, accounting and consulting fees, and miscellaneous business expenses such as office supplies, space rental and cleaning. While Mr. Kabra's business and personal expenses were commingled, at the end of each year his personal expenses were allocated to him as salary by his CPA firm. Exh. S (communications with CPA to categorize expenses).

### B.   KV Ventures

As the LaunchByte business grew, Mr. Kabra began making plans to start a venture capital firm. Victim No. 1 approached him and asked to get involved. The two worked together and conceived of the idea for a venture capital firm named KV Ventures (initials of their respective last

---

[6] The Government characterizes Mr. Kabra's trips to Mikonos, Majorca, Ibiza, Chicago, London, Rome, Munich, Palm Beach, Dubai, and San Francisco as extravagant personal trips. Gov. Sentencing Mem. (Dkt. 164). In fact, a majority of the trips were for business purposes. Specifically, he went to Mikonos to meet Victim No. 7, Chicago and London to meet with potential clients (Exh. Q), and Munich, Palm Beach, and Dubai to meet with potential investors for KV Ventures (Exh. Q & Exh. R). Mr. Kabra's trips to Majorca, Ibiza, and Rome were personal trips. Though all of these expenses appeared on Mr. Kabra's credit card, they were not all business expenses. At the end of each year, Mr. Kabra met with his CPA to appropriately categorize his expenses. This means that even on business trips, there were expenses that would be removed and categorized as personal.

names).  The aim was to create a fund that would invest in start-up technology companies, including but not limited to purchasing LaunchByte's portfolio companies.  Mr. Kabra hired a Global Director of Growth, recommended by Victim No. 1, to help raise capital for the fund.  The Global Director of Growth assured Mr. Kabra that she could use her extensive connections in the United States and abroad to raise capital.  Mr. Kabra entered into a contract with the Global Director of Growth where he agreed to pay her $8,000 for the first three months and $10,000 a month from then on in exchange for efforts to raise $7 million in investment funds.

From late 2018 to January 2019, the Global Director of Growth and Victim No. 1 made representations and promises that led Mr. Kabra to believe they would secure sufficient capital to close the fund.  In fact, while assuring Mr. Kabra she could secure the funds, the Global Director of Growth was telling her contacts not to invest with Mr. Kabra.  Exh. T (Noble 302).  Likewise, Victim No. 1 admitted that he was leading Mr. Kabra on and never intended to raise a single dollar for the fund.  Exh. U (Victim No. 1 302).  Mr. Kabra set out to establish a legitimate fund that would invest in start-ups like those developed at LaunchByte, but his efforts failed.

*C.  Mr. Kabra's Business Plans Were Designed With the Interest of His Clients in Mind*

Mr. Kabra's plans and development of LaunchByte and KV Ventures were the designs of a young, ambitious, inexperienced man that got in over his head and made bad decisions when faced with the pressure to raise funds for a growing business.  Mr. Kabra did not intend at the outset to harm his clients or lenders.  Mr. Kabra did not set out to steal from his clients or investors.  While he fully owns and regrets that he resorted to fraudulent misrepresentations to lenders and certain clients, that was not his initial plan, but rather the unfortunate result of succumbing to the temptation to seeming quick solutions to mounting business pressures.

**E.**     **Mr. Kabra's Charitable Conduct**

Several letters submitted in support of Mr. Kabra by friends, family members, and business contacts describe him as hard working and generous.  Exh. I. Mr. Kabra has participated in community service activities since he was young.  Starting in middle school, Mr. Kabra became involved in community service work through the Boy Scouts.  When he moved to Singapore he joined Students Against Violating the Environment ("SAVE").  Through SAVE, Mr. Kabra engaged in various activities including building houses in the Philippines, revamping a sensory trail for the visually handicapped on the island of Palu Ubin, and teaching English and Math at schools in Indonesia and the Philippines.

During his college years, Mr. Kabra participated in Big Brother events and worked with a local service group called Save a Dog, Inc.  His charitable work continued once he graduated and worked at LaunchByte.  Mr. Kabra planned a series of workshops at Excel High School to help create opportunities for young entrepreneurs.  During the workshops, teams of students presented ideas for new software applications, and a panel of entrepreneurs, assembled by LaunchByte, asked the teams questions and helped develop their ideas.  LaunchByte held three different events at Excel High School.  At the third event, the winning team received a consultation with LaunchByte where the LaunchByte team met with the students and helped develop their idea into an app.  Mr. Kabra also donated twenty-five Apple mini computers with key pads to create a computer lab for students. Further, LaunchByte offered free services to minority business owners to help their businesses develop and excel. *See, e.g.,* Exh. V.

Mr. Kabra continues to seek out volunteer and charitable giving opportunities.  As of late, he has donated his time to Prides Beach Association in Beverly and People Making a Difference.  He attended recent volunteer events to create care packages and meals.  He also donated his time to

develop a website for the COVID-19: Knowing, Understanding, Preventing project.  Mr. Kabra is committed to continuing to contribute to his community in the future.

### E.        Post-arrest Employment

Following his release from Plymouth County Correctional Facility, Mr. Kabra began work at ExecuServices, Inc. ("ExecuServices").  ExecuServices is a company that provides website design, cloud solutions, chief technology officer services, and hosting solutions to its clients.  His role has included assisting the company to develop, create and manage social media channels, assisting with marketing, and developing client relationships.

At present, the majority of Mr. Kabra's time is spent working at Frontline Strategy Ltd. ("Frontline"), a Private Equity Advisory Firm owned by Mr. Kabra's father.  Mr. Kabra began work for Frontline in March 2020.  At Frontline, Mr. Kabra assists in developing the company's business strategy, creates and manages social media presence, and develops, designs, manages, and sells digital software products, app builds, and new business development.

### E.        The Offense Conduct

The charges in this case stem from fraudulent misrepresentations Mr. Kabra made to secure funds for his growing business.  Mr. Kabra acknowledges that his actions financially harmed clients and lenders and he accepts full responsibility for his wrongful conduct.  Mr. Kabra has worked to repay his victims, has succeeded in raising $800,000, and is fully committed to ensuring that he fully meets his obligations to make full restitution.  Mr. Kabra never intended to leave his customers high and dry.  Notwithstanding his criminal conduct, Mr. Kabra always believed that his business plan would succeed, his lenders would be made whole and his customers businesses would succeed.

Mr. Kabra notes that the Government has conflated investments that were the result of his criminal conduct with funds secured during the course of his legitimate business dealings through LaunchByte.  Specifically, he disputes that there was criminal conduct with regards to Victim No. 7,

Victim No. 15, Victim No. 25, Victim No. 26, Victim No. 27, and Victim No. 28, as discussed below. Nevertheless, Mr. Kabra has agreed to pay these amounts as part of restitution because he desires to resolve all legitimate business disputes.

A. **Victim No. 7**

Mr. Kabra and Victim No. 7 entered into two agreements to develop mobile apps. The first agreement was entered into on April 26, 2018 for MobilMani LLC ("MobilMani"). After approximately six months of working with LaunchByte on the MobilMani project, Victim No. 7 entered into a second agreement to develop DentRx LLC ("DentRx") on October 10, 2018, demonstrating her satisfaction with the services provided by LaunchByte as of that date.

Mr. Kabra admits that he misrepresented to Victim No. 7 that funds would be placed in a sub account, when in fact they were not. *See* Gov. Mot. for Restitution, Exh. A (Dkt. No. 154). Nevertheless, the Government has acknowledged LaunchByte performed valuable work developing an app for MobilMani project, as it conceded Mr. Kabra is not obligated to repay the entire amount Vitim No. 7 paid to LaunchByte. Rather, the Government contends that he should repay Victim No. 7 the difference between the amount Victim No. 7 paid Mr. Kabra ($235,000) and the value of the services received ($58,750) is $176,250. Mr. Kabra has agreed to repay that amount.

Mr. Kabra respectfully maintains, however, that LaunchByte provided well over $58,750.00 in value on the MobilMani project. The Statement of Work provided for a two-phase process. The first phase was scheduled for about eight weeks and involved creating a landing page, investor deck, UI/UX dynamic prototype, and project plan for Phase two. Exh. W. Phase two was scheduled for about sixteen weeks and involved completing the platform (mobile and/or web) and back end database set up. *Id.* LaunchByte's work for MobilMani well exceeded the scope and timeframe contracted for. The initial phase lasted over four months and the second phase lasted approximately

six months.  All deliverables were provided.  Exh. X;[7] Exh. Y (June 19, 2018 email from Victim

No. 7 to LaunchByte, "very exciting to see the wire frames and initial branding – so awesome");

Exh. Z (MobilMani requirements).[8]  The additional time investment by LaunchByte resulted from

the fact that Victim No. 7 repeatedly changed and expanded her idea for the app, a common

occurrence among founders.  Exh. X; Exh. AA (October 12, 2018 email from LaunchByte

employee, "I spoke with [Victim No. 7] this morning and she's given us a new direction for

Mobilmani (think Angie's list meets beauty industry)"); Exh. BB (October 23, 2018 email from

Victim No. 7, "I wanted to make sure you will let [LaunchByte Employee] know that Mobilmani

will now be mani & mane and also give the option for blowout prices the same way as manicures");

Exh. CC (Dec. 31, 2018 email from LaunchByte employee, "During my last development status

meeting with [Victim No. 7], [Victim No. 7] mentioned two interrelated features that were not

included in the initial requirements . . . we have an estimate of an ***additional 3 weeks*** to complete

the above features.") (emphasis added).  The volume of the changes requested is evidenced in a

power point LaunchByte created documenting the requests and changes LaunchByte made

throughout the process.  Exh. DD.

     LaunchByte delivered all but a small number of deliverables required under the MobilMani

contract.  *See* Gov. Mot. for Restitution, Exh. L (Dkt. No. 154) (Letter from Mr. Kabra to Victim

No. 7, "For MobilMani, we have completed (and gone well over) the Phase 1 and Engineering

piece.  What has not been done yet is the Investments Analyst (since you only did 1 meeting with

---

[7] Exh. X is a development log created internally by the LaunchByte team to track the weekly work done on projects.
This document was created and maintained by Operating Director.  Entries show that work began on MobilMani during
the week of April 27, 2018 and the second phase, development, did not begin until the week of September 7, 2018
projects.  Development lasted through the week of February 11, 2019.
[8] Requirements provide a roadmap for developers to create code for an MVP.

Sean), the Operations & Revenue piece, and the Operational Co-Founder piece totaling $19,700"). Phase One of the work was completed by LaunchByte's in-house Boston staff.  Exh. EE.[9]

During the second phase, or "development" phase, LaunchByte introduced CodetoArt, an Indian based development firm, to work on the development work.  CodetoArt had a longstanding relationship with LaunchByte, having worked on many of the LaunchByte projects   Though Mr. Kabra, at times, was late on payments to the developers, they were eventually paid, and work was completed on the project. Exh. GG.[10]  Delayed payments to subcontractors is not uncommon for a small business with high overhead.  Furthermore, throughout the development process, the Boston based LaunchByte team oversaw the developers to ensure the work was done, conducting project management status meetings to clarify and assist in the development, often without the client present.  Throughout this process, bugs were identified, discussed, and addressed.[11]

Ultimately, MobilMani launched on the app store.  Exh. X (Jan. 14, 2019 development log entry, "Status: Approved in app store . . . pending development release").  The relationship between Victim No. 7 and LaunchByte came to an end when Victim No. 7 demanded that LaunchByte transfer all of the developed code to Victim No. 7's new developer.  At that point, LaunchByte had developed and launched the initial MVP that well exceeded the scope of the initial agreement, fulfilled almost all of the other requirements in the Consulting Agreement, and was working to fix bugs and develop new features.  LaunchByte transferred all of the requested materials to Victim No.

---

[9] Mr. Kabra paid employees in his Boston office by check.  Exh. EE shows examples of checks written to employees from Mr. Kabra's Brookline Bank account.  Later he wrote checks from his Bank of America account.  Mr. Kabra paid taxes for these employees using a program called Gusto. Exh. FF.

[10] Exh. GG includes a CodetoArt invoices for the time period at issue and a BrooklineBank statements evidencing payment.

[11] The Government cites Gov. Mot. for Restitution Exh. K (Dkt. No. 154) as evidence that Mr. Kabra acknowledged "the Company A mobile-application was non-functional."  Exh. K is an email from Mr. Kabra to Operating Director in which he writes "I looked at the platform today and couldn't use either of them because of the bug." This statement does not mean the app was completely non-functional.  It means that there was a bug that needed resolving, and LaunchByte was working internally to fix it.

7.  Exh. HH.  The value of LaunchByte's work well exceeds $58,750.00 and the Government and Victim No. 7 have provided no basis to suggest otherwise.

As to DentRx, Mr. Kabra does not contest that work for the project was not completed.  Mr. Kabra disputes, however, that no value was provided.  When Victim No. 7 asked for work to stop on MobilMani and for the code to be transferred, work, at that point, had already stopped for DentRx. Victim No. 7 had previously requested LaunchByte to stop work on DentRx and to focus on MobilMani.  Exh. II. At that point, LaunchByte had completed Phase 1 of the DentRx project, valued at $27,370.  Exh. JJ (items created during this process include investor deck, brand guidelines, and mockup UI/UX screens).

**A.  Victim No. 15**

Mr. Kabra disputes that the $25,000 amount Victim No. 15 paid pursuant to his Consulting Agreement involved fraud.  The government has pointed to no evidence that Mr. Kabra engaged in fraud to secure the $25,000 payment.  Victim No. 15 was working at LaunchByte as an intern in May 2019 when he signed the Consulting Agreement.  As an intern, Victim No. 15 saw how other companies were being built by the LaunchByte team, and shared an idea of his own.  He was privy to the inner workings of the company and opted to work with LaunchByte to develop his idea, a testimonial to the LaunchByte process.

Pursuant to the Consulting Agreement, Victim No. 15 was to pay LaunchByte $125,000 for business development and services and LaunchByte was to invest $125,000 in services to develop the app.  *See* Gov. Mot. for Restitution Exh. Y (Dkt. No. 154).  Victim No. 15 never paid the full amount of the Consulting Agreement.  He wired an initial amount of $25,000.[12]  PSR ¶ 84.

---

[12] LaunchByte did not, as the Government argues, provide materials / produce materials to "lure" Victim No. 15 to provide additional funds for his "Ponzi-scheme."  His request for additional funds in Gov. Mot. for Restitution Exh. DD (Dkt. No. 154) was not a "press [ ] for more money."  Rather, Mr. Kabra asked Victim No. 15 to continue payment on the Consulting Agreement as agreed upon.  This is not evidence of a fraudulent scheme.  Rather it is standard business practice.

LaunchByte worked on the project up until the time of Mr. Kabra's arrest. Though unable to complete the work after that time, Victim No. 15 received work product valued $27,370. *See* Gov. Mot. for Restitution Exh. Y (Dkt. No. 154) (see Phase 1 deliverables in Exhibit A-1 and project pricing Initial Framework/Design Phase). LaunchByte provided Victim No. 15 a UI/UX[13], an investor slide deck,[14] and planning and strategy meetings. *See* Gov. Mot. for Restitution Exh. DD (Dkt. No. 154) (email from Mr. Kabra to Victim No. 15 "Invision:[15] did you go through the screens and make the comments / check it out?"). In fact, Victim No. 15 expressed satisfaction with the work product until Kabra's arrest. To the extent that Victim No. 15 now contests the value of those services, that is a civil matter. Nevertheless, Mr. Kabra has agreed to pay $30,000, the full amount sought as restitution.

### B. Victim No. 25, Victim No. 26, and Victim No. 27

Mr. Kabra disputes that Victim No. 25, Victim No. 26, and Victim No. 27 are owed restitution. Contrary to the Government's representations, LaunchByte did provide to HollarHype the contracted for development services after entering a Consulting Agreement with the company.

In January 2018, HollarHype signed a Consulting Agreement with LaunchByte and HollarHype's founders raised funds to fulfill their contract from outside investors, Victim No. 25 - 27. Exh. KK. Before any payment was provided to LaunchByte, Mr. Kabra attended meetings with HollarHype founders to explain the LaunchByte process to potential HollarHype investors as a commitment to their idea and to demonstrate LaunchByte's "operational co-founder" value. The objective of the project, like the other projects, was to develop an MVP for HollarHype. This

---

[13] Mr. Kabra is unable to produce copies of the UI/UX because, we are informed, it is on a computer the government has in its possession.
[14] The investor deck provided by the Government as Gov. Mot. for Restitution Exh. CC (Dkt. No. 154) includes the statement "[p]reviously raised $125,000 from Vanguard Venture Group." This statement is accurate, not a lie as the government contends. As LaunchByte was planning to sell its portfolio to a venture capital firm, Mr. Kabra stopped investing in companies through LaunchByte. Instead, $125,000 investments were made through his new company Vanguard Venture Group.
[15] Invision is a storyboard used by designers to allow individuals to view the flow and design of an app.

process involved initial work completed by the Boston LaunchByte team and then work by outside developers.[16]  The LaunchByte team worked diligently with the founders to create the foundational documents needed to prepare the app for development.  Exh. LL (investor presentation, brand and logo options document, and sample UI/UX screen mockups).  Once complete, LaunchByte outsourced the development work to developers in India.  Mr. Kabra does not dispute that he had cash flow issues and, at times, was late in making payments to his developers.  *See, e.g.,* Gov. Mot. for Restitution Exh. FF, GG (Dkt. No. 154).  He was inexperienced and became overwhelmed by the realities of running a growing business.  Nevertheless, work for HollarHype continued despite payment delays.  Exh. MM.

Mr. Kabra disputes the assertions that LaunchByte did not "design, engineer, and develop . . . the [ ] application" or provide "marketing, financial and business development consulting."  *See* Gov. Mot. for Restitution Exh. II (Dkt. No. 154).[17]  LaunchByte completed the agreed upon scope of work, including creating the app and the "Co-Founder Support Services."  Exh. MM (Mar. 29, 2019 email from founder announcing work completed on the project including "lots of apple hoops jumped through," "UI/UX on our MVP build," "90 % of our MVP functionality build . . . (hopefully down to one more build before the first release)," "invested, focused work from a dedicated product dev. team"); Exh. NN (email confirmation from TestFlight that HollarHype Beta

---

[16] The Government cites Gov. Mot. for Restitution Exh. EE (Dkt. No. 154) as evidence that there was no development team for HollarHype.  In the email, The LaunchByte Operations Director states, "We don't have teams for Parse, HollarHype, Nutre and Learnbolt (evaluating Shashank for Nutre)."  This email does not indicate that a team did not exist or would not be put in place.  Rather, it is an internal company email between the Operations Director and Mr. Kabra trying to determine how to allocate resources as projects entered the development phase.  This is evidenced by the statement, "We have Engivity (India and Brazil) options but need to get caught up on payments etc."

[17] The letter further states that LaunchByte misrepresented that it had a team of seasoned executives who had a combined exit of more than $500M+ and helped 30+ portfolios build stellar products and raise their next round of funding.  This representation is accurate.  As explained above, LaunchByte employed a team of talented and experienced individuals that had extensive experience in the start-up industry.  For example, the CTO was the 20th employee at Sapient that was acquired for $3.7 billion and the Operations Director worked at Vertify which sold for approximately $45 million.  Additionally, each employee had involvement in a number of companies before and while they were at LaunchByte, working to help them launch and secure funding.  The letter also inaccurately states that Mr. Kabra dissolved LaunchByte.io.

1.16 launched and was ready for testing); Exh. OO (June 17, 2019 email between Mr. Kabra and founder sharing document with final HollarHype edits). The value of the work performed by LaunchByte is evidenced by the settlement agreement proposed by HollarHype's counsel, requesting LaunchByte to: "deliver to HollarHype the source code of the HollarHype application in a form that is accessible, readable and customary in the mobile application development industry" and a "total of $2,500.00 [ ] in two equal payments of $1,250.00." Exh. PP. This is a clear admission of the value of the work performed.

### C. Victim No. 28

Finally, Mr. Kabra disputes that restitution is owed to Victim No. 28. LaunchByte signed a Development Consultancy Agreement with EDSO, Inc. ("EDSO") in June 2017. *See* Gov. Mot. for Restitution Exh. JJ (Dkt. No. 154). The parties agreed that LaunchByte would provide a landing page, web user interaction platform, and backend system to EDSO. The agreement clearly provided that LaunchByte "will utilize employees and/or contractors capable of designing and implementing the Deliverables." *Id.*[18] Accordingly, LaunchByte did not violate the terms of its agreement by hiring outside developers.

Mr. Kabra disputes that LaunchByte failed to provide the promised services and that the work cost less than $2,000.[19] Victim No. 28 breached the agreement on multiple occasions, including by failing to make payments owed and repeatedly changing the scope of work. Exh. RR

---

[18] The Government erroneously argues that the LaunchByte agreed that all services required under the agreement would be performed at LauncByte's Boston Office. It makes this assertion based on a line in Exhibit A-1 that states, "Services are to be performed at Consultant's location." The agreement also provides that LaunchByte may hire contractors to perform the work. LaunchByte included the language in Exhibit A-1 to make clear that all meetings between LaunchByte and Victim No. 28 were to occur at LaunchByte's Boston location.

[19] The Government cites Gov. Mot. for Restitution Exh. MM (Dkt. No. 154). for the argument that the work performed only amounted to $2,000. LaunchByte contracted with Doodleblue to do work on HollarHype. The total value of the work was quoted at over $13,000. Exh. QQ. LaunchByte paid an initial $5,000 down payment for the work. When LaunchByte's relationship terminated with Victim No. 28 it negotiated with Doodleblue regarding how to allocate the $5,000. This does not mean that only $2,000 of value was provided to Victim No. 28. The LaunchByte team in Boston did work on the project before and during the time Doodleblue was working on the app. The Government has not accounted for the value of this work.

(Sept. 15, 2017 email from developer to Mr. Kabra, "It's pretty clear now, that the end-client is expecting both user groups in the MVP.  So, this appears to be a clear add to scope to my mind."). The breaches caused delays in work.[20]  When Victim No. 28 continued to breach the agreement and was rude towards LaunchByte staff members, Mr. Kabra decided to terminate the agreement.  Exh. SS.  The parties executed a settlement agreement which LaunchByte accepted in order to end defamatory and false published statements.  Exh. TT.  In consideration for the payment, Victim No. 28 agreed to remove the false reviews and granted a complete release.  *Id.*  This agreement settled the matter and no further payment should be owed.[21]  Nevertheless, Mr. Kabra has agreed to the restitution $20,000 amount.

## III.   ANALYSIS

## A.   SENTENCING FACTORS UNDER *UNITED STATES V. BOOKER*

In the post-*Booker* world, district court judges are empowered with considerable discretion in sentencing.  *United States v. Booker*, 543 U.S. 220 (2005); *Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007).  After *Booker*, the applicable United States Sentencing Guideline ("Guideline") range is treated merely as advisory, and the sentencing court is free to exercise its discretion to impose a reasonable sentence outside the Guideline range that is "sufficient, but not greater than necessary," based on the factors articulated in U.S.S.G. § 3553(a). *United States v. Vidal-Reyes*, 562 F.3d 43, 46 (1st Cir. 2009); *see also United States v. Rodriguez*, 527 F.3d 221, 227-28 (1st Cir. 2008) (Section 3553(a) sets forth a "tapestry of factors, through

---

[20] Victim NO. 28's breaches explain why deliverables were not provided by LaunchByte on the agreed upon due dates.
[21] In footnote 12 of the Gov. Mot. for Restitution, the Government cites case law for the principle that a civil settlement cannot, as a matter of law, extinguish Kabra's restitution obligations under the MVRA.  The cases cited, however, are distinguishable as they deal with criminal conduct.  The principle is that a civil settlement cannot extinguish the requirement for restitution for criminal conduct.  However, here, as explained above, there was no criminal conduct. Thus, the cases cited by the Government are inapposite.

which runs the thread of an overarching . . . parsimony principle" that "instructs district courts to impose a sentence sufficient, but not greater than necessary to accomplish the goals of sentencing.")

While the Guidelines are the starting point and the initial benchmark, they are only one consideration; the sentencing court must consider all of the § 3553(a) factors to determine the sentence to be imposed. *United States v. Acevedo-Vazquez*, 977 F.3d 85, 88 (1st Cir. 2020); *Gall v. United States*, 128 S. Ct. 586, 596 (2007) (the "sufficient-but-not-greater-than-necessary" requirement is not just another factor; it sets an independent limit on the sentence a court may impose); *United States v. Denardi*, 892 F.2d 269, 276-77 (3rd Cir. 1989) (since § 3553(a) requires a sentence to be no greater than necessary to meet the four purposes of sentencing, imposition of a sentence that is greater than necessary to meet those four purposes is reversible, even if within Guideline range).

Taking account of the factors and characteristics described below, Mr. Kabra respectfully submits that a sentence of time served and home confinement is appropriate in this case.

1. **Section 3553(a)(1): The Nature and Circumstances of the Offense and The History and Characteristics of the Defendant**

This Court must consider the nature and circumstances of the offense and the history and characteristics of Mr. Kabra. 18 U.S.C. § 3553(a)(1). To this end, Mr. Kabra respectfully requests that the Court take note of the fact that he has pled guilty to nonviolent offenses and accepts complete responsibility for his conduct. Mr. Kabra was young and inexperienced in business at the time of these offenses. Mr. Kabra opened a business and, as it grew, quickly became overwhelmed by the costs and pressures associated with running the business. Mr. Kabra acknowledges that in certain cases, he made fraudulent misrepresentations to secure funds through lenders and made false representations to founders.

Mr. Kabra also requests that the Court consider his desire to continue make restitution and to give back to the community through his employment and his charitable works.  Mr. Kabra is an extremely hard worker who has generated jobs and internship opportunities for individuals since a young age.  He is committed to reforming his conduct going forward and to continuing to work make full restitution to his victims.  As the accompanying character letters submitted to the Court attest, Mr. Kabra is an intelligent, hardworking, compassionate man who has a genuine concern for his community, family, and friends.  Exh. I.

Mr. Kabra accepts full responsibility for his conduct and deeply regrets his actions.  He has experienced a great deal of remorse and shame as a result of his role in the offense.  The Government has agreed to a reduction of Mr. Kabra's offense level because he has accepted responsibility for the offenses.  PRS, ¶ 3(d).

## 2. Section 3553(a)(2):  Punishment, Deterrence and Rehabilitation

Section 3553(a)(2) requires the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the four purposes of sentencing set forth in that section -- punishment, specific deterrence, general deterrence and rehabilitation.  Mr. Kabra respectfully submits that a sentence of home confinement would adequately serve these goals.

### a. Just Punishment

Mr. Kabra has already been punished for his crimes, through deprivation of liberty, physically, mentally and emotionally.  He lives each day under the weight of the guilt and shame caused by his actions.  Following his arrest on August 5, 2019, Mr. Kabra was denied bail and spent sixty days in the Plymouth House of Corrections.  PSR, ¶ 1.  Mr. Kabra was greatly impacted and reformed by the time he spent in prison.  He has been diagnosed and treated for PTSD and depression since the time of his release.  *See* Exh. UU.

Since October 3, 2019, the date of Mr. Kabra's release from Plymouth House of Corrections, Mr. Kabra has been subject to strict conditions of release. Initially, he was released to home detention and GPS monitoring and later to a condition of curfew with GPS monitoring. For over a year and a half now, Mr. Kabra has adhered to all his strict conditions of release. This, in addition to his time served, has amounted to considerable punishment.

Mr. Kabra has also been impacted financially and socially. Financially, Mr. Kabra no longer has his business, any bank accounts, or any personal assets. After his arrest, his business was effectively shut down and he lost all his clients and business contacts. Mr. Kabra understands that he will never be able to work in the financial industry again. Socially, since the date of his arrest, Mr. Kabra has lost most of his friends, his girlfriend, and almost all business acquaintances.

b.    General Deterrence

Section 3553(a)(2) requires the Court to consider the need to afford adequate general deterrence of criminal conduct. 18 U.S.C. § 3553(a)(2)(B). Mr. Kabra respectfully submits that a further prison sentence is not necessary to accomplish the goal of general deterrence. Mr. Kabra has served time, had his liberty interests curtailed for over two years and has seen his reputation permanently destroyed in the media. *See, e.g.,* "'Serial entrepreneur' behind LaunchByte pleads guilty to wire fraud," The Boston Business Journal (April 9, 2021); "Alleged Ponzi scheme mastermind reaches plea deal," The Salem News (March 27, 2021); "Prosecutors: A 25-year-old man promised big returns for investors in his 'angel fund' but spent the money on himself," Boston Globe (Aug. 8, 2019). The message that wire fraud will not be tolerated has been widely disseminated in regard to this case and other similar cases. In light of the strong message sent by the Government's prosecution of Mr. Kabra, Mr. Kabra submits that a further prison sentence in not required to promote the important goal of general deterrence.

     c.     <u>Specific Deterrence</u>

Section 3553(a)(2)(C) also requires the Court to consider the need to "protect the public from further crimes of the defendant." Mr. Kabra is unlikely in the extreme to commit another crime in the future. Mr. Kabra had no prior criminal history. Far beyond any punishment that the Court could impose, Mr. Kabra must live the rest of his life with the shame and other profound consequences of his criminal convictions. He has let down his family and his friends. He will be a convicted felon the rest of his life and his career opportunities are severely limited moving forward. For a young ambitious man, this punishment is severe enough to deter him from ever again engaging in criminal conduct. In light of Mr. Kabra's character, employment history, and genuine remorse, a further prison sentence is not necessary to satisfy the goal of specific deterrence.

     d.     <u>Rehabilitation</u>

Nor is a prison sentence necessary to rehabilitate Mr. Kabra. Mr. Kabra was convicted of four counts of wire fraud for which he has fully accepted responsibility and experienced grave remorse. He is fully aware that his actions were wrong, has served sixty days incarceration at Plymouth House of Corrections, twenty-three months with electronic monitoring including three months home confinement and the remainder with a curfew, and he will accept any further punishment ordered by the Court. He is committed to being an upstanding and productive member of society. Mr. Kabra is a bright, innovative young man with a promising future ahead of him. He has taken and will continue to take actions to ensure that he is a model citizen going forward. In light of Mr. Kabra's commitment to his community, family and friends, and his genuine remorse and acceptance of responsibility, a further prison sentence is not necessary for rehabilitative purposes.

3.      **Section 3553(a)(3): The Kinds of Sentences Available**

Section 3553(a)(3) requires that the Court consider the kinds of sentences available.  For all

of the reasons set forth herein, Mr. Kabra repeats his request that this Court consider imposing a

sentence of home confinement.  Courts regularly grant non-prison sentences for similar crimes.  *See*

*United States v. Prosperi*, 686 F.3d 32, 34 (1st Cir. 2012)(affirming sentence of six months of home

monitoring, three years of probation, and 1,000 hours of community service for defendants

convicted of mail fraud, highway project fraud, and conspiracy to defraud the government when

guidelines sentencing range was 87 to 108 months of incarceration.  Court emphasized its finding

was based on various factors including that the loss amount was imprecise and did not fairly reflect

defendant's culpability, deterrence, and considerations of the defendants individual circumstances);

*United States v. Thurston,* 544 F.3d 22 (1st Cir.2008) (affirming three-month sentence, constituting

time served, and supervised release where applicable Guidelines sentence was 60 months); *United*

*States v. Howe,* 543 F.3d 128 (3d Cir.2008) (affirming probationary sentence where applicable

Guidelines range was 18 to 24 months for wire fraud charge considering factors such as remorse,

isolated mistake, and deterrence); *United States v. Ruff,* 535 F.3d 999 (9th Cir.2008) (affirming one-

day prison term and supervised release in a residential facility where applicable Guidelines range

was 30 to 37 months for health care fraud, embezzlement, and money laundering).

In light of Mr. Kabra's time served, commitment to rehabilitation, and his full acceptance of

responsibility, remorse for his conduct and commitment to earning funds for restitution, a prison

sentence is not necessary.

4.      **Section 3553(a)(4):  The Applicable Advisory Guidelines Range**

Section 3553(a)(4) requires the Court to consider the range of imprisonment recommended

by the advisory Guidelines, including the "applicable category of offense committed by the

applicable category of defendant."  18 U.S.C. 3553(a)(4)(A).  Mr. Kabra refers the Court to

27

paragraph 172 of the PSR for a description of the Applicable Advisory Guidelines Range.  The government and probation department are in agreement that the total adjusted offense level under the Sentencing Guidelines is 22.  Mr. Kabra requests that the Court grant a downward departure and/or variance to an offense level of 11 and impose a below guidelines sentence of time served and home confinement.

5.      **Section 3553(a)(5):  Any Pertinent Policy Statement**

In imposing a sentence under § 3553(a)(5), the Court must also consider any pertinent policy statements issued by the Sentencing Commission or Congress.  *Booker*, 543 U.S. at 261.  The pertinent policy statements include: § 5H1.5, § 5H1.11, § 5K2.0.   For the reasons set forth in his Motion for Downward Departure or Variance filed herewith, Mr. Kabra respectfully submits that the Court should allow a variance from the applicable advisory Guidelines range based on the Court's consideration of these policy statements.

6.      **Section 3553(a)(6):  The Need to Prevent Unwarranted Sentence Disparities**

Mr. Kabra respectfully submits that this category is not pertinent to the Court's determination of his sentence.  *See Prosperi*, 686 F.3d at 34; *United States v. Thurston,* 544 F.3d at 22; *Howe,* 543 F.3d at 128 (3d Cir.2008); *Ruff,* 535 F.3d at 999.

7.      **Section 3553(a)(7):  The Need to Provide Restitution to Any Victims**

The lenders and clients here are individuals who loaned Mr. Kabra money or who signed contracts with LaunchByte for its services.  The Government has listed twenty-eight individuals that are owed restitution.  Mr. Kabra has agreed to pay the restitution amount for all of these individuals.  Importantly, however, there are several individuals as to whom Mr. Kabra has agreed to pay restitution amounts whose funds were lawfully obtained by LaunchByte for services that LaunchByte actually performed.   As to those individuals, Mr. Kabra has agreed to make restitution payments, because he desires to resolve all legitimate business disputes, in addition to making

restitution to the victims of his criminal conduct.  *See* Offense Conduct Section.  Over the course of the last year and a half Mr. Kabra has worked diligently to earn money for restitution.  He has already deposited $800,000 of restitution into a Court ordered escrow account and asks that his bail amount, $250,000, be applied to restitution as well.  Mr. Kabra has earned this amount while working at his father's company Frontline Strategy.  In order to finish earning the remaining amount owed, Mr. Kabra needs to continue working.  Incarceration would prohibit him from working and delay the remaining restitution payment.  Accordingly, a further prison sentence is unwarranted in this case.

## CONCLUSION

In light of the factors and purposes of sentencing set forth at 18 U.S.C. § 3553(a) and the charged misconduct as described above, Mr. Kabra respectfully submits that a sentence of home confinement is appropriate.

Respectfully submitted,

TANMAYA KABRA

By his attorneys,

/s/ Michael J. Connolly
Michael J. Connolly
Julianna Malogolowkin
HINCKLEY, ALLEN & SNYDER LLP
28 State Street
Boston, MA 02109
mconnolly@hinckleyallen.com
jmalogolowkin@hinckleyallen.com
Tel. (617) 345-9000
Fax (617) 345-9020

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 13, 2021, a copy of the foregoing Sentencing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

<u>/s/ Michael J. Connolly</u>
Michael J. Connolly